# 19 MAG 2258

ORIGINAL

Approved: _____ /Nicholas Folly/ Julieta Lozano
CHRISTOPHER J. DIMASE / NICHOLAS FOLLY
Assistant United States Attorneys
JULIETA V. LOZANO
Special Assistant United States Attorney

Before:     HONORABLE DEBRA FREEMAN
            United States Magistrate Judge
            Southern District of New York

- - - - - - - - - - - - - - - -  x
                                 :
                                 :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA         :
                                 :   Violation of 18 U.S.C.
          - v. -                 :   § 1349
                                 :
                                 :
KONSTANTIN IGNATOV,              :   COUNTY OF OFFENSE:
                                 :   NEW YORK
          Defendant.             :
                                 :
                                 :
- - - - - - - - - - - - - - - -  x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    RONALD SHIMKO, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation and
charges as follows:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

    1.     From in or about 2014 through in or about March 2019,
in the Southern District of New York and elsewhere, KONSTANTIN
IGNATOV, the defendant, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree
together and with each other to violate Title 18, United States
Code, Section 1343.

    2.     It was a part and an object of the conspiracy that
KONSTANTIN IGNATOV, the defendant, and others known and unknown,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, would and did transmit and cause
to be transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of

executing such scheme and artifice, to wit, IGNATOV and others made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and instructed individuals to transmit investment funds to OneCoin depository accounts in order to purchase OneCoin packages, thereby causing individuals to send interstate and international wires representing their OneCoin investments.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

3. I am currently employed as a Special Agent assigned to the New York Field Office of the Federal Bureau of Investigation ("FBI"), and I have been employed in this position since approximately March 2016. During my tenure with the FBI, I have participated in numerous investigations of securities and wire fraud schemes, bank fraud, and money laundering.

4. The information contained in this affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by law enforcement officials at the United States Attorney's Office for the Southern District of New York ("USAO"), the Internal Revenue Service ("IRS"), the FBI, and the New York County District Attorney's Office ("DANY") participating in the same investigation (collectively, the "Investigative Team" or "Team"); (iii) the Team's review of publicly available OneCoin promotional materials; (iv) information that the Team has obtained from international law enforcement authorities pursuant to Mutual Legal Assistance Treaty ("MLAT") requests and other requests to foreign authorities; (v) the Team's review of OneCoin's publicly available website and materials available on that website; (vi) open source research that the Team has conducted on the Internet; (vii) the Team's review of digital videos posted on www.youtube.com ("YouTube") by OneCoin Ltd. and its members; (viii) my participation and the participation of other Team members in various witness interviews; (ix) the Team's review of e-mail evidence obtained pursuant to subpoenas, MLAT requests, and judicially authorized search warrants; (x) the review and analysis of various bank account records, including financial records obtained from international law enforcement authorities pursuant to MLAT requests and other requests to foreign authorities, conducted by members of the

2

Team; and (xi) my training and experience concerning the commission of financial crimes. Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation. Where communications and events are referred to herein, moreover, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## Overview

5.    As described in greater detail below, KONSTANTIN IGNATOV, the defendant, currently serves as the top leader of OneCoin Ltd., a company marketing a purported cryptocurrency, which the investigation has revealed is in fact a fraudulent scheme. OneCoin Ltd. was founded in or about 2014, and markets a purported digital cryptocurrency called "OneCoin" through a multi-level-marketing network. OneCoin members receive commissions for recruiting others to purchase cryptocurrency packages. This multi-level marketing structure appears to have influenced rapid growth of the OneCoin member network. Records that the Team has obtained in the course of the investigation show that, between the fourth quarter of 2014 and the third quarter of 2016 alone, OneCoin Ltd. generated €3.353 billion in sales revenue and earned "profits" of €2.232 billion. OneCoin continues to operate to this day.

6.    KONSTANTIN IGNATOV, the defendant, is the brother of Ruja Ignatova ("Ruja"), OneCoin's founder, and top leader until her disappearance from public view, in or about October 2017. Based on publicly-available materials, starting in late 2017, IGNATOV assumed high-level positions at OneCoin, rising to the top leadership position in mid-2018. As detailed below, the investigation has revealed that before ascending to OneCoin leadership in late 2017, IGNATOV served as Ruja's personal assistant.

7.    As set forth below, since December 2017, KONSTANTIN IGNATOV, the defendant, has functioned as a high-level executive, promoter, and spokesperson for the OneCoin organization, appearing at OneCoin-OneLife events worldwide, including in Thailand, Singapore, Colombia, Argentina, Brazil, Paraguay, Bulgaria, France, and Spain. The investigation has revealed that in this role, IGNATOV has made fraudulent representations to investors about OneCoin's structure, value, usability, and future public offering.

## Background on OneCoin Ltd.

8.     Based on the review of publicly available OneCoin promotional materials, records and information that the Investigative Team has obtained pursuant to MLAT requests and other requests to foreign authorities, publicly available information about OneCoin, my participation and the participation of other Team members in various witness interviews, the Team's review of e-mail evidence obtained pursuant to subpoenas, MLATs, and judicially authorized search warrants, and the Team's review and analysis of various bank account records, I have learned the following:

a.     OneCoin Ltd. was founded in or about April 2014 by two individuals, specifically, Ruja - the sister of KONSTANTIN IGNATOV, the defendant - and a second person not named herein ("Founder-2").[1]  OneCoin Ltd. is based in Sophia, Bulgaria, and markets a purported digital cryptocurrency called "OneCoin" through a global multi-level marketing ("MLM") network of OneCoin members.  OneCoin Ltd. has promoted various different "trader packages" priced at, for example, €110 and €55,500 euros, including "starter" packages and "tycoon trader," "premium trader," "infinity trader," and "super combo" packages.  Purchase of a trader package provides access to "educational materials" and "tokens."

b.     According to OneCoin Ltd.'s promotional materials, "tokens" are used to secure positions in OneCoin's "mining pools," depicted in promotional materials as computer hardware used to "mine" OneCoins.[2]  Promotional materials also

---

[1]   I have learned that OneCoin operates using several corporate entities and d.b.a. names, to include "OnePayments Ltd.," "OneNetwork Services Ltd.," "OneAcademy," and "OneLife."  In this Complaint, I refer to these entities and d.b.a. names collectively as "OneCoin Ltd."

[2]   In the context of a legitimate cryptocurrency, "mining" refers to the process of adding carefully reviewed transaction records to the cryptocurrency's ledger of past transactions, i.e., the "blockchain."  The primary purpose of mining is to allow the cryptocurrency's nodes to reach a secure, tamper-resistant consensus.  Mining is also the mechanism used to introduce cryptocurrency "coins" into the system.  "Miners" are paid any transaction fees as well as a subsidy of newly created coins.  This both serves the purpose of disseminating new coins in a decentralized manner, as well as motivating miners to provide security for the system.

have claimed that OneCoin Ltd. "ensures" these mining resources and that two mining servers are located in Bulgaria and a third in Hong Kong. Consistent with other cryptocurrencies such as Bitcoin, OneCoin Ltd.'s promotional materials claim that the mining difficulty of OneCoin increases over time, as additional computer resources, and thus more tokens, are needed to mine a single OneCoin. Once a OneCoin member "mines" OneCoins using his or her tokens, the resulting OneCoins are deposited into the member's account and may be accessed by logging in through a website operated by OneCoin Ltd.

   c. OneCoin Ltd. has claimed that the value of OneCoin is based on market supply and demand. In or about June 2016, in a OneCoin promotional video posted on YouTube, Ruja stated: "We discussed several times how the value of cryptocurrency comes. Cryptocurrency is not backed up. It is . . . an asset where demand and supply drive the price. Now, one of the drivers of the coin is, of course, the brand. Brand, of course, is how many people know about OneCoin? How many people use OneCoin? How spread are we worldwide?" An official press release issued by OneCoin Ltd. on or about October 1, 2016, announcing a so-called OneCoin "split," stated in part: "Cryptocurrency value is driven by supply and demand – and demand is driven by brand and usability. By doubling the coins, we will be able to bring the coin to more people and places and strengthen the brand." Another press release, issued by OneCoin Ltd. on or about December 2, 2016, stated in part: "The value of each cryptocurrency depends on its usability, supply and demand. With over 2.7 million users OneCoin has one of the biggest user bases." The purported value of a OneCoin has steadily grown from €0.50 to approximately €29.95 per coin, as of in or about January 2019. The chart below — which was used as part of a presentation slide deck at a large OneCoin event in Macau, in or about October 2015 – plots the purported increasing value of OneCoin throughout 2015.



