LAW OFFICES OF
# JEFFREY LICHTMAN
11 EAST 44TH STREET
SUITE 501
NEW YORK, NEW YORK 10017
www.jeffreylichtman.com

JEFFREY LICHTMAN
JEFFREY EINHORN
JASON GOLDMAN

PH: (212) 581-1001
FX: (212) 581-4999

June 17, 2019

**BY ECF AND HAND DELIVERY**
Hon. Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: <u>United States v. Konstantin Ignatov</u>, S7 17 CR 630 (ER)

Dear Judge Ramos:

### A.     INTRODUCTION

Defendant Konstantin Ignatov respectfully submits this Letter in support of his motion for bail pending trial. Despite his status as a foreign national of Germany, it is respectfully submitted that Mr. Ignatov is eminently bailable, and the government cannot overcome their burden of demonstrating that no "conditions" exist which will "reasonably assure" his "appearance" in court and the "safety" of the "community," (see 18 U.S.C. § 3142 (f)) particularly in light of the restrictive conditions of release that we propose today, which include the use of 24 hour armed security guards, GPS location monitoring, and $10M in cash and properties securing a $20M personal recognizance bond.

*First*, Mr. Ignatov poses no credible risk of flight. While he is not a citizen of the United States, he willingly came to this country knowing that an investigation into OneCoin was in progress: as the Court is aware, OneCoin executive and now co-defendant, Mark Scott, had already been charged with money laundering in the Southern District of New York six months prior in 2018 by the time Mr. Ignatov arrived in March of this year. Further, when he was questioned upon his entry into the country and his phone and laptop were searched, Mr. Ignatov did not seek to flee. Instead, he was apprehended approximately one week later at the airport <u>after</u> he concluded his trip to the United States. This behavior is simply not indicative of an individual who plans to abscond in the face of pending criminal charges.

*Second*, it cannot be credibly argued that the defendant poses a risk of danger to the community. While Mr. Ignatov is an accomplished mixed martial arts competitor, he has no criminal record and, indeed, there is no violence or weapons associated with this case. Instead,

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 2

the Superseding Information charges a single count of wire fraud, wherein the defendant is alleged to have made misrepresentations which caused individuals to invest in the OneCoin cryptocurrency. See S7 Superseding Information. Additionally, the proffered bail conditions will ensure that Mr. Ignatov have no contact with any OneCoin business.

*Third*, the conditions of pretrial release that we propose ameliorate any fears that Mr. Ignatov is either a flight risk or danger to the community. He would be released via a $20M personal recognizance bond, secured by $10M in cash and property put up by persons who have placed their unwavering trust in the fact that Mr. Ignatov will remain to face these charges. He would pay for 24 hour armed guards at an apartment to be leased in this district and shared with his pregnant girlfriend, Kristina, who is also an attorney – ensuring that he does not flee. The security agency would be chosen with the agreement of the government. Only preauthorized individuals would be permitted inside the residence, Mr. Ignatov would agree not to use cellphones, and he would not use a computer for any purpose other than the review of discovery and note taking. Additionally, his location would be monitored via a GPS bracelet, and he would permit the government to search his residence at any time to ensure compliance with the conditions of his release.

*Finally*, Mr. Ignatov is at least as bailable – if not a better candidate for release – than other non-citizen defendants facing major fraud prosecutions who have recently been granted bail in the Eastern and Southern Districts of New York – even without the use of self-funded armed security guards preventing their flight. See, e.g., United States v. Nejad, 18 CR 224 (ALC) (S.D.N.Y.) (Iranian national alleged to have funneled $115M from the United States to Iranian entities and individuals); United States v. Ng, 18 CR. 538 (MKB) (E.D.N.Y.) (Malaysian national extradited to the United States alleged to have participated in a scheme to embezzle some $2.7B). The conditions of release that we propose are far more rigorous than that demanded of either Messrs. Nejad or Ng, who similarly faced large white collar prosecutions, and as such, Mr. Ignatov should also be freed pending trial.

### B. SUMMARY OF THE CHARGES

Mr. Ignatov is charged in a one count Superseding Information (S7) with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1343. While the Superseding Information is silent as to many of the details, it generally alleges that from 2014 through 2019, Mr. Ignatov and others "made and caused to be made false statements and misrepresentations soliciting individuals ... to invest in 'OneCoin,' a purported cryptocurrency, and instructed individuals to transmit investment funds to OneCoin depository accounts in order to purchase OneCoin packages." S7 Superseding Information, at p. 2.

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 3

The March 2019 Complaint (the "Complaint") alleges much more detail as to the charged conspiracy. Specifically, the Complaint alleges that Mr. Ignatov's elder sibling and co-defendant, Raja Ignatova, was the founder of OneCoin, which markets a cryptocurrency by the same name. The Complaint further alleges that Mr. Ignatov was initially Raja's personal assistant, then functioned as a "high-level executive" for OneCoin starting in December 2017, and appeared as a "promoter and spokesperson" for the company at "events world wide." Complaint at p. 3. The Complaint further alleges that Mr. Ignatov took over for his sister in mid-2018 in its top leadership position when she "disappeared from public view." Id. at pp. 3, 17. At base, the government alleges that OneCoin was "conceived by Ruja [Ignatova] to defraud investors," and that OneCoin's "public representations" which caused individuals to invest were false and misleading, including claims that the cryptocurrency is "mined," and that its value is set by "supply and demand." Id. at p. 7.

