**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 27, 2019

**BY ELECTRONIC MAIL & ECF**

The Honorable Edgardo Ramos
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

    **Re:**       ***United States* v. *Konstantin Ignatov*, S7 17 Cr. 630 (ER)**

Dear Judge Ramos:

        The Government respectfully writes in advance of the bail revocation hearing scheduled in the above-captioned matter on Friday, June 28, 2019, at 2:00 p.m.  Neither the conditions proposed by the defendant in his letter of June 17, 2019, nor any other combination of bail conditions, will reasonably assure the appearance of the defendant in this case or protect the community from the danger posed by the defendant.  The defendant has no ties whatsoever to the United States, possesses citizenship and other ties to countries that will not extradite to the United States, has engaged in extensive international travel, and has access to massive foreign financial resources.  He simply cannot be trusted to comply with any conditions set by the Court, having already lied to U.S. border agents, investigating case agents, and even the very Pretrial Services Officers tasked with evaluating appropriate bail in this case.  Moreover, the defendant's sister and co-conspirator, Ruja Ignatova—who the defendant described as his "best friend" during his post-arrest statement—has herself disappeared, fleeing prosecution shortly after sealed charges against her were filed by the United States in October 2017.  Finally, given that the OneCoin fraud scheme continues to operate to this day, and that the defendant recently travelled to the United States to participate in meetings related to the operation of OneCoin in this country, his release would also endanger the economic safety of the community.

        In short, in light of the unprecedented risk of flight that the defendant presents, along with the danger of ongoing economic harm, the Court should follow the recommendations of the Pretrial Services Offices for both the Central District of California ("CDCA") and the Southern District of New York ("SDNY") and the prior ruling of the Honorable Gail J. Standish, CDCA United States Magistrate Judge, and detain the defendant pending trial.

**I.**    **Procedural History**

        On March 6, 2019, the defendant was arrested in Los Angeles, California on a complaint filed the same day, under docket number 19 Mag. 2258 (the "Complaint").  The Complaint

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

charged the defendant with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, in connection with his involvement in a massive international pyramid fraud scheme known as "OneCoin."  The CDCA Pretrial Services Office ("CDCA PTS") interviewed the defendant following his arrest.  CDCA PTS recommended that the defendant be detained, and identified the following factors indicating that the defendant was a risk of non-appearance: (i) foreign nationality and extensive foreign travel; (ii) lack of United States ties; (iii) unknown bail resources; (iv) unverified background; and (v) arrest on a fugitive warrant.  CDCA PTS also cited the risk of economic danger to the community.  At his presentment in CDCA on March 7, 2019, the defendant waived his right to an identity hearing and consented to his removal to SDNY.  The Government sought detention.  After argument, CDCA Magistrate Judge Gail Standish ordered the defendant detained and removed to SDNY.

On March 27, 2019, the defendant arrived in SDNY and was interviewed by the SDNY Pretrial Services Office ("SDNY PTS"), in order to assess the defendant's risk of flight and danger to the community.  SDNY PTS concurred with CDCA PTS and recommended that the defendant be detained, citing a series of factors underlying a risk of non-appearance similar to those identified by CDCA PTS, and a risk of ongoing economic danger to the community based on the nature of the charged offense.  At a subsequent presentment before Magistrate Judge Katherine Parker, the defendant did not make a bail application, and instead reserved the right to make such an application in the future.  Accordingly, Judge Parker ordered the defendant detained without prejudice to make a future bail application.

On May 28, 2019, the defendant consented to the filing of a one-count Superseding Information, S7 17 Cr. 630 (ER) (the "S7 Information"), charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.  The defendant waived indictment and was arraigned on the S7 Information before Magistrate Judge James Cott; the matter was then adjourned to this Court for an initial appearance on June 6, 2019.

On June 6, 2019, the parties appeared before Your Honor for an initial pretrial conference.  At that time, counsel informed the Court that the defendant intended to file a motion seeking release on certain bail conditions.  The matter was adjourned to July 19, 2019 for a pre-trial conference.

In the interim, on June 17, 2019, the defendant filed a letter appealing his detention, and requesting that the Court release him under certain bail conditions (the "Bail Letter").  Specifically, the defendant proposes the following bail conditions for his release:

- Full-time, self-funded armed security guards to monitor and accompany the defendant, at an unspecified residence to be rented by him in this district;
- A $20 million personal recognizance bond signed by five unspecified financially responsible individuals, secured by $1.5 million in equity from unspecified properties belonging to unspecified friends in the United States, and $8.5 million in cash from an unspecified source;
- Strict pretrial supervision;

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

- GPS location monitoring;
- Home incarceration with only visitors pre-authorized by the Government permitted inside;
- No contact between the defendant and his co-defendants outside the presence of counsel;
- No contact between the defendant and any known victims or witnesses;
- No use of the internet;
- No involvement with OneCoin business or contact with OneCoin employees;
- Surrender of the defendant's passport and any other travel documents with no renewals;
- No use of cellular telephones by the defendant, and computer use restricted to the review of discovery and note-taking for his defense; and
- Permission for the Government to search the defendant's residence and to tap his telephone to ensure compliance with the conditions of his release at any time.

## II.   <u>Applicable Law</u>

### A.   **Bail Pending Trial – Generally**

Under the Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  18 U.S.C. § 3142(e) (detention warranted where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community").  In seeking detention, the Government bears the burden of establishing risk of flight by a preponderance of the evidence, or dangerousness by clear and convincing evidence. *Id.* § 3142(f); *see United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) (a finding of dangerousness must be supported by clear and convincing evidence); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987) (a finding of risk of flight must be supported by a preponderance of the evidence).

The Government is not bound by the rules of evidence in discharging its burden at detention hearings, and is entitled to present evidence by proffer.  *See* 18 U.S.C. §3142(f)(2); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); *Ferranti*, 66 F.3d at 542 (same).

The Bail Reform Act lists the following four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the defendant, and (4) the seriousness of the danger posed by the defendant's release.  *See* 18 U.S.C. §3142(g); *United States v. Dreier*, 596 F.Supp.2d 831,833 (S.D.N.Y. 2009).  In assessing a defendant's history and characteristics, courts evaluate, among other things, the defendant's access to significant wealth and assets, ties—or lack thereof—to the United States, incentive and ability to flee, extent of international travel, ability to flee to jurisdictions from which he or she cannot be

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

extradited, and past instances of misleading courts or law enforcement authorities.  *See United States v. Zarrab*, 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (Court ordered continued detention of Iranian businessman defendant where his substantial wealth, extensive travel, and strong ties to jurisdictions without extradition provide "[the defendant] with the incentive and the wherewithal to flee and render him a flight risk.").