ONE WORLD — ONE COIN

d.     OneCoin Ltd. has claimed to have a private "blockchain," or a digital ledger identifying OneCoins and recording historical transactions.[3]  OneCoin Ltd.'s private blockchain may be contrasted with Bitcoin's blockchain, which is decentralized and public.  At a promotional event in Dubai on or about May 15, 2015, Ruja represented that the OneCoin blockchain was audited, stating, in part:

> We all know it is a very bad world outside.  So many people making promises.  So many people lying.  So many people doing things and not delivering.  So, what we did in the last months is we hired an auditor to audit our blockchain.  And, ah, I am very proud to say that the result of the first audit is here.

Ruja then introduced the alleged auditor of the OneCoin blockchain.  The auditor subsequently provided an opinion that "all transactions are included in the blockchain (no coins are mined outside the blockchain)."

e.     As noted above, OneCoin Ltd. operates a multi-level marketing structure, through which individuals are compensated for recruiting new members who purchase OneCoin trader packages.  In an online video, Ruja attributed the multi-level marketing structure plan to Founder-2.  Founder-2 promoted OneCoin, including at official OneCoin events, and self-identifies as OneCoin's "Master Distributor 001."  I believe that "001" may be a reference to Founder-2's one-time position at the top of the OneCoin Ltd. network-marketing pyramid.

f.     OneCoin members receive a commission of between 10% and 25% of the value of the trader packages purchased by individuals they recruit to OneCoin.  However, only 60% of commissions paid to members are withdrawable in cash; the remaining 40% are deposited in a "trading account" which may only be used to purchase either OneCoins or more tokens.  OneCoin Ltd.'s multi-level marketing structure appears to have influenced rapid growth in the number of OneCoin members.  OneCoin Ltd. has claimed to have over three million members

---

[3]  In the context of a legitimate cryptocurrency, a "blockchain" refers to the cryptocurrency's public ledger of all past transactions.  A full copy of a currency's blockchain contains every transaction ever executed in the cryptocurrency.  The blockchain serves to confirm to the rest of the cryptocurrency's network that transactions have taken place.

worldwide. These OneCoin members include individuals living and/or working within the Southern District of New York who have purchased OneCoin trader packages, at least one of whom sent an interstate wire payment to make such a purchase.

g.    OneCoin Ltd. also operates a purported merchant platform named "Dealshaker," and advertises that OneCoin members may use OneCoins, generally in combination with fiat currency, to purchase goods and services on the Dealshaker platform. I have reviewed a Dealshaker webinar video, posted on YouTube in or about November 2018, during which a Dealshaker representative announced the unveiling of a "new Dealshaker," and stated among other things: (i) that Dealshaker merchants would be allowed to accept as little as 10% of payment for goods and services in OneCoin (and thus, as much as 90% in fiat currency), as opposed to the previous minimum of 50%; and (ii) buyers on the new Dealshaker may use PayPal to transmit fiat currency for purchases from Dealshaker merchants.

h.    OneCoin Ltd. continues to operate to this day, and as described further below, is now under the management of KONSTANTIN IGNATOV, the defendant.

### OneCoin is a Fraudulent Scheme

9.    As the result of judicially authorized search warrants, the Investigative Team has obtained and reviewed e-mails between Ruja and Founder-2 regarding the OneCoin scheme. I believe that the e-mail evidence described in the paragraphs below demonstrates, among other things, that: (i) Ruja and Founder-2 conceived of and built the OneCoin business fully intending to use it to defraud investors; (ii) contrary to OneCoin Ltd.'s public representations, the value of OneCoin is determined internally and not based on market supply and demand; and (iii) contrary to OneCoin Ltd.'s public representations, OneCoins are not in fact mined.

a.    In the summer of 2014, Ruja and Founder-2 were developing the concept and payout plan for OneCoin, which they referred to at the time in e-mail correspondence as "trashy coin." On June 11, 2014, Ruja wrote to Founder-2 concerning the OneCoin business plan:

> It might not be [something] really clean or that I normally work on or even can be proud of (except with you in private when we make the money) - but . . . I am especially good in this very borderline cases [sic],

where the things become gray – and you as the magic sales
machine – and me as someone who really can work with
numbers, legal and back you up in a good and professional
way – we could really make it big – like MLM meets bitch
of wall street ;-)

* * *

Your main sales argument is: **after 2 splits a member
makes out of 5.000 USD 25.000 USD. You should be able
to sell this** ☺ . . . I also added an **Extra Bonus for
all members joining the Presales** . . . they can do
actually 3 splits. Which means that they will actually
**have 10x their investment.** 2 splits is 5x your money.
So of course, everybody who is greedy will go in with
5.000 USD.

(bold in original). I believe this e-mail demonstrates that
Ruja developed OneCoin Ltd.'s unsustainable compensation
structure for the purpose of enticing people to invest in
OneCoin trader packages, including the false promise that
investors would make a five-fold or ten-fold investment return.

     b.    On or about August 9, 2014, Ruja sent an e-mail
to Founder-2 in which Ruja described her thoughts on the "exit
strategy" for OneCoin. The first option that Ruja listed was,
"Take the money and run and blame someone else for this
(standard approach, see Wenyard)." I believe that by "Wenyard,"
Ruja was referring to a separate multi-level marketing scheme by
the same name, which multiple sources online describe as both a
scam and Ponzi scheme.

    10.   I believe that the following evidence, including
e-mails between Ruja, Founder-2, and others, demonstrate that –
contrary to OneCoin Ltd.'s public representations – the value of
OneCoin is determined internally and not based on market supply
and demand:

     a.    On or about June 9, 2014, in an e-mail sent by
Ruja to a representative of a blockchain development company,
copying Founder-2, Ruja stated: "we are building our own
cryptocurrency – and would like to set up an internal exchange
service for them. We would like to be able to set the price
manually and automatically and also control the traded volume."

     b.    On or about March 21, 2015, Ruja wrote an e-mail
to Founder-2, in which Ruja stated: "We can **manipulate the**

**exchange** by simulating some volatility and intraday pricing." (bold in original). I believe that this e-mail refers to the intention of Ruja and Founder-2 to manipulate the price of OneCoin on OneCoin's private exchange to create the false appearance that the value fluctuated based on trading.

c.    On or about August 1, 2015, Ruja wrote an e-mail to Founder-2, and included as part of a section of the e-mail entitled "Goals": "6. Trading coin, stable exchange, always close on a high price end of day open day with high price, build confidence – better manipulation so they are happy." I believe that this e-mail refers to Ruja's plan to manipulate the price of OneCoin on OneCoin's private exchange in order to deceive investors into believing that OneCoin was a good investment.

d.    Moreover, I have reviewed the graph displayed above in paragraph 8(c), showing OneCoin's purported increase in value between January 2015 through September 2015. That graph looks like a step function, with an increasing price at approximately one-month intervals. The graph is consistent with the price of the OneCoin being manually set – or manipulated – to increase at approximately one-month intervals, and is not consistent with the expected plot of a commodity with a price actually determined by market supply and demand.

e.    As discussed further below in paragraphs 49(a)-49(e), I have reviewed messages recently recovered from a cellular telephone used by KONSTANTIN IGNATOV, the defendant, demonstrating that IGNATOV has himself been personally involved in manually setting and increasing the purported Euro value of a OneCoin, and determining the number of tokens required to "mine" a single OneCoin.