### C.   THE PROPOSED BAIL PACKAGE

At his March 27, 2019 initial appearance before Magistrate Judge Parker, Mr. Ignatov was unprepared to present a bail package to the Court, and accordingly, he was detained without prejudice to make a bail application in the future. With this application, Mr. Ignatov proposes that Your Honor adopt the following package, which while not "excessive" (U.S. Constitution amend. VIII) will "reasonably assure the appearance of [the defendant] as required." See United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007); see also United States v. Madoff, 586 F. Supp.2d 240, 249 (S.D.N.Y. 2009) ("The [Bail Reform] Act does not require that the risk be zero, but that conditions imposed reasonably assure appearance") (internal quotation marks omitted).

The proposed bail package includes the following conditions securing the defendant's pretrial release:

- Self-funded armed security guards stationed with the defendant 24 hours per day at a residence to be rented by him in the Southern District of New York;

- A $20M personal recognizance bond signed by five financially responsible individuals, secured by $1.5M in equity from the properties belonging to friends in the United States, and $8.5M in cash;

- Strict pretrial supervision;

- GPS location monitoring;

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 4

- Home incarceration with only visitors pre-authorized by the government permitted inside;

- No contact between Mr. Ignatov and his codefendants outside the presence of counsel;

- No contact between Mr. Ignatov and any known victims or witnesses;

- No use of the internet;

- No involvement with OneCoin business or contact with OneCoin employees;

- Surrender of Mr. Ignatov's passport and any other travel documents with no renewals;

- No use of cellular telephones by the defendant, and computer use restricted to the review of discovery and note taking for his defense; and

- Permission for the government to search the defendant's residence and to tap his telephone to ensure compliance with the conditions of his release at any time.

D. **ARGUMENT**

The Supreme Court has observed that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987); see also Sabhnani, 493 F.3d at 75 ("it is only a limited group of offenders who should be denied bail pending trial") (internal quotation marks omitted). Indeed, "[t]he Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes" (id. at 747) and directs the release of the defendant "subject to the least restrictive" conditions determined by the court which will "reasonably assure the appearance of the person" at trial. 18 U.S.C. § 3142(c). Further, a district court may not deny pretrial release based solely on sweeping assertions of flight risk arising from a defendant's nationality. See Hung v. United States, 439 U.S. 1326, 1329 (1978) (granting Vietnamese national's bail because while the inability to procure his return suggest "opportunities for flight," it does not "establish any inclination" for such).

Here, as the government must concede, none of the § 3142(f)(1) factors that trigger the presumption of detention are met; rather, the Superseding Information charges Mr. Ignatov with wire fraud, which is no doubt a bailable offense. See 18 U.S.C. § 3142(e)(2) (creating a limited class of offenses identified in § 3142(f)(1) wherein a rebuttable presumption against bail exists).

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 5

Accordingly, the government must overcome a substantial burden in proving that Mr. Ignatov poses a "serious" flight risk or there exists a "serious" risk that he will seek to obstruct justice in his case, in order for their request for pretrial detention to be granted. 18 U.S.C. §§ 3142(f)(2)(A) and (B). Therefore, Mr. Ignatov stands before this Court as both presumptively innocent, see 18 U.S.C. § 3142(j), and presumptively eligible for pretrial release. See, e.g., United States v. Scarpa, 815 F. Supp. 88, 91 (E.D.N.Y. 1993) (pretrial detention "has been and should remain the exceptional practice") (emphasis supplied); United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986) (pretrial detention is a drastic measure, narrowly reserved for "extreme case[s]").

To rebut the latter presumption – that the defendant is eligible for pretrial release – the government must prove that there are no "conditions" which will "reasonably assure" Mr. Ignatov's "appearance" and the "safety" of the "community." See 18 U.S.C. § 3142 (f). As shown below, the government will be unable to meet this burden – especially in light of the restrictive conditions of release that we propose.

### The Effect of Pretrial Detention on the Presumably Innocent Defendant

Before turning to a more detailed analysis of the relevant facts and legal principles involved, a few observations concerning the practical realities facing a defendant committed to pretrial detention are appropriate.

Certainly, the best exposition of the real consequences of pretrial detention is found in Judge Weinstein's decision in United States v. Gallo, 653 F. Supp. 320, 336-339 (E.D.N.Y. 1986). There, Judge Weinstein explained that being held in pretrial detention involves far more than merely the deprivation of an individual's liberty. Id. at 336. The obstacles and difficulties which are visited upon a defendant and his counsel, as well as their ability to effectively prepare a defense against serious criminal charges, can be almost empirically measured. Id. at 337. As Judge Weinstein noted:

> [A]ll of these hardships, including deterioration of [the defendant's] morale, demeanor, finances, resources, reputation and quality and thoroughness of legal defense, may combine to disadvantage the defendant at the judgment and sentencing stages of the proceeding. As to judgment, studies have indicated that the tension is likely to increase the chances of conviction at trial.