A defendant's lack of ties to the United States, and corresponding significant ties to foreign jurisdictions without extradition weigh heavily in favor of detention.  *See e.g., United States v. Boustani*, 356 F.Supp.3d 246, 255 (E.D.N.Y. February 4, 2019) ("the combination of Defendant's alleged deceptive actions, access to substantial resources, frequent international travel, *complete lack of ties to the United States, and extensive ties to foreign countries without extradition* demonstrates Defendant poses a serious flight risk") (emphasis added), *aff'd* No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019) (summary order); *Zarrab*, 2016 WL 3681423 (S.D.N.Y. June 16, 2016).

A defendant's access to substantial financial resources may also weigh in favor of detention, especially when those assets are located abroad.  *See Boustani*, 356 F.Supp.3d 246, 256-57 (E.D.N.Y. February 4, 2019), *aff'd* No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019) (summary order); *United States v. Ho*, 17-CR-779 (LAP), Dkt #116 (2d Cir Aug. 30, 2018) (summary order denying defendant's motion for release from detention where District Court had ordered defendant detained based on, among other things, the fact that the Government would be unable to prevent the defendant from using his vast financial resources located abroad to flee and reimburse individuals offering to secure a bond).

## B.     Bail Pending Trial – Release Under the Supervision of Private Security Guards

Courts have long been troubled by private jail proposals which, "at best 'elaborately replicate a detention facility without the confidence of security such a facility instills.'"  *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (citations omitted); *see United States v. Banki*, 369 F. App'x 152, 153-54 (2d Cir. 2010) (summary order) (it is not legal error "for a district court to decline to accept," as "a substitute for detention," a defendant hiring private security guards to monitor him).  In the *Banki* decision, the Second Circuit noted that it was "troubled" by the possibility of "allow[ing] wealthy defendants to buy their way out by constructing a private jail." (internal quotation marks omitted)).  *Accord, e.g.*, *United States v. Cilins*, No. 13 Cr. 315 (WHP), 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013) ("'it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the Government, even if carefully selected'" (quoting *Borodin* v. *Ashcroft*, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001)); *United States* v. *Valerio*, 9 F. Supp. 3d 283, 293-94 (E.D.N.Y. 2014) ("There is nothing in the Bail Reform Act that would suggest that a defendant (or even, hypothetically, a group of defendants with private funding) has a statutory right to replicate or construct a private jail in a home or some other location."); *but see United States* v. *Dreier*, 596 F. Supp. 2d 831, 834 (S.D.N.Y. 2009) (approving arrangement, but

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

ordering additional conditions with respect to, among other things, visitors and methods of
communication).

A recent SDNY decision reasoned that the private jail proposal presented did "not appear
to contemplate 'release' so much as describe[] a very expensive form of private jail or
detention." *United States v. Zarrab*, 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016); *see
also United States v. Boustani*, No. 19-344, 2019 WL 2070656, at *1 (2d Cir. Mar. 7, 2019)
(summary order) (affirming District Court's rejection of private jail proposal for defendant);
*United States v. Dan Zhong*, 682 F. App'x 71 (2d Cir. 2017) (summary order) (same).  Indeed,
"such [private prison] arrangements are never one hundred percent infallible[.]"  *United States v.
Cilins*, 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013) (quoting *Borodin v. Ashcroft*,
F.Supp.2d 125, 134 (E.D.N.Y. 2001)).[1]

Additionally, courts in this district and other districts have denied virtual private jail
solutions and ordered detention where defendants have failed to reveal how the arrangements
would be funded.  *See Zhong*, 682 F. App'x 71 (2d Cir. 2017); *United States v. Raniere*, 18-CR-
204 (NGG), 2018 WL 3057702, at *7-8 (E.D.N.Y. June 20, 2018) (detaining defendant based
upon flight risk where defendant had no declared assets but appeared to have access to enormous
resources offered to be guarded by a private security company); *Zarrab*, 2016 WL 3681423, at
*10.

## III.   Discussion

The combination of factors supporting detention in this case—which the Court must
consider not separately, but together in view of the totality of the circumstances, *see Boustani*,
356 F. Supp. 3d at 255 ("This Court must look to the totality of the circumstances and of
Defendant's characteristics, which ultimately demonstrate a risk of flight.")—are truly
exceptional.  There is simply no set of conditions that will reasonably assure the defendant's
appearance in this case or the safety of the community.  Accordingly, the Court should
summarily deny the defendant's release on his proposed bail package—a package, it bears
noting, that would be funded entirely by criminal proceeds earned from the charged offense.

---

[1]  As noted in the District Court's decision in *Boustani*, "[Security guard company] employees
would face a clear conflict of interest – private prison guards paid by an inmate . . . 'the
defendant in *United States v. Ng Lap Seng*, S5 15-CR-706 (VSB), who was released to private
armed guards from [security guard company] in an arrangement similar to what defendant
proposes here, was outside of his apartment virtually all day, every weekday; was visited by a
masseuse for a total of 160 hours in a 30-day period; and went on an unauthorized visit to a
restaurant in Chinatown with his private guards in tow.'"  *United States v. Boustani*, 356
F.Supp.3d 246, 257 (E.D.N.Y. February 4, 2019), *aff'd* No. 19-344, 2019 WL 2070656 (2d Cir.
Mar. 7, 2019).

Honorable Edgardo Ramos
United States District Judge
June 27, 2019


### A.    Risk of Flight

Just like the defendant in *Zarrab*, 2016 WL 3681423, Mr. Ignatov's "lack of ties to the United States; his significant wealth and his substantial resources; his extensive international travel; and his strong ties to foreign countries, including countries without extradition," among other factors, provide him "with the incentive and the wherewithal to flee and render him a flight risk."  *Id.* at *8.  Of the cases involving proposed monitoring by private security guards, the defendant is most similarly situated to Jean Boustani, a foreign national alleged to have committed a multi-billion dollar fraud scheme, whom the Court detained despite a proposed bail package similar to the one described by the defendant.  The *Boustani* court found that "the combination of Defendant's alleged deceptive actions, access to substantial financial resources, frequent international travel, complete lack of ties to the United States, and extensive ties to foreign countries without extradition demonstrates Defendant poses a serious risk of flight." *United States v. Boustani*, 356 F.Supp.3d at 255 (citing *Zarrab*, 2016 WL 3681423, at *8; *United States v. Epstein*, 155 F.Supp.2d 323, 326 (E.D. Pa. 2001)).[2]  Given the totality of circumstances presented here, the defendant poses an even more substantial risk of flight than did Zarrab or Boustani—both of whom were detained pending trial—particularly given the evidence that the defendant's sister, co-conspirator, and self-admitted "best friend" has herself fled prosecution in connection with this very case.