11.   I believe that the following evidence, including e-mails between Ruja and Founder-2, demonstrate that – contrary to OneCoin Ltd.'s public representations – OneCoins are not mined but have instead been auto-generated, and then distributed to members on as as-needed basis:

a.    Beginning in or about August 2014, Ruja and Founder-2 developed the idea of marketing to members that tokens could be used to "mine" OneCoins. In an e-mail to Ruja dated August 11, 2014, Founder-2 proposed: "Get members to think that they are mining their OneCoin via crunching (exchanging) tokens for OneCoin. This storey [sic] is good as ppl will then not go super crazy and just try and sell tokens all the time." Founder-2 e-mailed Ruja the following day, writing, "The concept

of converting tokens into OneCoin is an important phase for validity and truth behind the OneCoin. The so called 'mining' of coins is a concept that is very familiar in the industry and a story we can sell to the members." Ruja then wrote to Founder-2, "We are not mining actually – but telling people shit," to which Founder-2 responded, "how can this be investigated and found out?" and "Can any member (trying to be clever) find out that we actually are not investing in machines to mine but it is merely a piece of software doing this for us?" The fact that OneCoins are not created using mining hardware but instead are generated using "a piece of software" is wholly inconsistent with the mining process Ruja and Founder-2 publicly represented to OneCoin Ltd. members.

b.     At the end of the following week, on or about August 22, 2014, Ruja wrote an e-mail to Founder-2 summarizing progress made on various OneCoin Ltd. projects. In this e-mail, Ruja wrote:

> I am personally very unhappy – and feel that the future, regardless of what happens with onecoin is not really an exciting one – and nothing to be proud of. I have done mayn [sic] bad things in my life, many stupid things, many things that were borderline – but nothing that I was partly ashamed of – and it actually destroys part of who I am. The damage is done. I have to somehow live with it. But it is something that really upsets me.

c.     On September 6, 2014, Ruja wrote to Founder-2, reporting that "last night our Indian friend got back to me on the OneCoin. Coin is ready, tmr the blockchain will be." I believe this e-mail refers to Ruja procuring the OneCoin code and its blockchain from a third party. In the same e-mail, Ruja suggested that she and Founder-2 should decide upon the number of OneCoins to be generated every 10 minutes. Specifically, Ruja suggested two scenarios, one of which envisioned that 10,000 OneCoins would be generated every 10 minutes. Assuming 30 days per month, this rate equates to the generation of 43,200,000 OneCoins per month. I believe this e-mail to be inconsistent with how OneCoin Ltd. marketed OneCoin mining to members, and instead corroborates Founder-2's previously described e-mail, in which Founder-2 acknowledged that OneCoins were generated through software.

d.     By approximately March 2015, Ruja and Founder-2 appear to have started allocating to OneCoin members coins that did not exist in the OneCoin "blockchain." Specifically, on

March 19, 2015, Ruja e-mailed Founder-2, writing: "We have an **auditor in place** – but I think I cannot start auditing, as I cheat currently on coins, I need to find a way." (bold in original). By at least June 2015, Ruja and Founder-2 began e-mailing one another models tabulating current and projected future trader package sales volumes, along with outstanding tokens and OneCoins. The spreadsheets identify separate lines for "mined coins," "mined coins (real)," and "fake coins." I believe the references to "fake coins" in these records refer to OneCoins that had been distributed to members but did not exist in the OneCoin "blockchain." I also believe Ruja's March 19, 2015 e-mail referring to the need to "cheat . . . on coins" is also a reference to the existence of fake coins at that time.

     e.    The spreadsheets that Ruja and Founder-2 shared with one another containing references to "fake coins" also describe the projected future supply of OneCoins. Analysis of the projected growth rate in these models shows that the OneCoin supply was projected to grow linearly over time, at a rate of precisely 43,200,000 OneCoins every month. This rate matches that proposed by Ruja when she initially ordered the OneCoin software from a third-party vendor. I believe these models further demonstrate that OneCoins are not mined through use of extensive mining hardware, as is marketed to its members, but instead are automatically generated through software.

     f.    On or about August 6, 2015, Ruja wrote to Founder-2 an e-mail with subject line "I am afraid this is an issue," and writing further in the body of the e-mail:

    This is the implication from the big sales 4 weeks ago. 1.3 [billion] fake coins. We are fucked, this came unexpected and now needs serious, serious thinking.

    12.    In addition to the evidence described above, OneCoin Ltd. exhibits multiple additional features demonstrating that it is a fraudulent scheme. Specifically:

     a.    OneCoin Ltd. appears to be operating on an insolvent business model, if not for the restraints imposed on users to exchange OneCoins for euros. For example, in or around July 2016, OneCoin Ltd. introduced the "Ultimate Package." In a promotional video publicly circulated online, Ruja identified this trader package's price as €118,000 and stated that each package would generate over two million OneCoins for its purchaser. At the time, a OneCoin was purportedly valued in excess of €5; thus, the value of this package was worth over

€10,000,000. The offering and sale of such packages is not economically sustainable unless OneCoin Ltd.'s members do not exchange OneCoins for euros or the value of OneCoin collapses.

b.     As noted above, OneCoin Ltd. marketed an event referred to as a "split" to entice members to purchase new or additional trading packages. When a split occurred, a member's existing balance of tokens – directly linked to the number OneCoins the member could "mine" – would instantaneously double. In one instance, OneCoin Ltd. even doubled the balances of all members' OneCoin balances. Such "splits" never resulted in a corresponding downward adjustment in the price of OneCoin.

c.     OneCoins have never traded on an open exchange, and instead traded only briefly on OneCoin Ltd.'s private exchange, Xcoinx.com. Beginning sometime in or around January 2017, Xcoinx.com has been listed as "under maintenance" and therefore unavailable to OneCoin investors. Even when Xcoinx.com was operational, OneCoin Ltd. restrained the flow of real currency out of OneCoin Ltd. by its members. For example, OneCoin Ltd. limited sell orders to exchange OneCoins for euros to a daily maximum of 1.5% of the member's total OneCoins. Furthermore, not all sell orders submitted to Xcoinx.com were executed. Thus, the ability to convert OneCoins into other currencies has been severely limited.

d.     The ability of OneCoin Ltd. members to profit from selling OneCoins also exhibits indicators of a Ponzi scheme. Specifically, while the Xcoinx.com exchange was operating, the vast majority of OneCoin buyers apparently used so-called "trading account" funds, and not cash account funds, to purchase OneCoins. Thus, OneCoin Ltd. members' ability to convert OneCoins into cash was dependent upon the continued flow of revenues from the sale of trader packages to new members, which resulted in the payment of commissions to such "trading accounts."

e.     Finally, multiple sources on the Internet, including established news outlets, have publicly described OneCoin Ltd. as a scam and/or Ponzi scheme. The evidence provided supporting these claims often includes one of more of the following: (i) investors' difficulty selling OneCoins to recoup their original investments; (ii) the fact that OneCoin Ltd.'s blockchain is private and non-transparent; (iii) analysis of OneCoin "blockchain" transactional information published by OneCoin Ltd., which appears to be inconsistent with a real blockchain; and (iv) inaccurate or misleading claims made by

OneCoin Ltd. principals or network leaders when marketing
OneCoin trader packages to members or prospective investors.