Id.

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 6

In Gallo, Judge Weinstein underscored the need for a careful "balancing" by the trial court. Id. at 338. He urged his brethren to consider the detention equation beyond the perspective of quantifying the amount of information presented by the government. Id. at 338-39. Instead, he emphasized the importance of carefully weighing the less tangible – but surely deleterious – effects of pretrial detention upon an individual's ability to effectively defend himself.

In Scarpa, another decision by Judge Weinstein, he emphasized his concern for this process, stressing that preventive detention on the basis of future dangerousness should be the "exceptional practice." Scarpa, 815 F. Supp. at 91. As the court noted:

> It is well to remember the magnitude of the injury that pre-trial detention inflicts and the departure that it marks from ordinary forms of constitutional government. Executive power to detain an individual is the hallmark of the totalitarian state. Under our Constitution the prohibition against excessive bail, the Due Process Clause of the Fifth Amendment, the presumption of innocence – indeed, the fundamental separation of powers among the legislative, the executive and the judicial branches of government – all militate against the abhorrent practice. Our historical approach eschewing detention prior to trial reflects these concerns.

Id.

As this Court is undoubtedly in a position to observe, applications for preventive detention by the United States Attorney's Office have grown with alarming frequency. Applications seeking to hold an accused without bail have become commonplace. Although figures are unavailable, it is certainly true that there are hundreds of federal defendants presently housed at the local detention centers throughout New York State.

These issues are raised with the Court for several reasons. First, it is important that the degree of scrutiny brought to a matter as serious as the deprivation of an individual's liberty prior to conviction does not erode because the practice itself has become more commonplace. Second, the effect of pretrial detention upon the accused's ability to defend himself must be considered when evaluating the prosecutor's application. Even if a prosecutor is merely pursuing what he or she perceives to have become an accepted practice, the inescapable conclusion remains that the accused's ability to defend is materially affected. <u>This is especially heightened in a case such as this, where the discovery is anticipated to be extraordinarily voluminous, requiring high powered computers even to access much of the material, and the defendant will presumably have severely restricted access to the discovery while incarcerated.</u>

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 7

### The Use of Armed Guards to Secure Mr. Ignatov's Release

The severely restrictive bail package that we propose includes the provision for 24/7 home detention, secured not only by GPS monitoring of the defendant, but by the use of private armed security guards at his apartment which will restrict the entry and exit of both the defendant and any visitors. This is a lawful condition of release under the Bail Reform Act. United States v. Esposito, 749 F. App'x 20, 24 (2d Cir. 2018) (Summary Order). These guards, supplied by a security company approved by the government, would be paid for by the defendant and authorized to use force against him should he attempt to leave the premises without permission. This highly securitized and heavily monitored atmosphere would make it impossible for Mr. Ignatov to flee the United States – or conversely, for unapproved guests to enter his residence – ameliorating concerns that he would violate the conditions of his release.

As the Second Circuit recently opined in September 2018, "district courts are not required to consider private security guards as a condition of release ... *but they are not precluded from doing so when the defendant has substantial resources and such wealth contributes to his risk of flight.*" Esposito, 749 F. App'x at 24 (emphasis supplied) citing United States v. Banki, 369 F. App'x 152, 153 (2d Cir. 2010). This provision has been used to secure the pretrial release of multiple high profile, high net-worth defendants where their access to wealth has cut against their Eighth Amendment right to reasonable bail, including Bernie Madoff, David Brooks, Marc Dreier, Mahender and Varsha Sabhnani, and most recently, Vincent Esposito.[1] All agreed to pay for, and post, armed guards at their home to avoid pretrial detention.

While some district courts have opposed the use of self-funded guards to secure pretrial release, the Second Circuit has not outlawed the practice. Indeed, in Esposito, the Second Circuit specifically indicated that district courts are "not precluded" from considering it as an option for release. Esposito, 749 F. App'x at 24. Further, in Sabhnani, the Second Circuit accepted the condition of "on-site monitoring of [the] defendants' home confinement" by a "private security firm," owing in part to the defendants' agreement to "pay all costs associated [therewith] ...." 493 F.3d at 78. Such was also the case with Messrs. Madoff, Brooks and Dreier – and would be the case for Mr. Ignatov.

Further, while securing a defendant's pretrial release with self-funded guards arguably favors the wealthy – a factor that has drawn criticism from certain district courts – it is this very

---

[1] Additional research has revealed still more instances where the use of private security guards were approved as a condition of pretrial release in the Southern and Eastern Districts of New York. See, e.g., United States v. Seng, No. 15 CR 706 (S.D.N.Y.) (VSB) (Dkt. No. 53); United States v. Juan Angel Napout, No. 15 CR 252 (E.D.N.Y.) (Levy, M.J.) (Dkt. No. 127); United States v. Jeffrey Webb, No. 15 CR 252 (E.D.N.Y.) (Scanlon, M.J.) (Dkt. No. 40).