First, as noted in both Pretrial Services reports and by Judge Standish, the defendant has no ties whatsoever to the United States.  (*See* March 7, 2019 CDCA Detention Hr'g Tr. ("March 7 Tr."), attached hereto as Exhibit A, at 6 ("he has no ties to the United States")).  The defendant has no family, employment, residence, or property in the United States.  International travel records for the defendant obtained by the Government show only three entries into the United States: a one-week trip to New York in February 2016, a connecting stop between Europe and South America at Miami International Airport in July 2018, and the recent one-week trip to Los Angeles and Las Vegas in February-March 2019.  As the Court is aware, the defendant was arrested in March 2019, just before boarding an outbound flight to Istanbul, Turkey, en route to Sofia, Bulgaria.

On the other hand, the defendant has an extensive international travel history, and maintains strong ties to foreign countries, particularly to Bulgaria, where he resides, and to Germany, where he possess citizenship.  As described in the Complaint, since December 2017, the defendant has travelled all over the world to appear at OneCoin events, including in Thailand, Singapore, Colombia, Argentina, Brazil, Paraguay, Bulgaria, France, and Spain.  (*See* Complaint at ¶¶ 7, 21).  Moreover, and crucially, Germany will not extradite its citizens to the

---

[2]  Since the District Court's February 4, 2019 Decision and Order in *Boustani*, 356 F.Supp.3d 246, the Second Circuit has twice upheld the District Court's denial of Boustani's bail applications.

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

United States to face criminal charges.[3]  OneCoin Ltd. also has significant ties to Dubai, United Arab Emirates ("UAE")—another country which will not extradite to the United States—including a physical office and accounts at financial institutions there, providing another location to which the defendant could easily flee prosecution.  The defendant's access to substantial assets and to the resources that allowed his sister to disappear and evade law enforcement detection, described further below, would enable his escape to these jurisdictions.

Second, the defendant has access to significant foreign assets, amassed as a result of his involvement in the charged fraud scheme.  Records obtained by the Government show that, between the fourth quarter of 2014 and the third quarter of 2016 alone, OneCoin Ltd. generated €3.353 billion in sales revenue and earned "profits" of €2.232 billion.  (Complaint at ¶ 5).  The defendant has been employed by OneCoin for approximately four years, having started in approximately 2015 as the personal assistant for his sister Ruja Ignatova ("Ruja"), who founded OneCoin with a second individual.[4]  During that period, he was responsible for, among other things, controlling OneCoin-related cash proceeds drop-offs at OneCoin Ltd.'s Sofia office, often hundreds of thousands of euros at a time, and sometimes even more.[5]  Following Ruja's disappearance in or about October 2017, the defendant ascended to a high-level executive position at OneCoin Ltd.  In that position, he has had direct access to foreign bank accounts holding huge sums of money.  For example, evidence found on the defendant's cell phone reveals that the defendant possessed account opening statements and transactional data for purported UAE investment fund accounts into which at least €185 million of OneCoin fraud proceeds were deposited, and that the defendant referred to the funds in the accounts as "our $."  (*See* Complaint at ¶¶ 14(d)-(e), 52(a)-(g).)

Indeed, the defendant's access to massive financial resources is confirmed by statements he made during his CDCA PTS interview.  Specifically, the CDCA PTS Report indicates that the defendant told the interviewer that "bail is not an issue, as his family can wire *any amount* to cover it" (emphasis added).  Notably, outside of OneCoin fraud proceeds, the Government is not aware of any source of income for the defendant and his family.  Given the incredible fraud-related wealth possessed by the defendant and his family members, there is every reason to believe that the defendant would use these resources to flee prosecution in the United States by

---

[3]  The Government has confirmed with the attorney who handles German extradition issues at the Department of Justice's Office of International Affairs ("OIA"), that Germany will not extradite even where the German citizen in question was originally arrested in the United States and subsequently fled prosecution to Germany.

[4]  The defendant's mother, Veska Ignatova—who submitted a supporting letter as Exhibit No. 15 to the defendant's bail application—is also heavily involved in OneCoin Ltd., having served as a manager or director of certain corporate entities directly connected to OneCoin Ltd.

[5]  The Government's investigation has established that while a significant portion of OneCoin fraud proceeds entered the international banking/financial system, a large sum has also been amassed in cash.

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

any means necessary.[6]

Third, the defendant has lied repeatedly to Government officials—including during his CDCA PTS interview, meant to examine the very issue of appropriate bail—establishing that he cannot be trusted to comply with any conditions of release considered by the Court. For example, upon his entry into the United States, the defendant told Customs and Border Patrol ("CBP") officers that he had travelled to the U.S. to "visit his friend," and that he was "self-employed as a public speaker." (Complaint at ¶¶ 39(a), 39(c)). In fact, he came to the U.S. to participate in OneCoin-related events, and as noted above, he holds a high-level executive position at OneCoin Ltd. (*See* Complaint at ¶¶ 40, 45-48). In a post-arrest statement to case agents, the defendant lied repeatedly, including by claiming that he was visiting the U.S. on vacation and that he still served as his sister's "personal assistant," while at the same time acknowledging that she disappeared in 2017. He further claimed that he had not communicated with her since her disappearance, despite the fact that a border search of his laptop revealed a form granting the defendant power of attorney over his sister Ruja's affairs, signed by Ruja and dated February 8, 2018.[7]

Those misrepresentations, however, are not as central to the issue of bail as those the defendant told during his CDCA PTS interview. Among other lies, with respect to his financial resources, the defendant claimed that he owned a residence in Sofia, Bulgaria, valued at approximately €200,000, and that he paid a monthly mortgage bill of €300. In fact, the Government's investigation has established the Ruja purchased a home for the defendant worth over €3 million using OneCoin proceeds, and that the defendant has no mortgage obligation with respect to the house. The defendant also claimed to CDCA PTS that, with respect to his use of drugs and alcohol, he tried marijuana once when he was about 16 years old. In fact, the Government's investigation has revealed that the defendant had a long-time substance abuse problem in the past, and that he was a regular user of alcohol, cocaine, and methamphetamine, among other drugs, during that period. And contrary to the defendant's assertion that he earns only €3,000 per month at OneCoin Ltd., the Government's evidence indicates that even when he was serving in the capacity as Ruja's personal assistant, he earned as much as €10,000 to €20,000 a month in salary.