13. Moreover, I believe that the following evidence, among
other evidence, demonstrates that Dealshaker was set up and is
operated by OneCoin Ltd. in order to deceive OneCoin members and
outsiders into believing that OneCoins have actual value:

a. I have spoken to a cooperating witness ("CW-1"),
who knows Ruja and has direct knowledge regarding OneCoin Ltd.
and its related entities.[4] According to CW-1, in sum and
substance and in part, that Dealshaker was not set up by OneCoin
to be an independent marketplace, but rather was created to
provide cover for OneCoin Ltd. regarding claims that OneCoin was
making regarding its liquidity and usability.

b. I have reviewed e-mail communications, obtained
pursuant to a judicially authorized search warrant, between Ruja
and OneCoin's Hong Kong office manager (the "Hong Kong Manager")
in or about April 2017, which corroborate CW-1's information
about Dealshaker. Specifically, based on my review of those
e-mails, I learned that a number of OneCoin members in China
reported being defrauded of fiat currency in connection with
attempts to purchase cars through the Dealshaker platform. In
response, Ruja stated "I will not pay for members stupidity, I
am sorry. This will set a precedent that is simply not
acceptable. Only thing i am ok to do is to give them onecoins
of that value. Or double the value." In response the Hong Kong
Manager stated, in part, that the defrauded OneCoin members
would "say they need cash but i know that's impossible and will
try to make them understand this." Ruja subsequently approved
the Hong Kong Manager's proposal to refund the victims with
OneCoins, stating "do what you need to do to calm them down."

c. I have reviewed a video of a OneCoin/Dealshaker
event occurring between approximately June 8-10, 2018 in
Romania (the "Romania Event"), which further corroborates CW-1's
information about Dealshaker. Based on that video, I learned
that during the Romania Event, a luxury convertible BMW car (the
"BMW") was auctioned and was billed as "the first car in the

---

[4] CW-1 has pled guilty to federal crimes pursuant to a
cooperation agreement with the Government, and is cooperating in
the interest of receiving a reduced sentence in connection with
those crimes. The information CW-1 has provided concerning the
OneCoin scheme and its participants has been credible, and much
of the information has been corroborated by other sources.

history of Dealshaker paid by 100% OneCoin." Ultimately, the winning bidder bid 3.6 million OneCoins for the BMW, which I understand retailed for approximately €40,000. The winning bid thus valued a OneCoin at just €0.011. In a message posted on an official OneCoin/OneLife Facebook page, dated June 19, 2018, OneCoin Ltd. made the following announcement: "IMPORTANT NOTE! Dear members, You may have heard about a OneCoin only auction recently where the price, paid for a car, was seemingly unrealistic. Auctions have the effect often of getting people excited. What cannot be forgotten is that the Coin has a value that is carefully determined. In the interests of the integrity of the Coin, the auction has been voided and no repeat instance will be tolerated."

     d.   As discussed further below, in a subsequent recorded conference call, KONSTANTIN IGNATOV, the defendant, expressed his anger that the auction held at the Romania Event had caused OneCoin members to question the actual value of OneCoin.

## Financial Investigation of OneCoin Proceeds

     14.   Based on the Investigative Team's review and analysis of various bank account records and financial analyses, information obtained from MLAT requests and other requests to foreign authorities, open source research that the Team has conducted on the Internet, the Team's review of e-mail evidence and other communications obtained pursuant to subpoenas, MLATs, and judicially authorized search warrants, I have learned, among other things, the following:

     a.   New OneCoin members have traditionally purchased trader packages by either wiring money directly to a bank account controlled or used by OneCoin Ltd., or by paying a pre-existing OneCoin member who then transmits the funds to OneCoin Ltd. The Investigative Team has discovered accounts located in Bulgaria, the United Arab Emirates (the "UAE"), Georgia, Germany, the United Kingdom, the United States, Tanzania, Hong Kong, and Singapore, which OneCoin Ltd. and its promoters have used for the purpose of receiving investment funds from members purchasing its trader packages.

     b.   The Investigative Team has obtained OneCoin Ltd. financial and accounting records detailing revenue, profits, gross margin, and other information from the fourth quarter of 2014 through the third quarter of 2016. During this period, OneCoin Ltd. purported to have generated €3.353 billion in sales

revenue, and to have earned "profits" of €2.232 billion. The records show that approximately 60% of that revenue was from OneCoin members residing in China, about 18% from Europe, 15% from Australia, and the remainder from the rest of the world; according to the records, approximately three percent of that revenue came from investors in North America and the Caribbean. An e-mail sent by a top OneCoin promoter in the United States to OneCoin management, dated December 29, 2016, estimated that United States-based OneCoin members had wired a total of approximately €50 million to OneCoin's bank accounts.

      c.    To date, the Investigative Team has identified approximately $1.2 billion in OneCoin Ltd. investor funds, a substantial part of which has been laundered through financial institutions located in at least 21 different countries, including Hong Kong, Singapore, the United States, the Cayman Islands, the Isle of Jersey, the Republic of Ireland, and the country of Georgia. Although the Investigative Team's tracing analysis is ongoing, the Team has identified multiple transactions that directly benefited Ruja and Founder-2.

      d.    The Investigative Team has traced approximately €185 million in funds derived from the OneCoin scheme laundered through a series of bank accounts to an investment fund account in the United Arab Emirates (the "UAE Investment Fund"). Specifically, between in or about February 2017 and in or about April 2017, a purported investment fund with an account at a bank in Ireland (the "Ireland Fund") sent approximately 11 wire transfers totaling €185 million to the UAE Investment Fund.

      e.    As discussed further below, I have reviewed accounting opening documents for bank accounts associated with the UAE Investment Fund (the "UAE Fund Accounts"), recovered from a cell phone used by KONSTANTIN IGNATOV, the defendant. Those documents show that the UAE Fund Accounts were opened at a UAE bank (the "UAE Bank") by a purported investment fund manager (the "UAE Fund Manager"). According to responses to due diligence inquires posed by the UAE Bank, the UAE Fund Manager listed the nature of business of the UAE Investment Fund as "investment management," the business's listed "industry description" as "investment in retail trade enterprises and management," and the "purpose and intended use of the accounts" as "business transactions and for banking convenience." The account opening documents identify the Ireland Fund as a "major client," but do not make any mention of OneCoin.

## Ruja's Flight

15.     In the course of the investigation, I have become
aware of a series of international criminal investigations into
the OneCoin fraud scheme, including investigations conducted by
German and Bulgarian law enforcement authorities.  I have also
reviewed evidence revealing that Ruja and other OneCoin
principals have acquired unauthorized access to otherwise
confidential information regarding law enforcement operations.

16.     I have communicated with the FBI's Legal Attaché
("LEGAT") in Bulgaria regarding Ruja's documented travel in or
about October 2017.  According to the LEGAT in Bulgaria,
Bulgarian travel records show that on or about October 25, 2017,
Ruja flew on Ryanair, a budget commercial airline, from Sophia,
Bulgaria to Athens, Greece.[5]  Despite further inquiries to the
FBI's Assistant Legal Attaché ("ALAT") in Greece, investigating
agents have not been able to determine whether Ruja subsequently
traveled to another jurisdiction from Greece.

17.     Moreover, the Investigative Team has conducted open
source research regarding Ruja's online presence since in or
about October 2017.  Ruja has since made no appearances at any
public OneCoin events, and has made no public statement
regarding her whereabouts.  I believe this to be unusual, given
that, based on the substantial open source research conducted by
the Team over the course of the investigation, Ruja has in the
past maintained a persistent online presence, using video
portals such as YouTube, social media websites, and OneCoin
Ltd.'s own websites.