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 8

access to wealth which is frequently used by the government to argue that a defendant poses a risk of flight. And addressing this potential disparity, Judge Rakoff observed in Dreier that "many kinds of bail conditions favor the rich .... *But it is not a reason to deny a constitutional right to someone who, for whatever reason, can provide reasonable assurances against flight.*" United States v. Dreier, 09 CR 85 (JSR) (Order dated February 5, 2009) (emphasis supplied); see also United States v. Ng Lap Seng, 15 CR 706 (VSB) (Order dated October 23, 2015 granting pretrial release secured by, *inter alia*, "an armed security team responsible for ... preventing his flight, and compliance with all other conditions of release ... to be paid for by defendant").

It is respectfully urged, therefore, that the Court adopt the condition of self-funded armed guards securing Mr. Ignatov's release – an arrangement accepted by the Second Circuit in both Sabhnani and Esposito, and by several judges in this district and elsewhere.

### It Cannot Be Credibly Argued that Mr. Ignatov Poses a Risk of Flight or Danger to the Community

Other than his foreign citizenship and presumed access to wealth given the nature of the allegations, there is little to suggest that Mr. Ignatov poses a risk of flight, and even less to suggest that he posses any danger to the community. While the nature of the charges surely weigh upon this application, specifically the amount of money OneCoin executives allegedly received from the scheme, an examination of the balance of the 18 U.S.C. §3142 (g) factors, reviewed below, supports his release. Finally, the proposed bail package, which includes self-funded armed guards and a $20M personal recognizance bond secured by $10M in property and cash, certainly "assure[s] the appearance of" the defendant and the "safety of the community." 18. U.S.C. § 3142(e).

i. Applicable Law

In determining whether there are conditions of release that will "reasonably assure" the appearance of Mr. Ignatov at future court appearances and the safety of the community, the following should be considered:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--

>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
>> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142 (g). Because the Court is required to examine the § 3142 (g) factors in considering both the defendant's risk of flight and danger to the community, albeit by differing legal standards, they will be discussed together in the proceeding sections. See United States v. Duncan, 897 F. Supp 688, 690-92 (N.D.N.Y. 1995) (18 U.S.C. § 3142 (g) factors are considered in both danger to the community and risk of flight analyses).

Finally, as this Court is aware, assertions that the defendant poses a risk of flight must be proven by a preponderance of the evidence, while allegations that the defendant poses a danger to the community must be proven by clear and convincing evidence. 18 U.S.C. § 3142 (f)(2)(B) ("The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person in the community shall be supported by clear and convincing evidence"); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985) (allegations of flight risk must be supported by a preponderance of the evidence).

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 10

  ii.  <u>The Nature of the Charges</u>

  Mr. Ignatov is not charged with an offense – such as a crime of violence, terrorism, or one that involves a minor victim or controlled substance, firearm, or explosive – for which the bail statute dictates a rebuttable presumption of detention. <u>See</u> 18 U.S.C. § 3142(e)(2). There are no allegations that Mr. Ignatov engaged in any type of violence, nor does he possess any criminal record. Rather, he is alleged to have participated in a conspiracy to commit wire fraud via the marketing of an international cryptocurrency, specifically, by making and abetting materially false statements that induced others to invest. <u>See</u> S7 Superseding Information at pp. 1-2.

  While the Complaint alleges that some €2.232B in profits were generated by OneCoin, and therefore the government presumably will argue that Mr. Ignatov has access to vast wealth, courts in this district have routinely found that pretrial release is appropriate for foreign defendants with both financial means and limited ties to this country. <u>See</u>, <u>e.g.</u>, <u>United States v. Bodmer</u>, No. 03 CR 947 (SAS), 2004 WL 169790, at *3 (S.D.N.Y. January 28, 2004) (releasing Swiss national on bail); <u>United States v. Khashoggi</u>, 717 F. Supp. 1048, 1050-52 (S.D.N.Y. 1989) (releasing "enormously wealthy" Saudi Arabian national who was facing mail fraud charges despite the fact that there was no extradition treaty in place). Examples of other defendants who are similarly foreign nationals are detailed, *infra*.

  iii.  <u>The Weight of Evidence Against Mr. Ignatov</u>

  It is somewhat difficult to discern the evidence against Mr. Ignatov at this stage. While a detailed complaint was filed and some discovery has been provided, much more remains to be turned over to counsel. Essentially, and as described, <u>supra</u>, the government claims that following the disappearance of Raja Ignatova from public view in 2017, the defendant took on advancing leadership positions within the company behind the cryptocurrency, OneCoin, and in 2018, became one of its leaders. <u>See</u> Complaint at pp. 17-18.