In short, the defendant has shown his willingness to flagrantly misrepresent facts to CBP agents, case agents, and even the Court. Particularly in light of all of the other factors described

---

[6] In this regard, it bears noting that the Government's investigation has revealed a pattern of regular corrupt payments to government officials around the world in order to facilitate the OneCoin fraud scheme.

[7] Notably, although CBP officers returned the laptop to the defendant at the conclusion of the border search conducted on his way into the U.S., when the defendant was arrested one week later at Los Angeles International Airport, on his way out of the U.S., the defendant's laptop was nowhere to be found.

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

herein, the Court cannot and should not trust him to comply with any conditions of release.

Fourth, the strength of the evidence against him and the likely sentence he faces if convicted provide the defendant with an incredibly strong incentive to flee.  Because some of the Government's evidence is laid out in depth in the Complaint, we do not repeat those facts here.  As just one example of the strength of the case against the defendant, the Government attaches as Exhibit B a portion of the June Conference Call relating to the June 2018 Romania Event, during which a BMW was auctioned for 3.6 million OneCoin, resulting in the subsequent cancellation of the sale.  (*See* Complaint at ¶¶ 13(c)-(d), 32).[8]  This audio recording, among many other pieces of evidence, proves the defendant's knowledge that OneCoin was nothing more than a fraud scheme.[9]

Given the massive loss amount associated with the OneCoin scheme, the applicable Guidelines sentence associated with the single wire-fraud conspiracy count contained in the S7 Information is equivalent to the statutory maximum sentence on that count, *20 years' imprisonment*, even considering a reduction of three levels under Section 3E1.1 were the defendant to plead guilty.  Moreover, as it has already informed the defendant, the Government will very likely supersede the Information with additional charges, including one or more money laundering offenses, resulting in a significantly higher applicable Guidelines sentence.  Thus, the defendant has every reason to take advantage of the massive OneCoin-generated wealth at his disposal to violate any conditions set by the Court in order to flee prosecution to Germany, the UAE, or elsewhere, where he will be safe from extradition.

The factors above would be more than sufficient to support a finding that no conditions would reasonably assure the defendant's appearance in this case.  But here, the Court has an unprecedented additional reason to deny this defendant bail.  The defendant's own sister, Ruja, herself successfully staged a total disappearance almost immediately after sealed charges were filed against her by the United States, a fact left entirely unaddressed by the defendant in his Bail Letter.  The Government's investigation revealed that Ruja and other OneCoin principals acquired unauthorized access to otherwise confidential information regarding law enforcement operations.  (Complaint ¶ 15).  Shortly after her indictment under seal in the U.S. on October 12, 2017 (*see* Dkt. No. 52), Ruja departed Bulgaria, not to emerge publicly again (Complaint ¶ 17).  The Government's investigation has revealed the Ruja had an escape plan all along in case of trouble with the authorities.  A September 2016 message chain between Ruja and the second founder of OneCoin regarding Ruja's concerns about being arrested when travelling through the Frankfurt airport demonstrate that the defendant was himself aware of that plan.  (*See* Complaint at ¶ 37 ("If [something] happens.  My brother knows what to do and will inform you.")).

---

[8]  A publicly available video showing the BMW auction, which has been preserved by the Government, may presently be viewed here:  https://www.youtube.com/watch?v=TcAlgyzWxlk.

[9]  This evidence also directly contradicts the views of the defendant's many supporters who have written letters in support of his bail application, in which they disclaim any possibility that the defendant could have committed the charged offense.

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

Moreover, the February 2018 power of attorney form found on the defendant's laptop establishes that—contrary to the claims that he made during his post-arrest statement—the defendant has in fact communicated with Ruja since her October 2017 disappearance.

In short, this is not a case where the Court need merely speculate about the possibility of the defendant's flight were he to be released. There is ample evidence that as operators of a massive international fraud scheme that raked in billions of dollars in criminal proceeds, members of the defendant's family actually have the resources and wherewithal to mount an international escape plan. This is all the more true, when, as discussed below, the very authorities meant to monitor the defendant—i.e., *private* 24/7 security guards—are on that family's payroll.

### B.    Economic Danger to the Community

The defendant's release would also pose a substantial risk of ongoing economic harm to the community. Such harm may be considered in evaluating danger to the community under Section 3142 of the Bail Reform Act. *See, e.g., United States v. Madoff*, 586 F. Supp. 2d 240, 252 (S.D.N.Y. 2009) ("[T]here is support for considering economic harm in evaluating danger to the community under § 3142 of the Bail Reform Act."); *see also United States v. Reynolds*, 956 F.2d 192, 192–93 (9th Cir. 1992) (danger to community may extend in some cases to pecuniary or economic harm); *United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979) (danger not limited to physical harm); *United States v. Dekhkanov*, 2:11 Cr. 581 (JFB) (E.D.N.Y. Oct. 20, 2011) (ECF No. 41-2 at 26:8–28:3 (determining that defendant's ability to access others' identities and continue fraud warranted detention)); *United States v. Jinwright*, No. 09 Cr. 67, 2010 WL 2926084, at *3 (W.D.N.C. July 23, 2010) (economic danger provides adequate basis for detention under the Bail Reform Act); *United States v. Persaud*, No. 05-CR-368, 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5, 2007) (agreeing that economic harm qualifies as a danger under the Bail Reform Act).