18.     Based on, among other things, the evidence that I have
reviewed establishing that Ruja and others have acquired
unauthorized access to sensitive information regarding law
enforcement operations, Ruja's unusual travel out of Bulgaria in
or about October 2017, and Ruja's lack of any online presence
since in or about October 2017, I believe that Ruja grew
concerned about possible prosecution and arrest, and took steps
to avoid any such arrest.

## IGNATOV's Background

19.     As described above, KONSTANTIN IGNATOV, the defendant,
is Ruja's brother. A review of emails and other communications

---

[5]  I believe that this mode of travel is unusual, because in the
past, Ruja has traveled by private jet.

reveals that before ascending to OneCoin leadership in late 2017, IGNATOV served as Ruja's personal assistant; in that role, IGNATOV scheduled appointments, made travel arrangements, and managed a personal calendar for Ruja, among other significant responsibilities.[6]

20. A review of publicly-available materials, including videos of OneCoin events, reveals that, starting in late 2017, upon Ruja's flight and disappearance from her public role in operating and promoting OneCoin, IGNATOV assumed high-level positions at OneCoin. Publicly-available materials indicate that by in or about mid-2018, IGNATOV assumed the top leadership position at OneCoin.

21. As detailed below, since December 2017, KONSTANTIN IGNATOV, the defendant, has appeared at OneCoin-OneLife events worldwide, including in Thailand, Singapore, Colombia, Argentina, Brazil, Paraguay, Bulgaria, France, and Spain. During this time, he has functioned as a high-level executive and spokesperson for the OneCoin organization. Ruja, on the other hand, has not appeared at any public OneCoin events since in or about October 2017.

22. Based on social media platform postings, KONSTANTIN IGNATOV, the defendant, appears to be using a Facebook account under the profile name "Konsti Keks," and an Instagram account under the profile name Konstantin.Ignatov_. The Konsti Keks Facebook account and the Konstantin.Ignatov_ Instagram account contain photographs of IGNATOV and references to OneCoin-OneLife events.

### IGNATOV – OneCoin Appearances

23. During his appearances at OneCoin-OneLife events, and in publicly-posted online videos connected to those events, KONSTANTIN IGNATOV, the defendant, presents himself as the leader of and spokesperson for OneCoin, and a proxy for his sister, Ruja. IGNATOV routinely and repeatedly makes misrepresentations to investors about OneCoin's structure, value, usability, and future public offering. Several examples

---

[6] In addition to serving as Ruja's personal assistant during this period, IGNATOV appears to have also served in an administrative role at OneCoin. In a publicly available video published on YouTube on or about December 17, 2016, IGNATOV is introduced as the "Head of Administration of OneLife."

of IGNATOV's statements at OneCoin-OneLife events are set forth below.

24. On or about December 2, 2017, KONSTANTIN IGNATOV, the defendant, attended a OneLife "Mastermind Event" in Bangkok, Thailand. I have viewed a video of that event, which is available on YouTube. The Bangkok event featured a backdrop that read "Konstantin Ignatov – Blockchain: a New Financial System for a New Age." At this event, IGNATOV identified himself as from the "management group" and mentioned that his "beloved sister, the founder and visionary behind the innovative concept of OneCoin," Ruja, "sends her warmest regards." IGNATOV also discussed a purported merchant platform called "Dealshaker," claiming that the website associated with Dealshaker had registered 50,000 new merchants, and that one individual was able to buy a home through the Dealshaker site, using OneCoins.

25. On or about March 4, 2018, KONSTANTIN IGNATOV, the defendant, attended a OneCoin-OneLife event in Bogota, Colombia. I have viewed a video of that event, which is available on YouTube. IGNATOV identified himself as from the "Sofia Management Group" of OneCoin. During this event, IGNATOV addressed recent investigations conducted by German and Bulgarian authorities into OneCoin. He claimed that the investigations had been closed, and that the investigations had confirmed that a OneCoin blockchain exists and that Dealshaker and OneCoin were legitimate businesses. However, the Team's investigation has revealed that OneCoin lacks a true blockchain, that is, a public and verifiable blockchain that records OneCoin mining by members. Also, according to publicly-available reports, the German investigation remains ongoing.

26. On or about June 12, 2018, KONSTANTIN IGNATOV, the defendant, hosted a meeting with a OneCoin group from Vietnam, in OneCoin's Sofia, Bulgaria office. I have viewed a video of that meeting, which is available on YouTube. At that meeting, IGNATOV indicated that he continued to meet with Ruja every 10-20 days, and that she was still involved in all strategic decisions for the company. But he noted that Ruja was now a full-time mother, and thus was reducing her public profile in order to shield her child from public view.

27. On or about July 28, 2018, KONSTANTIN IGNATOV, the defendant, appeared at a OneCoin-OneLife event in Cordoba, Argentina (the "Argentina Event"). I have viewed a video of that event, which is available on YouTube. During that event,

IGNATOV identified himself as the "head of Sofia Management Group," as well as the head of the Global Leadership Group ("GLG") and "Inner Circle." IGNATOV informed attendees that a purported public offering related to OneCoin would not take place in October 2018, as previously promised, and that the public offering had instead been deferred to 2019.

28. Based on my review of recordings and videos in which KONSTANTIN IGNATOV, the defendant, has marketed OneCoin, IGNATOV has repeatedly made claims that the OneCoin cryptocurrency will "go public" by specific dates. IGNATOV and his associates have repeatedly used the prospect of "going public" in order to solicit investments from victims. OneCoin leaders first represented that OneCoin currency would be offered publicly in January 2018. No such offering occurred. In a July 2018 speech at the Argentina Event, IGNATOV acknowledged that the January 2018 offering "was stopped one day before we went online" and promised that a future public offering would be held.

29. On or about September 1, 2018, KONSTANTIN IGNATOV, the defendant, appeared at a OneCoin-OneLife event in Barcelona, Spain. I have viewed a video of that event, which is available on YouTube. During that event, IGNATOV discussed OneCoin's purported blockchain, insisting that it was "transparent" and that know-your-customer ("KYC"), or due diligence, documents were stored within the blockchain. He stated that the OneCoin blockchain was "easy to use, easy to mine." As described above, the Team's investigation has revealed that OneCoin lacks a true, verifiable blockchain that records OneCoin mining by members, and that OneCoins are not in fact mined by OneCoin members.

30. According to videos posted on YouTube, and entries posted to the Instagram account used by KONSTANTIN IGNATOV, the defendant, between October 2018 and February 2019, IGNATOV participated in additional OneCoin events, including providing a Dealshaker update in October 2018, speaking at a OneLife event in Paris, France in November 2018, and appearing at OneCoin-OneLife events in Singapore, Brazil, Paraguay, and Bulgaria.

31. Based on a recorded OneCoin conference call in or about late June 2018, (the "June Conference Call"), I have determined that KONSTANTIN IGNATOV, the defendant, spoke with members of the OneCoin "Inner Circle" (the "IC members") regarding another purported public offering. During the June Conference Call, IGNATOV stated that OneCoin would be publicly offered in or about October 2018. During the June Conference Call, IGNATOV reminded IC members that "the best will happen to

the coin when it's public." I believe that, in effect, IGNATOV was encouraging IC members to pitch investors the opportunity to invest at a discount ahead of the coin's public offering, when the price of the currency would ostensibly rise. IC members were each responsible for managing and marketing to segments of OneCoin investors known as "downlines." I believe that IGNATOV made false representations to IC members on the June Conference Call with knowledge that the IC members would convey these false representations to downlines in order to solicit investments. Despite IGNATOV's promise of a public offering in or about October 2018, no such offering ultimately occurred.