  Further, the government advances in the Complaint that Mr. Ignatov made false statements to border patrol agents upon entering the United States concerning both his employment and purpose of his visit. Complaint at pp. 22-23. The government claims that these statements "appear to have been deliberately misleading and untruthful," and "an attempt by [the defendant] to hide ... the fact that he runs OneCoin, and was visiting .... to attend a OneCoin event." <u>Id.</u> at 23. It is somewhat understandable that Mr. Ignatov, knowing of the arrest of Mark Scott, knowing of the seemingly global investigation of OneCoin, would have been nervous to speak to law enforcement about OneCoin upon being questioned by agents after his arrival in the United States, having just stepped off a plane. In addition, the claim that Mr. Ignatov lied to law enforcement upon his arrest at the airport a week later, should be weighed against the fact that he was interviewed without counsel present, presumably with the understanding that he was under

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 11

criminal investigation at the time. Regardless of the truthfulness of his assertions, they should not preclude Mr. Ignatov from being trusted to remain on bail.

Recently, in United States v. Esposito, the government accused another defendant of making false statements to Pretrial Services during a bail interview concerning his own finances – *allegedly omitting some $3.8M in cash recovered from his own house that same day* and other properties. See United States v. Esposito, 309 F.Supp.3d 24, 28-29 (S.D.N.Y. 2018); see also April 18, 2018 Bail Transcript United States v. Nejad, 18 CR 224 (ALC) (S.D.N.Y.) (Iranian national granted bail despite falsely indicating that his primary residence was in the United States to appear more bailable). Esposito – the son of former Genovese family boss Vincent Gigante – was granted bail over the government's objection that his claims demonstrated that he could not be trusted to remain in the United States and that he was hoarding vast sums of cash – which could have been used to flee. So too should be the case for Konstantin Ignatov.

    iv.    The Defendant's History and Character

We have received over 20 letters from friends and family members on behalf of Mr. Ignatov in support of this application. These individuals are universally shocked that Mr. Ignatov could be charged in any crime. E.g., April 24, 2019 Letter of Ivan Yochkolski, attached as Exhibit 1. They further describe a man who is "disciplined," (April 10, 2019 Letter of Rosen Dimitrov, attached as Exhibit 2) spends much of his time training in mixed martial arts (see April 9, 2019 Letter of Peter Mustakov, attached as Exhibit 3) and is a dedicated animal lover. See April 7, 2019 Letter of Petyo Pagelski, attached as Exhibit 4. Finally, several of the letters note that Mr. Ignatov poses no risk of absconding, especially given that his girlfriend is expecting their first child. Ltr. of Ivan Yochkolovski, Ex. 1; April 8, 2019 Letter of Angel Varbanov, attached as Exhibit 5 ("Knowing Konstantin, he will be more than happy to appear before you and defend himself").

First, as noted above, many of those who submitted letters on behalf of Mr. Ignatov expressed shock that he would be charged with a crime based on their experiences with him. As Ivan Yochkolovski writes: "the charges brought against him do not coincide with his persona in any way[,] shape[,] or form." Ltr. of Ivan Yochkolovski, Ex. 1 ("he is not a person that would want to cheat somebody"). Petyo Pagelski echoes that the charges in this case do "not correspond with the person [he] know[s]," (Ltr. of Petyo Pagelski, Ex. 4) and Angel Varbanov adds: "everything he has done for me and others is just so contradictory to the news I saw on TV [about] him being arrested and detained." Ltr. of Angel Varbanov, Ex. 5; see also Letter of Sebastian Tost, attached as Exhibit 6 ("shock[ed]" by "[t]he arrest and the allegations").

Friend Vladimir Gunev concurs with this sentiment, noting: "I am confused with the charges against him as he is very strict about abiding the law." April 10, 2019 Letter of Vladimir

Gunev, attached as Exhibit 7. Of his conversations with the defendant on this very topic, Mr. Gunev recalls for the Court:

> I am keen on driving a little faster, especially on the highway, and when we were driving last summer to the seaside, we had this discussion that started from speed limits and ended with Konstantin firmly stating that all laws in general exist for a reason and we should all abide them, otherwise it would be chaos. <u>This is why I also know Konstantin is not a flight risk</u> ....

Id. (emphasis supplied); see also April 8, 2019 Letter of Mihaela Toteva, attached as Exhibit 8 ("I was shocked to hear that he was charged with such a serious crime ... this does not even sound like him"). Asen Chanev echoes: "When I first heard about his arrest, I literally could not believe what was happen[ing] and I was shocked." April 10, 2019 Letter of Asen Chanev, attached as Exhibit 9; see also April 8, 2019 Letter of Kristina Gouneva, attached as Exhibit 10 ("I was shocked when I read ... that he is suspected to have committed such a serious crime").