The OneCoin fraud scheme continues to operate to this day. As the Complaint makes clear, the defendant travelled to the United States in March 2019 to engage in discussions related to the operations of OneCoin, and associated entities such as DealShaker, here in the U.S., where thousands of victims have already been defrauded to the tune of tens of millions of dollars as part of the OneCoin fraud scheme. Following the defendant's arrest, a OneCoin promoter posted online a message directed to the U.S. OneCoin community concerning the arrest, in which the promoter stated, among other things:

> I don't personally believe that [Konstantin] is guilty of any crime here in the USA or abroad . . . [I]f the judge believes there is insufficient evidence for a trial, then Konstantin will be released. I personally believe there will be a trial, no matter what evidence they conjure up, because OneCoin and OneLife are such a huge threat to the USA government and banking system . . . Konstantin would appreciate hearing from each of us, especially from USA members,

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

> letting him know that we feel badly how the USA greeted our
> captain on his first visit here in the USA . . . The more
> correspondence he receives from the USA, the better our case for
> corporate support for the USA in the future.  We were so close to
> getting the USA adopted back into the family, and now we are
> further than ever from that direct support.[10]

Immediately after the defendant's arrest on the Complaint, OneCoin Ltd. issued a press release incorrectly stating that "Mr. Ignatov has not been formally charged with a crime" and correctly noting that he "is entitled to the presumption of innocence."  Moreover, in early June 2019, OneCoin issued a press release claiming that a Swedish investigation into OneCoin was closed; the release ended with the following statement: "We sure hope the fact that all allegations against OneCoin in Sweden have dropped serves as an example to the public that there are many rumors, circulating online, and they should definitely be disregarded."

The defendant's efforts to further expand OneCoin's business in the United States just before he was arrested in March 2019 and OneCoin Ltd.'s efforts to cast doubt on the charges as the fraud scheme continues to operate suggests that the defendant's release would seriously jeopardize the economic safety of the community.  Even under strict bail conditions, the defendant could surreptitiously continue his marketing efforts in support of OneCoin Ltd., especially with cooperative monitoring guards.  Moreover, the very fact of his release, would likely further embolden OneCoin Ltd. and its promoters, providing fodder for a false narrative to additional victims that the defendant and OneCoin have been exonerated.  Accordingly, the Court should also detain the defendant on the ground that no series of conditions would protect against ongoing economic danger to the community.

### C.    The Defendant's Proposed Bail Package

The Government submits that there is simply no set of conditions that could appropriately address the defendant's risk of flight or economic danger to the community.  That said, the particular conditions proposed by the defendant are inadequate to ensure his reasonably appearance in this case and the safety of the community.

As an initial matter, the defendant's proposal to provide his own monitoring and security is deeply flawed, particularly given that the Government's evidence has revealed OneCoin Ltd.'s involvement in regular acts of corruption around the world in furtherance of the charged fraud scheme.  As a threshold matter, district courts and the Second Circuit have raised grave concerns about such arrangements, on both practical grounds—including the exact nature of the security to

---

[10]  At the conclusion of the post, the OneCoin promoter solicited letters in support of the defendant from OneCoin members, to be sent to the defendant's counsel, Jeffrey Lichtman, Esq. It is unclear whether any of the letters attached as exhibits to the Bail Letter originated as a result of this solicitation.  Regardless, the content of the letters does not alter the analysis of the bail factors described herein.

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

be provided and the private guards would themselves be appropriately monitored by the Court—
and on moral grounds—i.e., legitimate concerns regarding the availability of such "private jails"
for only the wealthy.  Given the enormous foreign financial assets accessible to the defendant,
and the history of his sister's (and co-conspirator's) successful flight from prosecution,
monitoring by inherently conflicted private security guards is entirely insufficient to address the
risks of flight and ongoing economic danger to the community in this case.  Moreover, given that
the defendant does not have any source of income other than the OneCoin scheme, any such
arrangement will ultimately be paid for by the victims of the defendant's fraud.

      The other purported safeguards fare no better.  The defendant makes reference to a rental
apartment in New York where he could stay.  Notably, in his SDNY PTS interview, the
defendant stated cryptically that he had "access to an apartment in New York City," but claimed
that he could not provide information regarding the apartment.  Notwithstanding that several
months have passed since the SDNY PTS interview, the defendant provides no further details
regarding the location of the apartment, or how it would be paid for in his bail application.
Likewise, he offers no details regarding the source of the proposed $8.5 million cash security, the
source of "equity in property belonging to friends in the U.S.," the identities of such friends, or
the identities or even location/citizenship of the five individuals he proposes to sign his $20
million bond.  In short, even were these conditions appropriate in light of all of the factors
discussed above (which there are not), any specificity to the defendant's proposal which would
be critical to evaluating its strength, is completely lacking.

      Moreover, the cases cited by the defendant in support of his proposed bail package are
readily distinguishable.  First and foremost, not one of those cases contemplated the flight of an
immediate family member and conspirator in the charged conspiracy.  That unprecedented fact
alone is enough to place this case in an entirely different category from those set forth by the
defendant in his bail application.  That said, the cases differ in other important ways.  For example:

- The defendant in *United States v. Ng Chong Hwa*, 18 CR 538 (MKB) (E.D.N.Y.),
  voluntarily waived extradition from Malaysia and the bail package in that case was agreed
  upon by the parties.
- The defendant in *United States v. Nejad*, 18 CR 224 (ALC) (S.D.N.Y.), had substantial
  ties to the U.S., including the fact that he had obtained permanent residence status and that
  his mother and children were U.S. citizens.
- The defendant in *United States v. Khashoggi*, 717 F. Supp. 1048 (S.D.N.Y. 1989), declined
  to appeal his extradition from Switzerland, where he was arrested, and the Royal Consulate
  General of Saudi Arabia, the country in which the defendant maintained citizenship,
  guaranteed his appearance at trial.
- The defendant in *United States v. Bodmer*, 2004 WL 169790 (S.D.N.Y. 2009), lacked
  access to substantial financial resources, had longtime family friends in the U.S. whose
  home collateralized the bond, and waived extradition from South Korea to appear for
  prosecution in the U.S.
- The defendant in *United States v. Ng Lap Seng*, 15 CR 706 (VSB) (S.D.N.Y.), owned an
  apartment in New York City, establishing some tie to the District; that residence secured

Honorable Edgardo Ramos
United States District Judge
June 27, 2019

    the defendant's bond, and he agreed to home incarceration in that residence as a condition of his bail; and, as described above in footnote one, the self-funded private security guard monitoring arrangement failed to prevent significant violations of the defendant's bail conditions.