32. During the June Conference Call, KONSTANTIN IGNATOV, the defendant, also discussed the June 2018 Romania Event during which the BMW was auctioned for 3.6 million OneCoin, resulting in the sale later being cancelled. IGNATOV told IC members that "the recent auction was poorly planned and very very chaotic . . . This led to a lot of complaints and the value of the coin, because of what was paid, was questioned." IGNATOV went on to threaten the IC members:

> Really, I will tell you something. If I see something like this again I will cut the person's head off publicly. You know my sister, what happened when somebody messed up what she did.    This  will  be  worse  than  you  ever experienced  .  .  .  I really want and will have in  future  an  eye  on  everything,  and  if somebody messes up something like this, there will be very very hard consequences. This I promise you.

33. While marketing OneCoin at the Argentina Event in or about July 2018, KONSTANTIN IGNATOV, the defendant, again claimed that a OneCoin public offering was scheduled to take place. At the Argentina Event and elsewhere, IGNATOV continued to use the prospect of a public offering to solicit Options on Future Certificates ("OFCs") investments ahead of the public offering.[7] Specifically, IGNATOV solicited OFC investments in four distinct "rounds." IGNATOV stated that investors would

---

[7]  Based on publicly available materials, I am aware that in January 2017, Ruja announced that OneCoin would be publicly traded in the second quarter of 2018, and that holders of OneCoins could exchange their coins for OFCs, which would entitle holders to shares of the publicly traded OneCoin company.

obtain a greater discount by purchasing OFCs in earlier rounds.
IGNATOV reminded the audience that "the ones who are first
profit the most." At the Argentina Event, IGNATOV stated that
the last OFC bundles would cease to be offered in January 2019,
after which a public offering would take place. To date, there
is no evidence that a OneCoin public offering has occurred.

## Communications with Founder-2

34. I have reviewed messages between Ruja and Founder-2,
and between KONSTANTIN IGNATOV, the defendant, and Founder-2.
Those messages include communications relating to the OneCoin
fraud scheme.

35. For example, on September 21, 2016, KONSTANTIN
IGNATOV, the defendant, and Founder-2 shared the following
message exchange:

| | |
|---|---|
| Founder-2: | These ppl are crazy |
| Founder-2: | Like they want to speak every hour |
| Founder-2: | Abt shit |
| IGNATOV: | haha they are. tried to fixed it with him, tried to avoid bothering you as far as possible. so you are not lost everything s fine ;) |
| Founder-2: | Emoticon |
| Founder-2: | These ppl are idiots |
| IGNATOV: | as you told me, the network would not work with intelligent people ;) |

36. Based on my experience, and the information and
evidence collected in the course of this investigation, I
believe that the references made by KONSTANTIN IGNATOV, the
defendant, and Founder-2 to "idiots" reveal an understanding
that OneCoin members had believed the misrepresentations made by
IGNATOV, Ruja, and Founder-2. Based on the same, I also believe
that IGNATOV's statement "the network would not work with
intelligent people" means that the OneCoin scheme would be
revealed if subjected to scrutiny by members.

37. Additionally, on September 15, 2016, Ruja sent the
following messages to Founder-2:

| Ruja:[8] | Ok love. Just landed in frankfurt. Let s hope all will be well and i can pass |
| Ruja: | I will not go through passport control. But a bit nervous |
| Ruja: | Such a bad feeling |
| Ruja: | I pass tjrough [sic] airport |
| Ruja: | Frankfurt. Just landed. And then sofia in 2 hrs. If sth happens. My brother knows what to do and will inform you |
| Ruja: | Hate my life. But have mtgs tonight. Had no choice in flights |
| Ruja: | Will text in 3 hrs when on other plane |

38.    Based on my training and experience, and the information and evidence collected in the course of this investigation, I believe that the above exchange reveals: (i) Ruja's concern about traveling due to the pending German law enforcement investigation identifying her as the leader of the OneCoin fraud scheme; and (ii) that Ruja identifies her brother, KONSTANTIN IGNATOV, the defendant, as the person who "knows what to do" in the event that Ruja is unable to function as the leader of OneCoin.

**February 2019: Border Search and Seizure of IGNATOV's Cellphone**

39.    On or about February 27, 2019, KONSTANTIN IGNATOV, the defendant, arrived at San Francisco International Airport ("SFO") on an international flight from Istanbul, Turkey.  After IGNATOV landed at SFO, Customs and Border Protection ("CBP") agents referred IGNATOV to a secondary baggage exam (the "Secondary Baggage Exam").  Based on my review of a law enforcement report, I have learned that IGNATOV stated the following, in substance and in part, during the course of the Secondary Baggage Exam:

    a.    IGNATOV had travelled to the United States in order to visit his friend (the "Friend") in Las Vegas.

    b.    IGNATOV is trained in mixed martial arts, and planned to train with the Friend, who is an Ultimate Fighting

---

[8]  The actual contact name for Ruja associated with her messages in Founder-2's phone is "HRH."  Based on my experience, and the information collected in the course of this investigation, I believe that the initials "HRH" refer to Ruja as "Her Royal Highness."

Championship fighter.[9]  IGNATOV also planned to tour Las Vegas with the Friend.

      c.    IGNATOV has been self-employed for the last two years as a public speaker.  Specifically, IGNATOV gives seminars on financial events and personality development.

    40.  As set forth in more detail below, the statements made by KONSTANTIN IGNATOV, the defendant, about his employment and the purpose of his trip to the United States appear to have been deliberately misleading and untruthful.  Specifically, his statements appear to have been an attempt by IGNATOV to hide from law enforcement agents the fact that he runs OneCoin, and was visiting Las Vegas, at least in part, to attend a OneCoin event.

    41.  During the Secondary Baggage Exam, law enforcement agents determined that KONSTANTIN IGNATOV, the defendant, was in possession of a single cellular telephone (the "Ignatov Cellphone"), and a single laptop computer (the "Ignatov Laptop").  Agents then conducted a border search involving a cursory on-site review of the Ignatov Cellphone and Laptop.  Agents involved in these searches provided photographs of certain relevant information and documents that the agents located within the two devices.  I have since reviewed those photographs.

    42.  Based on my review of photographs of the Ignatov Cellphone and Laptop I have learned the following, among other things:

      a.    Images from the Ignatov Laptop revealed, among other things, a signed power of attorney form granting KONSTANTIN IGNATOV, the defendant, the power to exercise, among other powers, "full control over any and all of [Ruja's] property," the power to "take the benefit of any and all income or capital benefit from all of [Ruja's] property," the power to "agree, negotiate, and make any agreement, promise or undertaking concerning [Ruja's] property with any third party," and the power to "appear in [Ruja's] name and in [her] stead before any competent court and legal or public authority."  The power of attorney form is signed by Ruja and is dated February 8, 2018.

---

[9]  Ultimate Fighting Championship, known as "UFC," is an American mixed martial arts promotion company based in Las Vegas, Nevada.

b.    Images from the Ignatov Cellphone revealed, among other things, that the Ignatov Cellphone contained at least four different contact entries with distinct telephone numbers associated with the contact name "Ruja," *i.e.*, Ruja Ignatova, IGNATOV's sister and one of the founders of OneCoin.

43.    Law enforcement agents seized the Ignatov Cellphone from KONSTANTIN IGNATOV, the defendant, after completing the onsite review.

44.    On or about March 3, 2019, United States District Judge Edgardo Ramos, Southern District of New York, authorized a search and seizure warrant for the Ignatov Cellphone.

### February – March 2019: IGNATOV Travels to Las Vegas to Meet with OneCoin Associates

45.    As noted above, KONSTANTIN IGNATOV, the defendant, told law enforcement agents at SFO that the purpose of his trip to the United States was to visit the Friend, so that he could train with the Friend, and tour Las Vegas with him.  IGNATOV also stated that he was self-employed for the last two years as a public speaker.  As explained in more detail below, IGNATOV's statements appear to have been a deliberate attempt by IGNATOV to hide from the law enforcement agents who questioned him the fact that IGNATOV runs OneCoin, and was visiting the United States, at least in part, to conduct OneCoin business.