Other writers have observed instances which demonstrate that he is a "giving [and] supportive individual." Ltr. of Ivan Yochkolovski, Ex. 1. Mr. Yochkolovski notes in his letter to the Court that Mr. Ignatov has been active in fundraising for "cancer and other medical treatments for people in Bulgaria." Id. Petyo Pagelski adds: "I appreciate him a lot, as he has proven to be a man who I know will always try the best he can to help ...." Ltr. of Petyo Pagelski, Ex. 4; Ltr. of Rosen Dimitrov, Ex. 2 ("I have always counted on him as a friend who I can confide in and trust even more than I trust myself ...."). Similarly, Angel Varbanov hails:

> He has become one of the most valuable people in my life because I had a big personal drama and he stood by m[e] and spent a lot of time to get me out of the depression I was in[]. I had basically lost my faith in people around me, <u>but he proved [to] me there are still honest, true-blue people</u> ....

Ltr. of Angel Varbanov, Ex. 5 (emphasis supplied); see also Ltr. of Asen Chanev, Ex. 9 ("He has always been very considerate and understanding, always showing compassion towards anyone who needs advice and help").

Mr. Ignatov's father, Plamen, writes that his son "has always helped people in need however he can." April 7, 2019 Letter of Plamen Ignatov, attached as Exhibit 11. Regarding the defendant's assistance in his own time of need, Plamen informs the Court:

> A few years ago, I had serious health problems and I had to undergo ... heart surgery. During those hard times for me[,] Konstantin was always by my side, supporting me, [taking on] my responsibilities and ... taking care of the family. <u>Without him I wouldn't have managed to successfully cope with my sickness.</u> Even after the surgery and during the recovery period, Konstantin continued to support me, his mother and his family the way he has always done.

<u>Id.</u> (emphasis supplied). Similarly, friend Vladimir Gunev recalls when he was there to take his girlfriend to the hospital in an emergency:

> There was this one time when my girlfriend had to go to the hospital and I was out of town. I called my sister to help my girlfriend and Konstantin just took everything in his hands, dropped everything he was doing, drove my girlfriend to the hospital, talked to the doctors, made sure the best specialists would take care of her and basically did my job. <u>He did not have to, but this is him</u> ....

Ltr. of Vladimir Gunev, Ex. 7 (emphasis supplied).

Of his assistance to her through the years, Jasmine Tost writes:

> Konstantin was always there for me no matter where he was traveling around the world. He is like a big brother to me[] who supports me when I feel unstable. He encourages me when I feel off ... and is the man who just drives me daily to never give up, no matter how many stones life puts in your way ....

Letter of Jasmine Tost, attached as Exhibit 12; <u>see</u> <u>also</u> Ltr. of Sebastian Tost, Ex. 6 ("he has always helped us as much as he can and even when the financial situation with us seemed poor, he immediately appeared and helped us"). Similarly, Mihaela Toteva proclaims that Mr. Ignatov is "a good listener and ... is always ready to help as much as he can. ... He told me I should believe more in myself ...." Ltr. of Mihaela Toteva, attached as Exhibit 8; <u>see</u> <u>also</u> Letter of Temenzhka Dimitrova, attached as Exhibit 13 ("good example" for "my own sons").

Vladimir Nikolov informs the Court of a touching account of the defendant's good nature in his letter, recalling:

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 14

> Three years ago in my hometown ... there was a fundraising campaign for a teenage girl who at birth suffered a severe twist in her spine and needed surgery ... which essentially was life saving .... I donated money to the campaign and shared it on my Facebook account, and a few minutes later Konstantin called me ... saddened by the girl's story .... He organized all his friends to help with raising money for the sick girl. I will never forget the tears of gratitude and joy of the girl's mother when I went to the place and gave the raised money. Subsequently, the girl underwent the necessary intervention, she recovered and now lives a new, fulfilling life.

Letter of Vladimir Nikolov, attached as Exhibit 14; Ltr. of Petyo Pagelski, Ex. 4 ("he gathered me and our friends to figure out who we could help a little girl who had health problems").

And still more writers comment on Mr. Ignatov's gentle nature and deep affection for animals. Petyo Pagelski writes: "He always helps people, and not only people, but animals, too. He has adopted several dogs that were almost dead when he took them. And he did not abandon them afterwards, but keeps looking after them." Id. Similarly, Peter Mustakov observes in his letter to the Court: "He helps dog shelters by donating food and spending time with the dogs[,] and is also involved in charity initiatives." Ltr. of Peter Mustakov, Ex. 3; see also April 9, 2019 Letter of L. Ignatova, attached as Exhibit 15 ("He loves animals, especially dogs. Currently he takes care of six dogs. They are all adopted from dog shelters or they were stray animals and he took them from the street ....").

Lyndall Vile, who praises that Mr. Ignatov is "without a doubt one of the kindest and most genuine people [she has] ever met," similarly informs the Court of the defendant's love of animals, writing: "He takes care of 6 dogs, almost all of which were without homes and in shelters or strays found dumped on the streets." April 9, 2019 Letter of Lyndall Vile, attached as Exhibit 16. And Jasmine Tost recalls: "In the later summer of 2014, we saved a dog [kept] in a cage and found him suitable new home. I immediately thought that this dog was the perfect dog for Konstantin and supported him .... He cared for the dog all these years ...." Ltr. of Jasmine Tost, Ex. 12.