- The defendant in *United States v. Webb*, 15 CR 252 (E.D.N.Y.), had substantial ties in the U.S., owning a residence in Georgia and having attended college in Georgia; moreover, the defendant consented to extradition from Switzerland to appear for prosecution in the U.S.

- Finally, the cases cited by the defendant involving U.S. citizens, including the prosecutions of Bernie Madoff and Marc Dreier, are completely inapposite here.

    In sum, none of the cases cited by the defendant alter the analysis of the bail factors described above, clearly establishing that no combination of bail conditions will secure the defendant's appearance in this case or protect the community from ongoing economic danger.

**IV.**    **Conclusion**

    For all of the reasons described above, and consistent with the recommendations of CDCA PTS and SDNY PTS, and the prior detention ruling of the Honorable Gail J. Standish, the Court should order that the defendant, Konstantin Ignatov, continue to be detained pending trial.

                Respectfully submitted,

                GEOFFREY S. BERMAN
                United States Attorney

        By:      _____/s/_____
                Christopher J. DiMase / Nicholas Folly
                Assistant United States Attorneys
                (212) 637-2433 / 1060
                Julieta V. Lozano
                Special Assistant United States Attorney
                (212) 335-4025

cc:    Jeffrey Lichtman, Esq. (by ECF and electronic mail)
       Jeffrey Einhorn, Esq. (by ECF and electronic mail)

# EXHIBIT A

```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION - LOS ANGELES



UNITED STATES OF AMERICA,   )   Case No. MJ 19-934-1
                            )
      Plaintiff,            )   Los Angeles, California
                            )   Thursday, March 7, 2019
          v.                )   3:16 P.M. to 3:35 P.M.
                            )
KONSTANTIN IGNATOV,         )
                            )
      Defendant.            )
_____)
```

```
                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE GAIL J. STANDISH,
                  UNITED STATES MAGISTRATE JUDGE.
```

Appearances:              See Page 2

Deputy Clerk:             Earlene Carson

Court Reporter:           Recorded; CourtSmart

Transcription Service:    JAMS Certified Transcription
                          16000 Ventura Boulevard #1010
                          Encino, California  91436
                          (661) 609-4528

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

1    APPEARANCES:

2

3    For the Plaintiff:        The United States Attorney's Office
                                Central District of California
4                               Criminal Division
                                By:  MARINA TORRES
5                               312 North Spring Street, 12th Floor
                                Los Angeles, California  90012
6                               (213) 894-2400
                                USACAC.Criminal@usdoj.gov
7

8

9    For the Defendant:        Federal Public Defender
                                Central District of California
                                By:  CAREL ALE
10                              321 East Second Street
                                Los Angeles, California  90012-4206
11                              (213) 894-5186
                                carel_ale@fd.org
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    LOS ANGELES, CALIFORNIA, THURSDAY, MARCH 7, 2019, 3:16 P.M.

2        (NO READING OF STATEMENT OF RIGHTS AVAILABLE)

3            THE CLERK:  Calling case No. 19-934-1,

4    *USA v. Konstantin Ignatov.*

5            Counsel, please state your appearances.

6            MARINA TORRES:  Good afternoon.  Marina Torres for

7    the United States.

8            THE COURT:  Good afternoon, Ms. Torres.

9            CAREL ALE:  Good afternoon, Your Honor.  Carel Ale

10   on behalf of Mr. Ignatov, who's present and in custody today.

11           THE COURT:  Good afternoon again, Ms. Ale.

12           Okay.  My understanding from my courtroom deputy is

13   that this case is still at this point under seal?

14           MS. TORRES:  That's correct and --

15           THE COURT:  Are we going to unseal it just with

16   respect to this defendant or --

17           MS. TORRES:  Yes.

18           THE COURT:  -- is it ready to be unsealed

19   completely?

20           MS. TORRES:  I believe there's only one defendant,

21   Your Honor.

22           THE COURT:  Oh, is it just the single -- I need to

23   look again.

24           MS. TORRES:  I could be wrong but let me -- yes, I

25   believe there's only --

1              THE COURT:  It's the -- okay.

2              MS. TORRES:  Uh-huh.

3              THE COURT:  All right.  I'm assuming I have a

4    motion, then, by the -- from the Government to unseal the

5    case?

6              MS. TORRES:  Yes, Your Honor.

7              THE COURT:  And that motion is granted.

8              And I want to find out, Ms. Ale, have -- you have

9    had an opportunity -- you have the complaint and --

10             MS. ALE:  I do, Your Honor.

11             THE COURT:  Okay.

12             All right.  Mr. Ignatov, before we go any further,

13   I wanted to make sure you'd had an opportunity before these

14   proceedings started to be advised of your constitutional and

15   statutory rights.

16             THE DEFENDANT:  Yes.

17             THE COURT:  Did you have an opportunity to discuss

18   those rights with counsel prior to now?

19             THE DEFENDANT:  Yes.

20             THE COURT:  And is this your signature on the --

21             THE DEFENDANT:  Yes.

22             THE COURT:  -- the advisement document?

23             I also have before me a financial affidavit.  My

24   understanding -- two things.  First of all, this is an out-

25   of-district complaint, and my understanding, sir, is also

1    you're not a resident here in the U.S.; is that correct?

2              THE DEFENDANT:  Exactly.

3              THE COURT:  So what I'm going to do is I'm going to

4    -- I've reviewed this and -- because the likelihood is that

5    in the future this case is going to be in another district.

6    I'm going to, based on the information contained herein,

7    appoint the Federal Public Defender's Office, specifically

8    Ms. Ale, today to represent you in all proceedings here in

9    this district.  It will be up to the magistrate judge or the

10   district judge in the charging district, if this case

11   proceeds that far, to potentially revisit this given the

12   amount of the assets but the fact that none of them are

13   really located here in the United States.

14             Sir, I previously sort of hinted at but I wanted to

15   ask you more directly:  Have you had an opportunity to go

16   over the complaint in this case -- the charging district from

17   New York -- with Ms. Ale before these proceedings?

18             THE DEFENDANT:  I just had an eye on it.  Yeah.

19             THE COURT:  Okay.  I'm not asking you to admit or

20   deny anything that's contained in that, but do you understand

21   what it is the Government contends that you have done?

22             THE DEFENDANT:  Yes.

23             THE COURT:  All right.  I have a written notice of

24   a request for detention from the Government on this case and

25   the Pretrial Services Report and its recommendation as well.