46.    As noted above, in late 2017, upon Ruja's flight and disappearance from her public role in operating and promoting OneCoin, IGNATOV assumed high-level positions at OneCoin. Publicly-available materials indicate that by in or about mid-2018, IGNATOV assumed the top leadership position at OneCoin. IGNATOV did not mention that he worked for OneCoin when he discussed his employment with law enforcement officers during the Secondary Baggage Exam.

47.    Based on my review of the Ignatov Cellphone, I have learned that the trip taken by KONSTANTIN IGNATOV, the defendant, to Las Vegas appears to have been a planned business trip in which he conducted business on behalf of OneCoin. Specifically, I have learned the following, among other things:

a.    Based on my review of messages on the Ignatov Cellphone, I have learned that in the lead-up to IGNATOV's trip to Las Vegas, IGNATOV discussed the logistics of the upcoming trip with a OneCoin affiliate ("OneCoin Affiliate-1"), who is a

promoter for OneCoin. OneCoin Affiliate-1 wrote to IGNATOV, "in Las Vegas, 14:00 – 18:00h..at least 20+ top selected leaders ([from many] cities in USA) there for the meeting/DS training and love to have you with us 30-60 minutes. Will be inside our Bellagio Hotel-Suite or Pen[t]house. . . . If you can meet any time between 17:00-20:00h on either 4 or 5 of March, I will arrange another group." IGNATOV responded, "Yes let's do this!"

     b.    Later, in the same message exchange, OneCoin Affiliate-1 wrote "send you again the proposed meeting schedule for next 02 days. Also, do not need mention dr. Ruja." Based on my training, experience, and participation in this investigation, I believe that the reference to "Ruja" refers to IGNATOV's sister, who co-founded OneCoin and has disappeared from public view since in or about October 2017.

     48.   In addition, I have reviewed publicly-available materials, including YouTube videos posted online, and social media posts, which appear to show that during the trip taken by KONSTANTIN IGNATOV, the defendant, to Las Vegas, he conducted business on behalf of OneCoin. Specifically, I have learned the following, among other things:

     a.    On or about March 5, 2019, IGNATOV posted a photo of himself in front of a sign that appears to be in Las Vegas on his Instagram account page ("Ignatov's Instagram Account").[10] In a comment on that Instagram post, IGNATOV wrote, "[I] am here for work reasons not holiday," contradicting statements made to law enforcement agents at SFO.

     b.    Between on or about March 1, 2019, and March 3, 2019, three videos were posted on YouTube that all appear to be from a OneCoin promotional/networking event that took place in Las Vegas Nevada (the "OneCoin Event").

     c.    One of the videos ("Video-1") is titled "Meeting in Las Vegas with mr. Konstantin." The description of the video is "Meeting in Las Vegas with Mr Konstantin Ignatov, [OneCoin Affiliate-1] [OneCoin Affiliate-2], [OneCoin Affiliate-3], and key American [OneLife Network] leaders consists of Black, Blue

---

[10] The Ignatov Instagram Account appears to be used by Ignatov because, among other reasons, it contains his name in the Instagram account username, and also contains his name in the heading at the top of the account page. Furthermore, I have reviewed the photos posted on Ignatov's Instagram Account and the majority of the photos depict Ignatov.

and Diamond and members and discuss about future possible dealshaker development in USA." Based on my review of public source material, and my participation in this investigation, I have learned that OneCoin Affiliates -1, -2, and -3, are all affiliated with OneCoin. Specifically, I have learned that OneCoin Affiliate-2 is an employee of Dealshaker; OneCoin Affiliate-3 is a president at Dealshaker in the United States; and, as noted above, OneCoin Affiliate-1 is a OneCoin promoter. Based on my review of Video-1, I observed IGNATOV, OneCoin Affiliate-1, OneCoin Affiliate-2, OneCoin Affiliate-3 and numerous other individuals in a large room that appeared to be a suite at a hotel. As described in more detail below, the footage appeared to be from a portion of the OneCoin Event.

d. Based on my review of another video ("Video-2") that appears to be from the OneCoin Event, I have learned the following, among other things:

i. Video-2 appears to show a series of photographs that were captured during the OneCoin Event.

ii. In one of the images from the OneCoin Event, IGNATOV appears to be wearing a blue shirt with the name "OneCoin" written on the front the shirt.

iii. IGNATOV is captured in several photographs with OneCoin Affiliates -1, -2, and -3, among other individuals. In one photograph from the OneCoin Event, IGNATOV is standing in front of a whiteboard in the meeting room (the "Whiteboard").

iv. In another photograph, it appears that the Whiteboard is titled " [OneLife Network]/Dealshaker," and lists a schedule, which includes, among other events "OneCoin/[OneLife Network]." The name "Konstantin," *i.e.*, IGNATOV, also appears on the Whiteboard to the right of one of the listed events.

e. Based on my review of a third video ("Video-3"), Video-3 appears to also show a series of photographs that were captured during the OneCoin Event. In one of those photographs, I observed IGNATOV holding up two framed portraits—one of himself, and one of Ruja Ignatova. Based on this photograph, it appears that IGNATOV was using these images to promote OneCoin to the attendees of the OneCoin Event.

f. In addition to the YouTube videos described above, I have also reviewed a Facebook post on a OneCoin-related Facebook group that appears to describe a portion of the OneCoin

Event.  In particular, in the post, which was dated March 4, 2019, the Facebook user states, among other things, that "During a meeting that just took place in Las Vegas, one of the first questions was, when can people monetize their coins(cash out). Konstantin said immediately 'if you are here to cash out leave this room now because you don't understand what this project is about.'"

## Evidence Found on IGNATOV's Cellphone

49.  Based on my review of messages obtained from the Ignatov Cellphone pursuant to a judicially authorized search warrant, my training, experience, and participation in this investigation, I have learned the following, among other things:

a.  On or about January 11, 2019, an individual who appears to be an employee of OneCoin (the "OneCoin Employee"),[11] wrote to KONSTANTIN IGNATOV, the defendant, "we have initiated procedure for mining difficulty and coin price change."

b.  Five minutes later, the OneCoin Employee wrote a second message, stating "new mining difficulty will be 300, ONE price 29.95."

c.  Three minutes later, in response, IGNATOV wrote "When will it happen."

d.  In response, the OneCoin employee wrote "I suggest Monday."  IGNATOV responded, "Great."

e.  Based on my training, experience, and participation in this investigation, this message exchange between IGNATOV and the OneCoin Employee appears to show that, unlike a legitimate cryptocurrency, the publicized value of OneCoin is not determined by supply and demand, but is instead set internally by OneCoin.  This is consistent with, as explained above, see supra ¶¶ 10(a)-10(e), evidence demonstrating that the price of the OneCoin is set — or manipulated — to increase at pre-determined intervals, which is not consistent with the plot of a commodity with a price set by supply-and-demand.

50.  Based on my review of messages obtained from the Ignatov Cellphone pursuant to a judicially authorized search

---

[11]  Among other things, the OneCoin Employee is saved in the Ignatov Cellphone with "OneCoin" as part of the contact's name.

g.    Based on my review of a message exchange between
KONSTANTIN IGNATOV, the defendant, and an individual who is a
OneCoin employee in Dubai (the "Dubai OneCoin Employee"), I have
learned that in or around June 2018, IGNATOV sent a picture of
the UAE Fund Manager to the Dubai OneCoin Employee.  The Dubai
OneCoin Employee then wrote, "this fffff is in Ascot-having fun
with our $."  Based on my training, experience, and
participation in this investigation, it appears that Dubai
OneCoin Employee is referring to the fact that the money that
the UAE Fund Manager was helping to launder was OneCoin proceeds
("our $") that had been laundered through the Ireland Fund.