Friend Asen Chanev recalls his experiences volunteering at animal shelters and fundraising with the defendant:

> I met Konstantin and we became close friends during our visits at the shelter for homeless or sick dogs. I was truly amazed by his love for animals and the way he cares about them. He was the initiator of a charity campaign to raise funds for food and medicine

JEFFREY LICHTMAN

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 15

> for the stray and helpless animals. ... Every month ... we bought
> food and medicine which we brought to the organizations "Last
> Hope," and "Four Paws."

Ltr. of Asen Chanev, Ex. 9. Vladimir Nikolov confirms: "Konstantin became a benefactor to one of the dog shelters in Sofia, [and] assisted with regular supplies ...." Letter of Vladimir Nikolov, Ex. 14.

Many of those supporting Mr. Ignatov's request for bail took the opportunity to proclaim their belief that he "does not pose a flight risk." See April 7, 2019 Letter of Mitko Dimitrov, attached as Exhibit 17; see also April 9, 2019 Letter of Tsvetan Diklyovski, attached as Exhibit 18 ("I strongly believe he will stand against all charges"). Krasmira Georgieva writes: "I have no doubt that Konstantin will follow the conditions of the bail and he will stay in the United States and fight this case," (April 9, 2019 Letter of Krasmira Georgieva, attached as Exhibit 19) and attorney Nicole Atansova concurs: "I believe that Konstantin, as a reliable member of the community, is not a flight risk ...." April 10, 2019 Letter of Nicole Atansova, attached as Exhibit 20; see also April 9, 2019 Letter of Tsvetomira Diklyovski, attached as Exhibit 21. Vladimir Nikolov "firmly believe[s] that he will remain in the United States until the final outcome," (Ltr. of Vladimir Nikolov, Ex. 14) and Rumen Dimitrov concurs: "I have no doubt that he will appear in court when required ...." April 10, 2019 Letter of Rumen Dimitrov, attached as Exhibit 22; see also April 17, 2019 Letter of Todor Gounev, attached as Exhibit 23 ("I am convinced that Konstantin is not a flight risk ....").

### Many Less Likely Candidates Have Been Released on Bail

As noted in the Introduction, pretrial release in this case would not be unreasonable – with many seemingly less suitable candidates routinely being granted bail who similarly are not United States citizens and charged in large, white collar frauds – and many without the condition of 24 hour armed security guards. For example:

- Roger Ng, a Malaysian national and former banker for Goldman Sachs, was granted bail after agreeing to post a $20M personal recognizance bond secured by $1M cash. See United States v. Ng Chong Hwa, 18 CR 538 (MKB) (E.D.N.Y.). Mr. Ng was extradited to the United States from Malaysia to face charges that he participated in a scheme to embezzle some $2.7B from 1MBD, the Malaysian state fund.

- Ali Sadr Hashemi Nejad, an Iranian national with access to untold wealth – billions of dollars – was granted bail via a $20M bond secured by multiple properties and cash. See United States v. Nejad, 18 CR 224 (ALC) (S.D.N.Y.) (Dkt. Entry 31). Mr. Nejad was arrested while attempting travel to London from

      the United States, and according to the government, he lied to pretrial services about his country of residence in an effort to appear more bailable. See United States v. Nejad, 18 CR 224 (ALC) (S.D.N.Y.) (April 18, 2018 Bail Transcript).

- Adnan Khashoggi, an "enormously wealthy and well-known Saudi Arabian businessman," was released by Judge Keenan on a $10M personal recognizance bond secured by $5M in cash and $5M in property. Khashoggi, 717 F. Supp. at 1050-52. Notably, at the time of his release, there was no extradition treaty in place between Saudi Arabia and the United States which would have facilitated his transport back to the United States if he had fled.

- Hans Bodmer, a Swiss national and attorney who was arrested in South Korea and charged with violating the Foreign Corrupt Practices Act by, *inter alia*, paying "bribes and authoriz[ing] the payment of bribes to various government officials of the Republic of Azerbaijan," was released by Judge Scheindlin on a $1M bond secured by a letter of credit. Bodmer, 2004 WL 169790, at *3. This, despite the government's complaint that the Swiss government would not "recognize Bodmer's written waiver of his right to avoid extradition" if he fled. Id. at *2.

- Ng Lap Seng, a Chinese national and billionaire real estate mogul, was charged in a conspiracy wherein over $1.3B in bribes were funneled to former U.N. ambassador John Ashe. See Nate Raymond, U.S. makes new arrest in U.N. bribery case, Reuters, March 18, 2016, available at https://in.reuters.com/article/un-corruption/u-s-makes-new-arrest-in-u-n-bribery-case-idINKCN0WK28B (last viewed May 30, 2019). Despite possessing multiple private planes and being detained while onboard one leaving the United States, Mr. Seng was granted bail by Judge Broderick in the form of a $50M personal recognizance bond secured by $20M in cash and a residence. See United States v. Seng, No. 15 CR 706 (S.D.N.Y.) (Dkt. No. 53).