1              Ms. Ale, how do you want to proceed today?

2              MS. ALE:  We're asking for release on his own

3    recognizance, Your Honor.  We contend that the Government is

4    not entitled to a detention hearing today.  This is not a

5    presumption case, and there's nothing in his history that

6    would suggest that Mr. Ignatov is a flight risk, other than

7    his alienage, which, as the Court knows, is not conclusive as

8    to flight risk.  Further, Mr. Ignatov has the resources to --

9              THE COURT:  Well, let me make them make their

10   proffer.  I do find that they do have -- have properly asked

11   for a hearing.  They're entitled to a hearing because all

12   they need to do is state that they have a belief that he's --

13   a serious belief that he's a flight risk.  There is a basis,

14   at least, for that because of the fact that he has no ties to

15   the United States and would have to actually stay in a hotel,

16   but let me make them, then, make their proffer in their

17   opening argument, and then you can respond to that, Ms. Ale.

18             MS. ALE:  Thank you, Your Honor.

19             MS. TORRES:  Yes, Your Honor, and so we would

20   proffer the Pretrial report as well as its recommendation, in

21   addition to the complaint and all the supporting documents in

22   support of our argument that the -- that defendant does merit

23   detention to secure both that he won't abscond, that he will

24   appear in the Southern District of New York, but also to

25   protect against the danger to the community.

1          Here, of course, the danger -- being the type of

2  case that it is, the type of danger here is economic.  We're

3  talking about billions of dollars of cryptocurrency in

4  criminal profits to the company, a company that the defendant

5  heads.  He's actually -- he has not been truthful with the

6  agents in various post-arrest statements.  He has actually

7  stated that he works as a personal assistant for OneCoin, the

8  company that's at issue here, but, in fact, he's actually

9  represented himself numerous times publicly in videos as the

10  leader of OneCoin, the company that is the focus of the

11  accusations here as a -- frankly, as a Ponzi scheme.

12          The defendant also lied to the border agents when

13  he gained entry into the United States.  He lied about the

14  purpose of the trip, stating that it was to visit a friend,

15  but our understanding and the evidence that we've seen so far

16  demonstrates that he was in the United States purely to

17  conduct business that's related to the charged offenses in

18  this case.

19          He's also, again, lied about his employment.  He's

20  saying he's just self-employed as a motivational speaker

21  when, again, he's actually the top leader.  He took over his

22  sister, who used to be the top leader of the organization, I

23  believe it was, until about October or December of 2017.

24  She's actually absconded, I think, absconded the day after

25  the indictment was filed under seal in her case.  So after

1 her absconding from the authorities, that's when the

2 defendant took over as top operational person for this

3 company.

4      As Your Honor has no doubt read in the complaint,

5 the evidence is very strong regarding the defendant's

6 involvement in but also leadership of the fraud scheme here.

7 The -- he has access to an incredibly sophisticated network

8 of international money launderers that are used by OneCoin to

9 move and hide millions of dollars of criminal proceeds.  I

10 believe it's about -- the evidence so far has shown that he

11 has access to at least $200 million in OneCoin proceeds.

12      The number of victims is numerous and encompasses

13 the world.  We know of several in the Southern District of

14 New York, throughout various states in the United States.  So

15 it's one of the larger fraud schemes.  The Southern -- I've

16 spoken to the Southern District of New York AUSAs that are

17 responsible for this, and this is obviously a very large case

18 for them.  The number of victims, the number of -- the amount

19 of fraud that's at issue here very much so speaks to the

20 danger that the defendant poses to the community if allowed

21 to be released on bond.

22      In terms of nonappearance, it's laid out in the

23 Pretrial report.  He has absolutely no ties to the

24 United States.  I believe he's been here twice and then the

25 third time, here, when he was arrested.  He is a German

1   citizen.   Germany will not extradite German citizens to the

2   United States for criminal prosecution.   He was arrested at

3   LAX airport when he was about to board an international

4   flight to Istanbul en route to Bulgaria, which is where

5   OneCoin is based, and I believe, also, in the Pretrial report

6   it shows he actually has many international contacts.   So he

7   obviously flies around the world, frankly, very, very

8   frequently.

9          Again, in addition, the access to financial -- to

10  substantial financial resources here is of concern, and then

11  amount of time he's facing given the amount of money that's

12  at stake here is quite large.   I think the statutory max for

13  just the current charges, and we believe there's going to be

14  more, is 20 years, the guidelines including life

15  imprisonment, and, again, we do -- we feel very confident

16  that other charges, including money laundering charges, will

17  be filed shortly.

18         The last thing I'll mention in terms of

19  dangerousness was that, according to our investigation, we do

20  believe that the defendant is directly associated with

21  significant players in Eastern European organized crime.   The

22  head of security at OneCoin is a large-scale international

23  drug trafficker, and it's actually that same head of security

24  that was involved in the disappearance of the defendant's

25  sister when she absconded from the filed charges in her case,

1    and we know he knows and talks to the head of security

2    because his -- that phone number was recovered from the phone

3    of defendant.

4            So, again, although I do understand he has no

5    criminal history, I think the size of the case, the potential

6    number of victims, the large degree of money that's involved

7    here, and the sophisticated nature of the criminal enterprise

8    and, in particular, knowledge -- his knowledge and leadership

9    of it is very much of concern to the Government.

10           THE COURT:  Yeah.  And, frankly, I would not

11   necessarily expect, if he's only been in the United States a

12   few times, for him to have a criminal history that

13   Pretrial Services could access, but I won't take into

14   consideration a criminal history here.

15           Ms. Ale, you have a very uphill battle.  I tend to,

16   you know, agree that the -- that there is both -- because of

17   the nature of the cryptocurrency-type transactions it -- and

18   that he does have access to the ability to get funds, and

19   potentially even without passport travel documents, and, you

20   know, it's -- again, this also arises out of another district

21   that has a whole lot more information.

22           The one thing I would be inclined to do, if you

23   requested it -- and I -- again, I will let you make your

24   complete record on this, but I do think he is both an

25   economic danger and a flight risk -- is I can make my order

1    that he's detained specifically pending his initial

2    appearance in the charging district should he still wish to

3    -- I have a waiver form, we haven't talked about it yet, but

4    should he still wish to waive and go back to the district of

5    New York so that he would be required to get another

6    detention hearing.  He wouldn't have any of that -- there's

7    an issue sometimes about whether or not they're automatically

8    entitled to one.  If I make the detention pending his initial

9    appearance, he'll have to have one at his initial appearance

10   there, and those arguments can be made when both the AUSA in

11   the charging district and his counsel for all further

12   proceedings are more up to speed on the case.