53.    Based on my review of messages obtained from the
Ignatov Cellphone pursuant to a judicially authorized search
warrant, my training, experience, and participation in this
investigation, I have learned the following, among other things:

a.    On or about August 2, 2018, KONSTANTIN IGNATOV,
the defendant, forwarded a screenshot image of a separate
message exchange (the "Forwarded Message") to a contact in his
phone.  The Forwarded Message contained a message that said "You
know that because of you guys the FBI and CID is investigating
the matter.  We can only combine all and finish the matter.  We
are all under investigation.  Its up to you.  I was there
yesterday and this is the message for you."

b.    After sending this message, IGNATOV immediately
sent an additional message that said "And have warnings from
other side to avoid d for a while."

c.    Based on my training, experience, and
participation in this investigation, it appears that IGNATOV is
attempting to warn the individual he is communicating with that
there is an active investigation related to OneCoin by the FBI
and CID, and that a large number of individuals associated with
OneCoin are under investigation ("everyone is under
investigation").  Furthermore, it appears that IGNATOV is
warning the recipient of the message that they should avoid
going to Dubai ("And have warnings from other side to avoid d
for a while.").  Nevertheless, as set forth above, IGNATOV
continued to remain involved as a leader of OneCoin operations
after this text message exchange.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of KONSTANTIN IGNATOV, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

RONALD SHIMKO
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
6th day of March, 2019

THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

warrant, my training, experience, and participation in this investigation, I have learned the following, among other things:

a.    In or around July 2018, OneCoin Affiliate-1, sent a message to KONSTANTIN IGNATOV, the defendant, asking, in sum and substance, if IGNATOV had received a prior email from OneCoin Affiliate-1 about the "serious and terrible" problems that would arise if OneCoin delayed the OneCoin public offering that was scheduled for October 2018. Among other concerns, OneCoin Affiliate-1 told IGNATOV that such a delay might result in the government arresting "many of us and [putting those arrested] in custody for investigation." OneCoin Affiliate-1 was so concerned about a delay of the OneCoin public offering, that he suggested that he would need to "evacuate" his own family back to the United States in order to "escape from many... unknown members/enem[ies]." Finally, OneCoin Affiliate-1 told IGNATOV that if there was a OneCoin public offering he "underst[ood] the ONE price may be low and hard to trade on the exchange."

b.    In response, IGNATOV wrote, "I have good news for you. Next week [at an event] in Cordoba."

c.    Based on my training, experience, and participation in this investigation, it appears that OneCoin Affiliate-1 is expressing his concern to IGNATOV that if the OneCoin public offering was again delayed, contrary to public representations that IGNATOV had made about when the offering would occur, it would potentially result in arrests, law enforcement investigations, and customers who were upset. As noted above, OneCoin leaders had already represented that OneCoin would be offered publicly in January 2018, yet no such offering occurred. IGNATOV had nonetheless again promised that a future public offering would be held, and subsequently stated that the OneCoin public offering would be in October 2018. From this text message exchange, it appears clear that OneCoin Affiliate-1 is concerned about the backlash that will follow if OneCoin once again misleads its investors.

d.    In addition, OneCoin Affiliate-1 appears to be aware that if OneCoins are listed on a public exchange, the price will be low and OneCoins will be hard to trade ("the ONE price may be low and hard to trade on the exchange"). This suggests that OneCoin Affiliate-1 is aware that the price that OneCoins were currently listed at internally by OneCoin, was not a price that actually reflected the real value of OneCoins, as determined by market supply and demand. As noted above, this is consistent with other evidence obtained during the

investigation, including text messages with IGNATOV, *see supra* ¶¶ 49(a)-49(e).

51. Based on my review of an additional set of messages between OneCoin Affiliate-1, and KONSTANTIN IGNATOV, the defendant, I have learned that OneCoin Affiliate-1 discussed potential payment solutions for OneCoin to transfer OneCoin proceeds. In particular, I have learned the following, among other things:

      a. In or about July 2018, OneCoin Affiliate-1 sent a message to IGNATOV that attached an email that OneCoin Affiliate-1 had also sent to IGNATOV. The email was sent from an email address in the name of OneCoin Affiliate-1, to two emails addresses, both bearing the name "konstantin" and "Konstantin Ignatov." One of the email addresses was listed as a OneCoin email account; specifically, it had "onelifecorp" in the email address.

      b. In the email, OneCoin Affiliate-1 lists four proposals, including: (1) using money exchangers in Vietnam who would transfer money to anywhere in the world, for a 1.2%-2% fee; (2) using a "training company" that OneCoin Affiliate-1 owns in the United States to wire payment to OneCoin's bank account; (3) opening a bank account in Dubai if necessary; and (4) making use of OneCoin Affiliate-1's possession of a Vanuatu passport in order to help transfer money to OneCoin.

      c. Based on my training, experience, and participation in this investigation, it appears that OneCoin Affiliate-1 is offering to help IGNATOV launder OneCoin proceeds. In particular, it is clear that OneCoin Affiliate-1 is proposing solutions to transfer OneCoin derived funds through channels that are outside of the legitimate financial system. In other words, it appears that OneCoin Affiliate-1 is aware that in order to successfully transfer OneCoin funds, they will not be able to rely on a regular bank, and must take some intermediate steps to hide the origin of the funds.

52. Based on my review of messages obtained from the Ignatov Cellphone pursuant to a judicially authorized search warrant, my training, experience, and participation in this investigation, I have learned the following, among other things:

      a. In or around April 2018, KONSTANTIN IGNATOV, the defendant, sent and received messages to and from an employee who was an accountant at OneCoin (the "OneCoin Accountant").

b.     In the message exchange, IGNATOV sent the OneCoin Accountant two spreadsheets titled "remittance" and "ACCOUNT STS," and a pdf file titled "Accounting Opening Details" (the "Account Opening Documents").

c.     Soon after sending these files, IGNATOV wrote to the OneCoin Accountant, "these papers should be reviewed by you as they may indicate that someone in the company has been complicit in the transfers." In response, the OneCoin Accountant wrote "I don't understand most of these transfers. I can tell you only for the incoming ones that I know of as they were payments for codes, but the rest I have no idea."

d.     As discussed above, the Account Opening Documents that IGNATOV sent to the OneCoin Accountant, pertained to the UAE Fund Accounts. Between in or about February 2017 and in or about April 2017, the UAE Fund Accounts received approximately €185 million in funds derived from the OneCoin fraud scheme that had been laundered through other financial institutions, *see supra* ¶¶ 14(d)-14(e). However, the Account Opening Documents listed the nature of business of the UAE Investment Fund as "investment management," the business's listed "industry description" as "investment in retail trade enterprises and management," and the "purpose and intended use of the accounts" as "business transactions and for banking convenience." The account opening documents identify the Ireland Fund as a "major client," but do not make any mention of OneCoin.

e.     Based on the message exchange described above, it appears that the representations in the Account Opening Documents were misleading in at least two primary ways: (i) first, as stated in this message exchange, the money flowing into at least one of the UAE Fund Accounts was directly derived from OneCoin ("I can tell you only for the incoming ones that I know of as they were payments for [OneCoin] codes") and therefore was unrelated to "investment in retail trade enterprises and management" as listed in the Account Opening Documents; and (ii) the Ireland Fund was not a client of the UAE Investment Fund — in fact, the Ireland Fund was being used to launder OneCoin fraud proceeds.

f.     In addition, this message exchange between IGNATOV and the OneCoin Accountant, as well as the message exchange described below, *see infra* ¶ 52(g), indicate that IGNATOV is aware that OneCoin derived proceeds are being routed through a series of financial accounts, consistent with money laundering.