- Jeffrey Webb, a national of the Cayman Islands, was charged with bribery and money laundering related to the international soccer organization, FIFA. See Nine FIFA Officials and Five Corporate Executives Indicted for Racketeering Conspiracy and Corruption, U.S. Department of Justice, May 27, 2015, available at https://www.justice.gov/opa/pr/nine-fifa-officials-and-five-corporate-executives-indicted-racketeering-conspiracy-and (last viewed May 30, 2019). Webb was released on a $10M personal recognizance bond secured by real property, vehicles, and jewelry. See United States v. Webb, No. 15 CR 252 (E.D.N.Y.) (Scanlon, M.J.) (Dkt. No. 40).

**JEFFREY LICHTMAN**

Hon. Edgardo Ramos
United States District Judge
June 17, 2019
Page 17

What is more, still less bailable defendants – those charged with crimes of violence – are frequently released in the Southern and Eastern Districts of New York. See, e.g., United States v. Michael J. Persico, 10 CR 147 (E.D.N.Y. 2010) (son of life-imprisoned mob boss, an allegedly powerful Colombo associate charged with racketeering murder); United States v. Modica, 09 CR 1243 (S.D.N.Y. 2010) (powerful Gambino soldier facing racketeering charges including double murder, jury tampering, assault and extortion); United States v. Agate, 08 CR 076 (E.D.N.Y. 2008) (high ranking gangsters charged with violence); United States v. Cutaia, 08 CR 097 (E.D.N.Y. 2008) (same); United States v. Spero, 99 CR 520 (E.D.N.Y. 1999) (acting Bonanno boss facing four murder charges); United States v. John A. Gotti, 98 CR 042 (S.D.N.Y. 1998) (son of life-imprisoned mob boss, allegedly Gambino Acting Boss); United States v. Orena, 93 CR 1366 (E.D.N.Y. 1993) (alleged powerful Colombo Capo and son of Colombo Acting Boss).

Finally, Marc Dreier and Bernie Madoff – both less likely candidates for release than Mr. Ignatov – were released on bail with the condition that they self-fund 24 hour armed security guards. First, according to the very judge who had granted him bail, Dreier "ranked with those who have committed some of the most egregious frauds in history." See United States v. Dreier, 09 CR 85 (JSR) (Dkt. No. 76, at p. 3) (internal quotation marks omitted). Specifically, as an attorney who "disgraced the venerable profession of law," Dreier engaged in a "series of frauds over a 7-year period" that exceeded $740M, "largely to finance a personal life of extraordinary lavishness." Id. Moreover, Dreier's attempts to further and cover up his schemes were seemingly unending: "He impersonated clients .... He created phony client and accounting firm documents .... He stole from clients .... He misappropriated funds from bankruptcy-court approved accounts .... [and] [h]e offered to pay off accounting firm professionals." Id. at pp. 3-4. And even after he was arrested, "from a prison in Canada, he called his law firm and directed the transfer of millions of dollars from an escrow account to a personal account in his control." Id. at p. 4 (emphasis supplied).

Bernie Madoff's fraud was even greater than Dreier's in scope and duration – and he too was granted bail. A crime of "extraordinary dimensions" that resulted in a loss "greater than $13 billion," Madoff's fraud "affected thousands of investors in the United States and worldwide," and took place "for more than a generation." United States v. Madoff, 09 CR 213 (DC) (Dkt. No. 92, at p. 3). Madoff also went to great strides to hide his crimes as he defrauded "individuals, non-profit organizations and for-profit institutions," and "drove many ... to economic collapse." Id. at p. 4. Madoff "repeatedly lied to the United States Securities and Exchange Commission ('SEC') in written submissions and in sworn testimony," and "caused to be created fraudulent certified financial statements," which were sent to the SEC. Id. at p. 5. Indeed, nearly every financial statement that he created and sent out to clients for over twenty years was false. Id. at p. 4. Further, "[w]henever an investigation threatened to uncover his fraud, Madoff resorted to obstruction and lies." Id. (emphasis supplied). And yet this individual was trusted to remain on bail until his case was resolved. Unlike Dreier and Madoff, Mr. Ignatov can hardly be deemed the brainchild of the fraud charged here. Indeed, according to the

JEFFREY LICHTMAN

Hon. Edgardo Ramos  
United States District Judge  
June 17, 2019  
Page 18

allegations, he was his sister's personal assistant until late 2017, making travel arrangements and managing her schedule. As his sister has not been apprehended, Mr. Ignatov has become the *de facto* face of the OneCoin operation.

Surely if Dreier and Madoff could be entrusted with pretrial release, so too can Mr. Ignatov, especially considering the severely restrictive conditions that we propose, which ameliorate any concern that he will not return to court.

### E. CONCLUSION

For all the foregoing reasons, Mr. Ignatov's pretrial release should be granted.

Respectfully submitted,

Jeffrey Lichtman

Encs.

cc:   All counsel (by ECF and hand delivery)