13           So let me, actually, hear from you now, but I will

14   tell you my inclination is to detain him at this point.

15           MS. ALE:  Thank you, Your Honor, and we would ask

16   for a detention ruling to be without prejudice to Mr. Ignatov

17   seeking bond in the charging district.

18           I would like to remind the Court that, you know,

19   these are simply allegations.  They have not been proven, and

20   they're supposed to receive the least weight of all the

21   factors.  Mr. Ignatov's history is one of being compliant.

22   He has no criminal history here or anywhere else.  He's never

23   been arrested.  He had no idea that he was being -- that he

24   was being investigated here or anywhere else.  His sister's

25   criminal history or his sister's actions, in any case, have

1  no reflection on Mr. Ignatov and shouldn't.  I understand

2  that these are serious charges, but they are simply

3  allegations at this point.

4        THE COURT:  Yeah, but they are very detailed,

5  single-spaced allegations that some other judge, not myself,

6  has read through probably even more thoroughly than I did and

7  found that there was probable cause to believe them.  And I

8  do understand it's the least-important factor amongst the

9  factors, but it's not one that gets thrown by the wayside,

10  and the problem is he has, in the Court's view, the ability

11  -- you know, no place to stay here, no bail resources here.

12  There's no resources whatsoever that the Court could get

13  jurisdiction over-- zero, absolutely zero.  So there's no way

14  the Court sees, at least in my view, to tie him here.

15        I will make the finding a detention not only

16  without prejudice, but the detention order would say, and

17  Ms. Torres can talk to the AUSA there just so that they're

18  aware because he will have an appearance there, that he is

19  expecting another detention hearing and my detention order

20  only goes through that initial appearance.  So that I would

21  be willing to do.

22        MS. ALE:  Thank you, Your Honor, and --

23        THE COURT:  Go ahead.

24        MS. ALE:  I'm sorry to interrupt.  If I may

25  complete my record.

1          Mr. Ignatov's family has already been in touch with

2    an attorney -- a private practice -- on the East Coast that

3    would be handling his case.  I've spoken with his attorney at

4    Schertler & Onorato LLP law firm, and she has represented to

5    me that his family is willing to put up the resources that he

6    would need in order to travel to New York and appear for

7    these charges, that they have already contacted her to make

8    arrangements to have him represented.  He and his family want

9    to answer for these charges and are willing to sign a bond or

10   if the Court would be amenable to putting up cash bail in

11   this case.

12          He has the resources to travel to New York, to stay

13   at a hotel.  He would give up his passport.  He's willing to

14   be on GPS monitoring.  Although he is a German citizen, he

15   has lived in Bulgaria for the last three years.  Bulgaria

16   does extradite people to the United States.  And I would

17   submit that his alienage does not mean that he is a flight

18   risk or that he poses a danger to the community.

19          THE COURT:  Okay.  The Court -- based on the

20   arguments of counsel, the Pretrial Services Report and its

21   recommendation of detention, the proffer of the Government,

22   including the detailed allegations in the complaint does --

23          (Background noise.)

24          THE COURT:  I would say it's, like, a C minor,

25   maybe?

1          (Laughter.)

2          THE COURT:  -- does find that the defendant at this

3 time is both by clear-and-convincing evidence an economic

4 danger to the community and by preponderance that no

5 condition or combination of conditions would adequately

6 assure his attendance at further proceedings either here or

7 in the charging district of the Southern District of

8 New York.

9          The Court, as it has stated on the record, will

10 note on its written order that this finding -- or this order

11 of detention is good through the initial appearance in the

12 charging district so that, when he has his retained counsel

13 in New York in the charging district, he may make all of

14 these arguments again and perhaps be able to present evidence

15 sufficient to the judge there.  Right now I just don't have

16 anything other than his say-so and your -- I mean, I trust

17 you, but that there's been contact and there's a sufficient

18 basis to believe that there are adequate conditions that

19 could be applied.  So that'll be the Court's ruling for

20 today.

21          You know, sir, I always ask this because sometimes,

22 after somebody has been ordered detained, they decide that

23 they're not as fond of the waiver that they have just

24 presented to the Court in writing, and so I need to make sure

25 it's a knowing and adequate waiver -- or knowing and

1   voluntary waiver.

2          I do have in front of me a form that it appears

3   that you and counsel signed stating that it's a waiver of

4   rights for out-of-district cases.  Where the boxes are

5   checked, it says you were waiving certain of the rights that

6   are explained in that advisement that we talked about earlier

7   -- your right to have an identity hearing and arrival of

8   process and a preliminary hearing in the charging -- I mean,

9   in the -- this district, as opposed to in the charging

10  district, that is dated today.

11         Is it your intent to give up those rights and to go

12  back to the -- face the charges in the charging district?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Okay.  Then I do find that that is a

15  knowing and voluntary waiver, and I will accept that waiver.

16         Are there any dates that you know of, Ms. Torres,

17  yet in the charging district?

18         MS. TORRES:  No, Your Honor.

19         THE COURT:  All right.

20         MS. TORRES:  I don't believe any have been set.

21         THE COURT:  Okay.  If that's the case, I believe

22  all that we have left to do -- please correct me if I'm wrong

23  because I have so many case files back there that I'm

24  sometimes mixing up cases -- is just to send him back to the

25  charging district for an initial appearance.  So based on the

1   -- my findings on detention, I do commit him to the custody

2   of the United States marshals for transportation back to the

3   Southern District of New York for all further proceedings.

4            Is there anything further on this case, Ms. Torres?

5            MS. TORRES:  Not from the Government.

6            THE COURT:  Is there anything further, Ms. Ale?

7            MS. ALE:  No, Your Honor.  Thank you.

8            THE COURT:  All right.  Thank you very much.

9        (Proceedings adjourned at 3:35 p.m.)

10  ///

11  ///

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                          CERTIFICATE

5        I certify that the foregoing is a correct transcript

6   from the electronic sound recording of the proceedings in the

7   above-entitled matter.

8

9   /s/ Julie Messa_____        March 13, 2019
    Julie Messa, CET**D-403         Date
10  Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT B**
## **(audio file, to be submitted to the Court by e-mail)**