

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 27, 2020

**BY ECF / EMAIL**

Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:   *United States v. Mark S. Scott*, S10 17 Cr. 630 (ER)

Dear Judge Ramos:

    The Government submits this letter in response to the defendant's March 24, 2020 motion, which seeks reconsideration of the Court's March 12, 2020 Order remanding Mark Scott pending his May 26, 2020 sentencing (the "Reconsideration Motion").   For the reasons described below, as well as those set forth in the Government's letter dated March 11, 2020 (the "Government's March 11 Letter"), the defendant cannot meet his burden to show by clear and convincing evidence that he does not pose a risk of flight and a financial danger to the community.   *See* 18 U.S.C. § 3143(a).   As the Court has previously found, Scott is "not only . . . a flight risk but is an economic danger to the community."   (March 12, 2020 Bail Hearing Transcript ("Tr.," attached hereto as Exhibit A) at 16).   The Court should accordingly deny the defendant's Reconsideration Motion and order that the defendant continue to remain detained pending sentence in this case.

**A.**    **Legal Standard**

    "Post-conviction, a defendant no longer has a substantive constitutional right to bail pending sentencing," because "the defendant is no longer entitled to the presumption of innocence."   *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (internal quotations omitted).   "In general, following a [conviction], there is 'a presumption in favor of detention.'"   *United States v. Nouri*, No. 07 CR. 1029DC, 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (quoting *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004)).   "Unless the applicable Guidelines would not call for a term of imprisonment, the court "shall order that a person who has been found guilty of an offense and who is awaiting imposition . . . of sentence . . . be detained."   *Nouri*, 2009 WL 2924334, at *2 (quoting 18 U.S.C. § 3143(a)(1)).   "Accordingly, § 3143(a)

Honorable Edgardo Ramos
March 27, 2020

places the burden on a defendant to demonstrate by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of others or the community." *Madoff*, 316 F. App'x at 59.

In addition, similar to the standard for bail pending sentence set forth in 18 U.S.C. § 3143(a)(1), 18 U.S.C. § 3148(b) provides that "[i]f there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community."

**B.      Scott's Challenges to the Bases for His Detention Are Meritless**

In his Reconsideration Motion, Scott raises no serious dispute regarding the key facts that show he is both a risk of flight and an economic danger to the community.    Those facts include, among others, the following:

1.      Scott, who faces a Guidelines sentence of 50 years' imprisonment, is a dual German citizen.   If Scott flees to Germany to avoid sentencing in this case, Scott cannot be extradited.

2.      While released on bail, in or about July 2019, Scott sold a 2016 Porsche (the "2016 Porsche") for $250,000.    Scott did so with full knowledge that he had purchased the 2016 Porsche with OneCoin victim money and that the 2016 Porsche was subject to both a seizure warrant— which was produced to the defendant in discovery in October 2018—and a Forfeiture Bill of Particulars (the "Forfeiture BOP") —which was filed with the Court and served on the defendant in February 2019.    (*See* Tr. at 15 (Court finding that "Scott continues to use some of these assets which are subject to forfeiture, that were subject to court orders, as though they were his own, after the bail conditions were imposed, after sitting through trial, after being convicted.")).

3.      While released on bail Scott also used $300,000 in OneCoin victim proceeds that were subject to a restraining order to pay for renovations to his property located at 31 Dale Avenue, Hyannis Port, Massachusetts (the "31 Dale Property").[1]    Furthermore, Scott mortgaged the 31 Dale Property—which he had also purchased with OneCoin proceeds,[2] and which was also subject to the Forfeiture BOP—to a creditor, specifically, a contracting business performing work on the 31 Dale Property.

4.      Marieta Halle, the suretor who had posted $750,000 as security for Scott's bond, "has a complete lack of confidence in Mr. Scott's ability and willingness to continue to appear as required to court," and was therefore appropriately released by the Court as a suretor for Scott's

_____

[1]   The $300,000 wire transfer is documented in a wire instruction attached as Exhibit I to the Government's March 11 Letter.   The MSS International Consultants (BVI) Ltd. bank account held at First Caribbean International Bank in the Cayman Islands—from which Scott sent the $300,000 wire—was specifically identified in the Government's September 4, 2018 restraining order.   (*See* Reconsideration Motion, Ex. B, ¶ (a)(iii)).   That restraining order was produced provided to the defendant in discovery in September 2018.

[2]   *See* GX 2617-D, attached to the Government's March 11 Letter as Exhibit H.

Honorable Edgardo Ramos
March 27, 2020

bond.   (Tr. 14).   Scott, accordingly, no longer has a third-party suretor to secure his bond. Further, while on bail, Scott induced Halle to provide him with a personal loan of $500,000, and falsely represented that he would repay her by February 29, 2020, which he has failed to do.   (*See* Tr. 14-15 (noting that regardless of whether Scott's failure to pay back Ms. Halle the $500,000 as he promised her he would amount to a separate crime, "Scott has again and again failed to meet the promises that he made to her.")).   Scott also offered to mortgage another property that he had invested in using OneCoin victim funds and which was subject to the Forfeiture BOP—specifically, the property located at 105 Sunset Lane, Barnstable, MA—to support a promissory note to Ms. Halle.

In his Reconsideration Motion, Scott does not contest these key facts, but instead offers a litany of excuses for his conduct.   For example, as to Scott's sale of the 2016 Porsche, Scott attempts to justify the sale by claiming that "Scott was *presumed innocent* when he sold the car in June 2019."   (Reconsideration Motion at 4) (emphasis in original).   Scott's excuse entirely misses the point—at trial, the Government proved beyond a reasonable doubt that Scott knew that the 2016 Porsche was purchased with the proceeds of the OneCoin fraud scheme at the time he purchased it in 2016.   (*See* GX 2619-C).   Accordingly, Scott's sale of the 2016 Porsche constituted a serious federal felony that Scott committed *while on bail*—specifically, Scott "knowingly engage[d] . . . in a monetary transaction in criminally derived property of a value greater than $10,000" in violation of 18 U.S.C. § 1957.   Scott's additional excuse that the Government did not include the 2016 Porsche in the Post-Indictment Restraining Order is beside the point.   As noted above, the 2016 Porsche was the subject of a seizure warrant *and* the Forfeiture BOP, both of which were produced to the defendant.   Accordingly, there is no argument that Scott was not notified that the 2016 Porsche was subject to seizure and forfeiture.

Scott raises similar excuses to justify his other conduct while out on bail, including a separate violation of 18 U.S.C. § 1957 through the use of $300,000 in OneCoin victim proceeds to pay for renovations to the 31 Dale Property (which was purchased with fraud proceeds as well). Specifically, Scott asserts that because the payment was intended to improve the property, his use of those funds, which were criminally derived and subject to forfeiture, should be excused. Scott's argument misses the mark.   As with Scott's sale of the 2016 Porsche, Scott's payment for home renovations with OneCoin victim funds shows that "Scott continues to use some of these assets which are subject to forfeiture, that were subject to court orders, as though they were his own, after the bail conditions" and demonstrate that he is "economic danger to the community." (Tr. 15-16).   Scott's self-serving excuses for why he used the funds are also inconsistent with his use of the proceeds from the sale of the 2016 Porsche, which he attempted to use to buy another Porsche for *himself*.   Furthermore, Scott's excuses do nothing to address the risks posed by Scott if released, including that he will continue to flout the orders of this Court, commit new crimes while on bail, and dissipate assets that are subject to court order and should be used to pay back the millions of victims of the OneCoin fraud scheme.

Scott also asserts that it would be appropriate to use his property located at 600 Coral Way, Unit 12, Florida (the "Florida Property") as a replacement for Ms. Halle's $750,000 cash security. Scott is mistaken.   As Scott notes in his Reconsideration Motion, *see* footnote 5, the Government showed at trial that the mortgage for the Florida Property was paid off on October 16, 2016, through the use of $1,000,794.66 in OneCoin fraud scheme proceeds.   (*See* GX 2617, attached

Honorable Edgardo Ramos
March 27, 2020

hereto as Exhibit B).   For that very reason, the Florida Property is also listed in the Government's Forfeiture BOP.   (*See* Dkt. Entry 46, ¶ cc).   In essence, Scott is asking the Court that to allow him to be released on a bond that is secured by a property that was paid for in substantial part with OneCoin victim proceeds.   This would be completely inappropriate and would give Scott no real incentive not to flee, given that the only resulting harm if he did flee would be the forfeiture of a property that was paid for by fraud scheme proceeds and is therefore subject to forfeiture as part of his sentence in this case.

## C.        The COVID-19 Pandemic Does Not Justify Scott's Release At This Time

Scott's final argument in his Reconsideration Motion is that he should be released as a result of the COVID-19 pandemic, and his alleged vulnerability based on certain pre-existing health conditions.   However, as described below, the Bureau of Prisons ("BOP") is equipped to address the current public health crisis.   Furthermore, the defendant has provided limited support for his claim that his health condition renders him especially vulnerable to COVID-19. Specifically, Scott relies on a vague one-page doctor's letter stating that Scott "has hypertension and was in the process of ongoing a cardiac workup.   He is considered at high risk for COVID19 complications, and therefore is considered a high risk patient," and a prior letter from the same doctor recommending that Scott not travel to New York in light of his history of hypertension and obstructed sleep apnea.   (*See* Reconsideration Motion, Exs. F and G).   These two letters provide an insufficient record to warrant Scott's release on bail.   Furthermore, the Government would note that at the time of this submission, there are no confirmed COVID-19 cases in Miami FDC, where Scott is currently being housed.[3]

Furthermore, contrary to Scott's assertions in his Reconsideration Motion, the BOP is prepared to handle the risks posed by coronavirus/COVID-19, as with other infectious diseases and other medical conditions.   Since at least October 2012, BOP has had a Pandemic Influenza Plan in place.   *See BOP Health Management Resources*, available at https://www.bop.gov/resources/health_care_mngmt.jsp.[4]   Moreover, beginning approximately two months ago, in January 2020, BOP began to plan specifically for the coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel.   *See Federal Bureau of Prisons COVID-19 Action Plan*, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.   As part of its Phase One response to coronavirus/COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission."   *Id.*   In addition, BOP stood up "an agency task force" to study and coordinate its response to coronavirus/COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and

---

[3]   The Government would have no objection to Scott remaining in Miami FDC pending his sentencing, which is scheduled for May 26, 2020.

[4]   *See also Module 1: Surveillance and Infection Control*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf.

Honorable Edgardo Ramos
March 27, 2020

Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President.   BOP's planning is structured using the Incident Command System (ICS) framework."   *Id.*

On March 13, 2020, BOP, after coordination with DOJ and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff."   *Id.*   BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty."   *Id.*   For example, BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities."   *Id.*   In addition, BOP has implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs.   *Id.*   As part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols."   *Id.*

Finally, the defendant's reliance on *United States v. Stephens*, No. 15-CR-95 (AJN) (S.D.N.Y. Mar. 19, 2020) (ECF Doc. No. 2798), is misplaced.   (*See* Reconsideration Motion, Ex. A).   In *Stephens*—a violation of supervised release proceeding involving a defendant accused of possessing a firearm while on supervised release—Judge Nathan released a previously detained defendant after finding that "the strength of the primary evidence relied upon by the Government to demonstrate the danger the Defendant poses to the community has been undermined by new information not available to either party at the time of [the prior detention] hearing."   *Id.* at 1-2.   Specifically, while the Government had previously argued that the defendant had possessed a loaded firearm in proximity to drugs, news facts showed that the arresting officer had "identified a different individual as holding the bag that contained the firearm."   *Id.* at 2.   There are no comparable changed circumstances in the instant case that suggest that Scott is less of a flight risk or danger to the community.

As for the risks to the defendant from the COVID-19 pandemic, Judge Nathan specifically declined to rule on whether the health risks from the pandemic presented a "compelling reason necessitating [the defendant's] release."   *Id.* at 6 n.3.   Rather, the Court found release appropriate under Section 3142(i) because the defendant had proffered specific, unrebutted facts demonstrating that the precautions taken by the BOP were impeding his ability to prepare for a hearing scheduled for March 25, 2020.[5]   *Id.* at 5-6.   Here, by contrast, for all the reasons set forth

---

[5]   Moreover, it does not appear that Section 3142(i), which is part of the bail statute addressing

Honorable Edgardo Ramos
March 27, 2020

above, the defendant has not overcome the statutory presumption of his dangerousness and risk of flight, and the Government has met its burden of demonstrating the defendant's dangerousness and risk of flight. Moreover, unlike the defendant in *Stephens*—who demonstrated that he was unable to prepare for a "merits hearing" scheduled just *one week* in the future—Scott has already been convicted and has no upcoming evidentiary hearing or trial for which to prepare; his sentencing proceeding is not until May 26, 2020.

<u>**CONCLUSION**</u>

For all of the reasons set forth herein, and those set forth in the Government's prior submissions and at the bail proceeding on March 12, 2020, the Court should deny Scott's Reconsideration Motion.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Christopher J. DiMase / Nicholas Folly/
Julieta V. Lozano
Assistant United States Attorneys /
Special Assistant United States Attorney
(212) 637-2433 / (212) 637-1060/
(212) 335-4025

---

"release or detention of a defendant *pending trial*" (emphasis added), applies to Scott, who stands convicted and is presently *pending sentence*. *See United States v. Bolze*, No. 3:09-CR-93, 2010 WL 199978, at *2 (E.D. Tenn. Jan. 13, 2010) ("[T]he Court questions the applicability of [Section 3142(i)] . . . because the Defendant is no longer in 'pretrial' detention, rather he is detained post plea, pending sentencing. Section 3143(a), which governs release or detention pending sentencing, contains no language providing for temporary release.") (citing 18 U.S.C. § 3143(a)).

# **<u>EXHIBIT A</u>**

k3c2scoC kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                            17 Cr. 630(ER)

5   MARK S. SCOTT,

6                   Defendant.

7   ------------------------------x         Bail Hearing

8                                           March 12, 2020
                                            4:30 p.m.
9
    Before:
10
                        HON. EDGARDO RAMOS,
11
                                            District Judge
12

13                          APPEARANCES

14  GEOFFREY S. BERMAN
         United States Attorney for the
15       Southern District of New York
    BY:  CHRISTOPHER J. DiMASE
16       NICHOLAS S. FOLLY
         Assistant United States Attorneys
17  BY:  JULIETA V. LOZANO,
         Special Assistant United States Attorney
18
    COVINGTON & BURLING LLP
19       Attorneys for Defendant
    BY:  ARLO DEVLIN-BROWN
20       KATRI A. STANLEY

21  DAVID M. GARVIN (via telephone)
         Attorney for Defendant
22
    ALSO PRESENT:
23
    NEIL G. TAYLOR
24       Attorney for Movant Halle

25  JOHN MOSCATO, Pretrial Services

k3c2scoC kjc

1           (Case called)

2           THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4           MR. DiMASE:  Good afternoon, your Honor.  Christopher

5    DiMase for the government.  I'm joined at counsel table by

6    AUSAs Nick Folly and Julieta Lozano, who is actually a Special

7    Assistant U.S. Attorney, as this court knows, and also by John

8    Moscato from the United States Pretrial Services Office.

9           THE COURT:  Good afternoon.

10          MR. DEVLIN-BROWN:  Good afternoon, your Honor.  Arlo

11   Devlin-Brown and Katri Stanley for Mr. Scott.  I believe

12   co-counsel David Garvin is appearing by telephone along with

13   Mark Scott pursuant to the court's order that they can distance

14   themselves.

15          THE COURT:  Okay.  Mr. Garvin?

16          MR. GARVIN:  Good afternoon, your Honor.  I am present

17   and Mark Scott is also present, sitting next to me.

18          THE COURT:  And good afternoon to you both.  You know,

19   Mr. Garvin, you made the front page out here.

20          MR. GARVIN:  Unfortunately, yes.

21          THE COURT:  And?

22          MR. TAYLOR:  Good afternoon, Judge Ramos Neil Taylor

23   on behalf of Marietta Halle.

24          THE COURT:  I'm sorry, how do you pronounce the last

25   name?

1          MR. TAYLOR:  "Haley."

2          THE COURT:  "Haley."

3          So this matter is on for a bond hearing, and this bond

4     hearing was initiated by a letter that I received from

5     Mr. Taylor on behalf of Ms. Halle on February 6, 2020.

6     Mr. Taylor, did you wish to put on the records the reasons

7     therefor?

8          MR. TAYLOR:  We will travel, with the court's

9     permission, on the affidavit that was filed.

10          THE COURT:  Very well.  There was an affidavit that

11     was filed by Ms. Halle, and I don't know whether a copy has

12     been provided to Mr. Devlin-Brown at this point.

13          MR. DiMASE:  That's fine, your Honor.  We spoke with

14     Mr. Taylor prior to today's proceeding and asked him if he

15     would permit us to turn it over just before the proceeding, and

16     he preferred the court to decide whether or not that should be

17     disclosed.  I don't know if he wishes to be heard on that.

18          MR. TAYLOR:  So thank you, Judge.

19          So the court knows, Ms. Halle is of the decided

20     opinion that she would prefer to keep the affidavit sealed.  Of

21     course that's subject to your Honor's call.  But the fact of

22     the matter is, we don't really feel like we have a dog in the

23     fight as it relates to the bond itself.  It's just the

24     protection of Ms. Halle's interests.

25          THE COURT:  I think given the seriousness of the

k3c2scoC kjc

1    issues that we are discussing and the importance of it, not

2    only to Ms. Halle, but to Mr. Scott, that he ought, in

3    fairness, to receive a copy of the affidavit.

4         So if you have a copy, could you please provide it to

5    Mr. Devlin-Brown

6         MR. FOLLY:  We just handed it over, your Honor.

7         MR. DEVLIN-BROWN:  And I don't know if there is a way

8    to send it to Mr. Garvin so that he and Mr. Scott can see it as

9    well.

10         MR. DiMASE:  I have everything prepared just for that

11   purpose, so if you give me a moment, your Honor, I will e-mail

12   Mr. Garvin.

13         THE COURT:  Okay.

14         And I don't think that I am telling tales out of

15   school if I were to simply state for the record that Ms. Halle,

16   who provided cash surety on Mr. Scott's bond, wishes to be

17   exonerated from the obligation of maintaining those amounts

18   with the court.  She wants no longer to serve as a surety to

19   Mr. Scott.  So I will give everyone an opportunity to read

20   those documents and we will pick up.

21         MR. DiMASE:  If I could ask Mr. Garvin, who is on the

22   phone, when he has received those materials to just let us know

23   that they went through.

24         MR. GARVIN:  Yes, I will.  I am expecting them now.

25         MR. DiMASE:  Thank you.

k3c2scoC kjc

1          MR. DEVLIN-BROWN:  And, your Honor, I don't mean to

2     delay the court at all, but we have just received these

3     documents with numerous exhibits, the affidavit.  I would like

4     at least ten minutes if we can have that to --

5          THE COURT:  Absolutely.  I will go back.  I will come

6     back out in ten minutes.

7          (Recess)

8          THE COURT:  Mr. Devlin-Brown, I trust you have had an

9     opportunity to review those document?

10          MR. DEVLIN-BROWN:  We have had some opportunity, your

11     Honor.

12          THE COURT:  Very well.  So now that the folks have

13     reviewed these documents -- and I understand, Mr. Devlin-Brown,

14     that you have also received a copy of the government's letter

15     to me dated yesterday?

16          MR. DEVLIN-BROWN:  Yes.

17          THE COURT:  Very well, then.  Given that, Mr. DiMase.

18          MR. DiMASE:  Your Honor, just so the record is clear

19     about the documents that were provided to counsel for

20     Mr. Scott, we provided the filing by Mr. Taylor and the

21     attached exhibits, including the affidavit of Ms. Halle.  We

22     also provided our letter of February 12, 2020 responding to

23     that application, and then we provided our letter dated

24     yesterday, March 11, 2020 as well, so all of those documents

25     have been turned over.

k3c2scoC kjc

1          THE COURT:  Okay.  Mr. DiMase, based on the letter, it

2    appears clear; but, for the record, what's the government's

3    position on Mr. Scott's continued bail?

4          MR. DiMASE:  Your Honor, in short, in light of the

5    heightened standard presentence and the egregious violations of

6    the bail conditions committed by Mr. Scott as laid out in the

7    government's letter, the government is seeking detention at

8    this point.

9          THE COURT:  Okay.

10         MR. DiMASE:  I can expand on that, obviously, but

11   that's the bottom line.

12         THE COURT:  Why don't you, because I know that the

13   government made the request that he be remanded right after

14   trial, and at that time I refused that request.  What has

15   happened since?

16         MR. DiMASE:  Well, one thing, your Honor, is I know

17   that the car sale was something that was raised in the

18   immediate after-trial bail proceeding.  I think we have laid

19   out a few more facts relevant to that sale, and I think it is

20   particularly important, as the court was probably aware, but

21   still, to understand Scott's level of knowledge there, it's not

22   just merely that that car was subject to a seizure warrant or,

23   as the government failed to point out immediately after the

24   trial, that it was also listed in the government's forfeiture

25   bill of particulars -- that fact was not put on the record

immediately after the trial.  I don't think we had recalled

that, but that's a public filing on the docket sheet that

Mr. Scott would have easily had access to.  But more

fundamentally, he knew he bought the car with OneCoin proceeds,

and there is an exhibit from the trial that shows the money

going from OneCoin accounts to the car, and we have proved that

at trial.  That is effectively a separate crime, engaging in

monetary transactions with criminal proceeds, and the proof of

his knowledge is not just the fact that it was subject to a

seizure warrant or that it was in the government's bill of

particulars, it is the evidence that he knew that was the money

he was using to buy it.  And I think it really just bears

noting that that ultimately is money that should be going back

to OneCoin victims.  He is taking that money that should go

back in restitution and he is using it for himself and all

while it is subject to the seizure warrant for that very

reason, subject to the forfeiture bill of particulars for that

very reason.  So I don't want to belabor that point --

obviously we raised it after the trial -- but I think there are

some details there that we didn't really address immediately

after the trial.

        Then there are a whole host of other facts that have

developed, pretty much all of which are following trial.

        First of all, there is the information provided by

Ms. Halle.  Obviously the court has her affidavit.  I think it

1   is fair to say that she believes that she is also now a victim

2   of fraudulent conduct committed by the defendant, that she has

3   lost faith in him, and that that is effectively the reason she

4   wants out of this bond.  I think she is concerned that not only

5   will she be never getting any of the money she has given

6   Mr. Scott back for loans and purported investments, now she may

7   also lose the $750,000 she graciously agreed to put up for him

8   as a friend when this case started.  And so she wants to

9   protect at least that portion of the money; and, frankly, the

10  government does not object to that in part because we don't

11  feel it would be appropriate to victimize her in that way based

12  on Mr. Scott's conduct.  And ultimately at this stage I think

13  it's fair to say that we view her as a victim of ongoing

14  conduct by Mr. Scott and that she should get this money back.

15          But I think the most obvious example of that is this

16  loan which Mr. Scott provided to her -- or which Mr. Scott

17  received from her of $500,000 with a promise that he would pay

18  it back within six months.  The six months has passed and

19  Ms. Halle has not seen any of that money.

20          She also has an investment in one of the properties

21  that's subject to forfeiture in this case.  She made a $1

22  million investment in that before Mr. Scott was arrested.  She

23  has not seen any revenue from that investment, and --

24          THE COURT:  What type of property is that?

25          MR. DiMASE:  So if you will recall, your Honor, I

1    think if you flip to Exhibit F attached to the government's

2    filing, so this is a beachfront property located in Barnstable,

3    Massachusetts, on Cape Cod, that Mr. Scott purchased as an

4    investment property; and, as reflected in the financial

5    tracing, the government traced over $2 million of OneCoin fraud

6    proceeds used to make that purchase.  Ms. Halle was also asked

7    to contribute money as a purported investment into this

8    investment property.  As I said, my understanding is that she

9    has not seen any revenue from that.

10                And in part, in an effort to promise payment of money

11   to Ms. Halle, Mr. Scott provided her with a proposed mortgage

12   on this property, one of the properties he bought with OneCoin

13   proceeds, and that was just in December 2019.  That would have

14   been about ten months after the property was listed in the

15   government's forfeiture bill of particulars in this case.  And,

16   again, I think, fundamentally, going back to the main point

17   here, Mr. Scott himself was aware that this house was purchased

18   with OneCoin proceeds and here he is offering, despite the fact

19   that it's in a bill of particulars, a forfeiture bill of

20   particulars, offering a mortgage to underlie a promissory note

21   to Ms. Halle.  Mr. Taylor may speak to this further, but my

22   understanding that Ms. Halle did not agree to that proposal.

23   But that's only one example of Mr. Scott essentially using

24   mortgages against properties subject to forfeiture to

25   substantiate promissory notes of money he owes to other

k3c2scoC kjc

1    people.

2         So the second example is a contractor working on the

3    31 Dale Avenue property.  That property is Attachment H to the

4    government's filing of last night, another even nicer

5    beachfront property.  This one into which the government traced

6    somewhere in the ballpark of 3.5 to $4 million of OneCoin

7    proceeds used to make that purchase.  This property has needed

8    quite a bit of work.  There has been a contractor working on

9    the property.  One of the government's -- one of the

10   attachments here relates to a $300,000 payment made from a

11   Cayman Island bank account to that contractor for work on this

12   property in April of 2019.  And then apparently, when Mr. Scott

13   was in negotiations with other money owed to the contractor, he

14   offered a mortgage against this property to cover 250,000

15   ballpark dollar debt to the contractor, which in fact that

16   mortgage was effectuated and a promissory note apparently was

17   provided to the contractor for that amount based on a mortgage

18   on this property.  And, again, just to be clear, this was in

19   the government's bill of -- forfeiture bill of particulars in

20   February of 2019, so ten or eleven months before he mortgaged

21   it; and, again, he knew that this property was purchased using

22   OneCoin money.  So he is offering up, as security against debt,

23   properties which should be forfeited and sold, again, to go

24   back to restitution of OneCoin victims.  That's the bottom

25   line.

1          So we have somebody who has violated a court order

2     insofar as he sold a car under a seizure warrant.  He has

3     defrauded his own suretor who he has -- who graciously put up

4     money for his bond.  He has attempted to mortgage two

5     properties subject to forfeiture and actually mortgaged one.

6          And I think this last point is not as important, but

7     it does bear noting that the government found out about this

8     violation of the home incarceration condition shortly after the

9     trial only from reading a blog post online, which we frankly

10    thought couldn't be true, that he had gone to a restaurant with

11    security guards days after the trial, after this court

12    subjected him to a home incarceration condition.  But the

13    government reached out and learned from Pretrial Services that,

14    yes, in fact, because he was wearing a GPS device, they were

15    able to tell where he was that day, and that he had provided a

16    reason to leave his house that day of visiting Mr. Garvin, that

17    he spent about an hour with Mr. Garvin, and then the GPS shows

18    that he went to this restaurant for about two hours to have

19    dinner under the false pretense of visiting with his lawyer

20    while under a period of home incarceration.

21          So like I said, I don't think that's of paramount

22    importance, in terms of the much more serious violations here,

23    but it shows that this is somebody who is not willing to follow

24    the court's clear directives and bail conditions in this case.

25    In addition to committing crimes, he is flagrantly violating

1    those very basic conditions.

2              I would also say, your Honor, that we have just

3    looked, based on a question posed by Mr. Devlin-Brown just

4    before the proceeding, and actually it appears that the account

5    in the Cayman Islands referenced in Exhibit I, that -- from

6    which $300,000 was transferred to the contractor in April of

7    2019, that that account at First Caribbean Bank was also

8    subject to restraint in a restraining order that was provided

9    to Mr. Scott in discovery, and that was -- that account would

10   have also been included in the government's forfeiture bill of

11   particulars in this case on the publicly filed docket.  So in

12   that case another violation of a clear court order which we

13   are -- we were not aware of until we checked this afternoon.

14             THE COURT:  Okay.

15             MR. DiMASE:  So that leads me to one other point, your

16   Honor.  The standard for presentence bail is very heightened.

17   It flips the presumption to the defendant or the burden to the

18   defendant, I should say.  It is on the defendant to show by

19   clear and convincing evidence that he does not pose a risk of

20   flight or a danger to the community.  There is another statute

21   applicable here, which is 3148(b), and that statute provides

22   that there is probable cause to believe that while on release

23   the person committed a federal, state, or local felony, a

24   rebuttable presumption arises that no condition or combination

25   of conditions will assure that the person will not pose a

1    danger to the safety of any other person or the community.

2              And so to be clear, all of this, whether pretrial or

3    posttrial, Mr. Scott did, while on bail.  Some of it he did

4    after being convicted of serious offenses carrying a 50-year

5    statutory maximum and a 50-year guidelines sentence.  There is

6    both a risk of flight, in particular because Ms. Halle is

7    requesting that her money be returned and that was a critical

8    component of the pretrial bail package under a very -- a much

9    less heightened standard.  But it is not just risk of flight.

10   There is a danger here, a financial danger, and it is the

11   danger that is addressed by 3148(b).  This is somebody who is

12   committing financial crimes and using OneCoin victim money for

13   himself all while on bail or after being convicted of fraud

14   crimes.  He poses a real danger to the community, although I am

15   not arguing here physical danger, but financial danger, and

16   that is, I think, a real concern here, your Honor, given the

17   pattern of conduct before the court.

18             So on the grounds of those very egregious violations

19   of bail conditions, his commission of new crimes while on bail,

20   and in some cases after trial in this case, the government

21   believes that detention is the only appropriate option at this

22   stage, your Honor.

23             THE COURT:  Thank you, Mr. DiMase.

24             I suppose that I should, as a procedural matter, deal

25   with the request of Ms. Halle to be exonerated.  Mr. Taylor,

k3c2scoC kjc

1    did you wish to be heard any further on that?

2             MR. TAYLOR:  If the court has any questions it would

3    like me to direct myself to, fine; otherwise, no, sir, I'm

4    satisfied.

5             THE COURT:  Very well.  And I understand from

6    Mr. DiMase the government does not object.

7             Mr. Devlin-Brown, is there any reason why I should not

8    exonerate Ms. Halle?

9             MR. DEVLIN-BROWN:  Your Honor, our chief complaint

10   here with respect to this request is really the same as with

11   the revocation of bail in that we would like some time to

12   respond.  Do I know off the top of my head what the standard is

13   for a suretor to be removed from a bond?  I don't.  Do I know

14   what the facts and circumstances are that are in this affidavit

15   that has just been provided to me?  I don't.  So I would like

16   time to address that issue and then, also, to the extent the

17   court is inclined to remove her, time to provide a proposed new

18   suretor or other new bail conditions to address any decision by

19   the court to take her off the bond.

20            THE COURT:  I'm going to take her off the bond.

21   Again, whether or not what she puts forth in her affidavit

22   amount to a separate and independent crime, they certainly

23   amount to, at least on the part of Ms. Halle, a complete lack

24   of confidence in Mr. Scott's ability and willingness to

25   continue to appear as required to court.  She has put up a

1    substantial amount of money based on representations that

2    Mr. Scott made.  Apparently Mr. Scott has again and again

3    failed to meet the promises that he made to her, and it seems

4    unduly harsh for this court to continue to hold her to the

5    obligation that she made to Mr. Scott many months ago.  So she

6    will be exonerated.

7            That, of course, removes from the bail package

8    supporting Mr. Scott's being out on bail the substantial piece

9    of it, which was cash in the amount of $750,000.  I know from

10   my reading of the transcripts before the magistrate, when they

11   were handled, the bail applications, that that was a

12   significant part of the bail package, particularly given

13   Mr. Scott's status as a dual citizen of a country that does not

14   extradite its own citizens.  The government has repeatedly made

15   that argument, and the very substantial bail package that was

16   established at the time certainly gave me some comfort that it

17   was sufficient and certainly that Mr. Scott, by continuing to

18   appear in court, by sitting through the trial, appeared not to

19   be a flight risk.

20           The admitted lack of confidence on Ms. Halle's part in

21   continuing to vouch for Mr. Scott, along with the incidents

22   highlighted by the government in its letter to me of March 11,

23   would show that Mr. Scott continues to use some of these assets

24   which are subject to forfeiture, that were subject to court

25   orders, as though they were his own, after the bail conditions

k3c2scoC kjc

1    were imposed, after sitting through trial, after being

2    convicted suggests to me that he not only is a flight risk but

3    is an economic danger to the community and, accordingly, the

4    bail is revoked, and I would require Mr. Scott to

5    self-surrender to the appropriate facilities tomorrow, Friday,

6    March 13, in Coral Gables.  I don't know what that facility is.

7    I'm going to have to rely on the government to provide

8    Mr. Scott's attorneys with that information, but he should

9    report there no later than 9 a.m. tomorrow morning.

10            Mr. Devlin-Brown.

11            MR. DEVLIN-BROWN:  I'm sorry, your Honor.  I did

12   address the court on the issue of Ms. Halle being removed from

13   the bond, but I hadn't been aware your Honor was asking for us

14   to argue against the government's position on revocation of the

15   bond, and we do wish to be heard on that issue.

16            THE COURT:  I'm happy to have you make your record,

17   Mr. Devlin-Brown.

18            MR. DEVLIN-BROWN:  Okay.  Thank you, your Honor.

19            So obviously it is a very serious -- these are serious

20   allegations, and we are not disputing that at all, your Honor.

21   However, it is a serious decision your Honor has to make.  Even

22   if your Honor were to at the end of the day sentence Mr. Scott

23   to some period of jail, there is a tremendous difference

24   between sentencing someone who has gone through the BOP

25   designation process, can self-surrender at an appropriate

k3c2scoC kjc

1    security facility, appropriate to addressing medical needs, to

2    throwing someone in on short notice into a jail system, whether

3    it's in Miami or New York, particularly, and I guess to be

4    transferred from Miami to New York, particularly at a time when

5    we have a virus that is spreading and posing risks to the jail

6    system.  And that won't just be a risk to Mr. Scott now when he

7    is in.  It will be a risk that will extend beyond through any

8    period of incarceration.

9             So I think that's a very serious thing, and so I do

10   wish to be heard a little bit further on why we don't think

11   that's appropriate.

12            So first of all, in terms of the answers to what the

13   government has raised, we can't answer all of these questions

14   now.  This is a very detailed document.  I'm not sure why it

15   was provided only under seal and *ex parte*, and we can only see

16   it now right before the court begins.  I guess the government's

17   position is there is some flight risk.  I don't see the flight

18   risk.

19            And beyond that, there are responses.  There are

20   things we would like to do to respond.  Just to give you some

21   examples, a short period where we could respond and at least

22   confer with our client, look up related records, and there are

23   a couple of things we would do.  First of all, there are

24   allegations that funds went from various accounts to -- that

25   are allegedly linked to OneCoin to certain properties where

1   there were mortgages of properties or a car was sold.  We would

2   like to look into the details of that, understand more about

3   them, make sure the government's statements that these are

4   OneCoin funds are correct, and also, crucially, look into the

5   issue of what our client had notice of.

6            THE COURT:  Wasn't that established at trial?

7            MR. DEVLIN-BROWN:  Which point, your Honor?

8            THE COURT:  The fact that these assets were acquired

9   by OneCoin funds.

10            MR. DEVLIN-BROWN:  That may have been -- well,

11   actually I don't know that -- there wasn't tracing each of

12   these assets I'm not sure at trial, but some of the conduct the

13   government is pointing to happened before trial.  Some of the

14   conduct the government is pointing to with respect to the car,

15   for example, that allegation involved a sale that was done I

16   believe in June of this year.

17            THE COURT:  I'm sorry.  I thought that you were making

18   the point that some of these transactions that are addressed in

19   the government's March 11 letter may not have been used with

20   OneCoin funds, and my question was, wasn't it established at

21   trial that these assets, including the homes, were purchased

22   with OneCoin funds?  I may be mistaken.

23            MR. DEVLIN-BROWN:  I don't know that it was

24   established that each and every one of these assets was

25   purchased solely with OneCoin funds.  We also have filed a Rule

29 that addresses the issue of whether funds from accounts that
had no U.S. investors or no U.S. investments are appropriately
wire fraud as an SUA to money laundering.  But the crucial
issues for bail, as I thought the court was perhaps suggesting,
that Mr. Scott, in taking actions after the trial of these
assets, would have himself had a state of mind that this was
clearly improper or criminal conduct.  This is conduct he
engaged in well before trial.  And it's not clear, and, again,
we would like to respond, that Mr. Scott had awareness that
these were things that he was not allowed to do.

         For example, at the end of the -- and I can't be
comprehensive here because I'm just sort of looking on the fly
at these, but at the end of the last trial, the only trial, the
government made the point that the car had been disclosed to
Mr. Scott through a discovery letter, you know, that they were
having some seizure of the car.  From Mr. Scott's perspective,
the government agents came.  They took certain cars.  They
didn't take other cars.  We looked at the discovery letter the
government referred to.  It has document after document of all
sorts of seizure warrants that were served on banks, served in
his home.  It wasn't meant to provide Mr. Scott with notice of
these are things you cannot touch.  It was discovery for
counsel as to the affidavits and warrants that have been issued
in the case.  And the bill of particulars that Mr. DiMase
referred to came subsequent to that.  Anyway --

1          MR. DiMASE:  They came long before the car sale, to be

2     clear.

3          MR. DEVLIN-BROWN:  Yeah, you know, there is only so

4     much I can do on the fly.  I can't compete with Mr. DiMase

5     because he has been able to brief this and research it.  I

6     would like a chance to do so.  Mr. Scott would like a chance to

7     do so.  That's one thing we would like to address.

8          There are two other of their allegations or three,

9     really, that are about what people have apparently told the

10    government.  It is a pretty serious thing to say that Mr. Scott

11    defrauded Ms. Halle.  And just, again, reading this on the fly,

12    it seems the core fraud allegation is that Mr. Scott borrowed

13    money from her, saying he would pay her back, and he didn't pay

14    her back.  That's not the first time in the world someone's

15    borrowed money, maybe overoptimistically, hoping to pay it back

16    and doesn't.  That may be a civil issue.  That doesn't mean

17    it's a fraud unless there is intent at the time to defraud the

18    person.

19         THE COURT:  I agree entirely, which is why I was

20    careful, I think, to make the point that even if these

21    allegations were not independent crimes.

22         MR. DEVLIN-BROWN:  Thank you, your Honor.  And I

23    understand your Honor's ruling with respect to that and

24    Mrs. Halle.  But to the extent that your Honor is thinking

25    about using that to revoke his bond, I would like to look into

k3c2scoC kjc

1    the circumstances of what money was offered by Ms. Halle, what

2    the terms were that Mr. Scott agreed to.  We would want to talk

3    to him about that and put in any sort of response.

4         The same thing is true about the contractor who

5    apparently says he didn't know of any liens on this property.

6    We would like to look into more about what work he did.

7    Because, again, going off the top of my head, my basic

8    understanding is that that was a house that was under

9    construction at the time and needed emergency work on it.  It

10   was a project in development or it would be ruined for the

11   winter.  And I think the expense he put into it probably

12   increased the value of the property.  That's not a perfect

13   defense to this at all, your Honor, but I think it's a relevant

14   consideration, and it's something that we would like an

15   opportunity to look at.

16        And the same thing goes for these allegations of him

17   violating the conditions of his release through this dinner.

18   That's something ordinarily when there is an allegation like

19   that, you have a pretrial officer or someone who is bringing it

20   and someone who we could look at the file and see what the

21   evidence is.  My understanding -- and, again, it is something

22   we would like to investigate -- is that Mr. Scott did meet with

23   Mr. Garvin on that occasion, that he then did have dinner, and

24   the government discloses this at the end, it is essentially at

25   his home, it's, you know, that's what they say, that Seasons 52

1    Restaurant in Coral Gables, Florida, where he resides, or it is

2    very close to his home.  There have been other occasions -- I

3    don't know about this one, your Honor.  There have been other

4    occasions where his pretrial officer has specifically permitted

5    him to have meals going to and from legal, medical

6    appointments, etc.  So, again, it's a serious allegation --

7            THE COURT:  I actually don't think that's a serious

8    allegation, and it entered into my consideration not at all,

9    the fact that he had this dinner.

10           MR. DEVLIN-BROWN:  Okay.  So those are the things we

11   would like to do if we had more time.  And as to why your Honor

12   should give us some more time, there are basically two reasons,

13   your Honor.  One is, you can say a lot of things perhaps about

14   Mr. Scott, you were at a whole trial involving Mr. Scott.  One

15   thing I think is very hard for anyone to say is that this is a

16   man who, tail between his legs, knows he did something and is

17   running away.  This is not a man who is running away.  This is

18   a man who has maintained his innocence from the get-go, who

19   fought this case at trial, who filed very extensive posttrial

20   motions, who intends to appeal any adverse ruling from the

21   court, who intends to engage in sentencing advocacy, so if he

22   is not -- if he does have to face some period of incarceration

23   he has an opportunity to argue as free as possible.  This is

24   not a man, even with these allegations, who is on the verge of

25   going somewhere.  That is one thing that I think should give

1    your Honor a little bit of comfort in giving us more time.

2              And the other consideration, your Honor, really is

3    this man's health.  I made the general point at the beginning,

4    but Mr. Scott is not a well man and, like some people perhaps,

5    you know, he is perhaps not really addressing his medical

6    problems until now as he is coming up for sentencing and

7    realizes that the decisions that he makes medically now he may

8    have to live with for some period of years.

9              He has long been diagnosed with sleep apnea, severe

10   sleep apnea.  He is now undergoing testing which,

11   unfortunately, the doctors just had to cancel because -- these

12   are Cape Cod doctors -- because of the coronavirus outbreak.

13   But he is undergoing testing for heart disease.  He is

14   undergoing testing for whether his elevated white blood cell

15   counts reflect a more serious infection or perhaps something

16   even worse.  He is in the middle of this process, and your

17   Honor knows full well that the Bureau of Prisons does not

18   provide adequate medical care, frankly, to anyone, and they

19   certainly aren't capable of doing this sort of work.

20             So giving him the time, if he is not a risk of flight,

21   to go through some of this, to get him diagnosed, so that he

22   can go, if he has to be sentenced to jail, to the Bureau of

23   Prisons with a record of what he has.  Because he is not going

24   to get that kind of diagnosis in the Bureau of Prisons.  They

25   are not going to send him to a prison hospital without some

k3c2scoC kjc

1   basis for doing so.

2          So that's what we would ask, your Honor.  We don't

3   think he is a risk of flight.  We think there are responses we

4   could at least investigate and give the court a fuller picture,

5   and we think that putting him in jail now without that is going

6   to do grievous damage to his health for a long period of time.

7          I would just ask -- I'm not with Mr. Scott.  that was

8   at our request, Mr. Scott's request.  He is with Mr. Garvin

9   now.  I don't know if they have had any opportunity to speak

10  right now.  But if your Honor permits, I would like Mr. Garvin,

11  to the extent he has anything further, to be permitted to

12  speak.

13          THE COURT:  Mr. Garvin, I'm happy to hear you.

14          MR. GARVIN:  Yes, your Honor.  I would join in what

15  Mr. Brown said, what Arlo said, and I would like to add a few

16  things that I have been scrambling here looking at the

17  documents that the government has supplied.  Respectfully, your

18  Honor, it would seem to me that this is an important decision

19  that should deserve hearing both sides presenting a cogent

20  argument.  The government has undoubtedly taken days, if not

21  weeks, to put together their presentation; and giving us

22  literally minutes to put together our presentation, I don't

23  think would be fair and is just.

24          But let me go to a couple of things that I have

25  scrambled to point to.

1          The funds that were invested, the government states

2     that there was an offer in April of 2019, I believe, to give a

3     mortgage to Marietta Halle of $300,000.  That transaction never

4     went through.  The amount of money of $250,000 that went to the

5     contractor, Mr. Scott did not have, from what I can tell, the

6     ability to pay the contractor, but there was a determination by

7     the contractor that if a certain amount of work was not done,

8     the home would likely through the winter incur substantial

9     damage and ultimately, when the house is in fact sold for

10    restitution, that the amount that would be received would be

11    substantially less than if the house had this minimal amount of

12    work done to preserve it from being damaged.  So this is a case

13    where I don't argue that it is correct, but it is a case that

14    was well meaning, which was to preserve an asset, which is one

15    of the major assets that can be sold for restitution purposes.

16         With regard to the dinner, I know the court has stated

17    that with the dinner it did not view it as significant, but

18    Mr. Scott did attend that dinner with two of the people from

19    our litigation team that could not make it to my office for

20    that one-hour meeting.  I had to leave, so Mr. Scott, on his

21    way home, stopped and met them to discuss what he had just

22    discussed with me and what work that needed to be done, and

23    then he went home from there, which was approximately two

24    blocks from his home is where the meeting occurred.

25         With regard to Ms. Halle and the investment that she

k3c2scoC kjc

1    made with Mr. Scott, that investment, I understand, and I would

2    like to run it down, is, first of all, in real property and

3    other business ventures, and then the loan is secured by a

4    third party.  So this is not a situation in which it is

5    resolved that Ms. Halle has loaned money that will not be

6    repaid.  In fact, based on the limited amount of time I have

7    had to scramble here, it appears that she may well be secured

8    100 percent.

9              So, Judge, I would plead with this court, although I

10   have heard the court has already stated out loud what it

11   believes its ruling should be, I would ask for the court to

12   give us an opportunity to research this over the weekend and to

13   put together a presentation answering these five or six claims,

14   accusations by the government, so that the court will be fully

15   informed of all of the arguments prior to making a final

16   decision, because the ramifications of this final decision are

17   so significant.  I would respectfully ask that the court afford

18   us over the weekend to place in writing our response, and at

19   that point the court may decide to issue the exact same ruling,

20   but I believe that, knowing this court, that having heard the

21   answers, it may have an effect.

22             THE COURT:  Thank you, Mr. Garvin.

23             Mr. DiMase.

24             MR. DiMASE:  Your Honor, I don't know if you would

25   like me to respond point by point.  There are some things that

1    are preposterous in that defense.

2             The idea that he Mr. Scott should be able to take

3    OneCoin victim money from an account in the Cayman Islands

4    that's subject to a restraining order without contacting the

5    government, just go ahead and do whatever he wants with it, if

6    he had some concern about the property and wanted to negotiate

7    its forfeiture, there are ways to do that legally.

8             I take it Mr. Garvin's defense on that particular

9    point is that he just felt like that was the best thing to do.

10   Even though it violated multiple orders, he did it without

11   asking anybody's permission, and that's OneCoin victim money.

12   There is a point to the restraining order.  It is to get these

13   fraud proceeds back to the victims who deserve it.

14            But, anyway, I don't know that it's worth going

15   through one by one.

16            With respect to the car, Mr. Devlin-Brown's point that

17   it was before the trial doesn't really hit the heart of the

18   matter.  The heart of the matter was he knew he bought it with

19   OneCoin money when he sold it.  So whether it was before or

20   after trial I think is kind of irrelevant.  He was on bail and

21   he committed this violation.

22            Bigger picture, your Honor, this is a series of

23   violations.  It is a pattern of conduct.  We have heard

24   Mr. Devlin-Brown and Mr. Garvin pull apart individual things

25   one at a time, but that's not really what this application is

k3c2scoC kjc

1    about.  It's about a pattern of conduct while Mr. Scott is on

2    bail in this case and some of which happened after he was

3    convicted of serious federal fraud and money laundering

4    offenses.

5           If the defense counsel want to put in something to the

6    court after Mr. Scott is detained, they are obviously free to

7    do that and it can continue to be litigated at that point.

8    What they are basically asking is for Mr. Scott to be let out

9    with no security at all because Ms. Halle is getting her money

10   back and, in light of all of this conduct, the standard for

11   bail pending release, that is simply not appropriate, your

12   Honor, and the government continues to seek detention here.

13          THE COURT:  Very well.

14          Mr. Moscato, I take it that you are in agreement with

15   the government's position.

16          THE PRETRIAL OFFICER:  That is correct.

17          THE COURT:  I have listened to Mr. Devlin-Brown and

18   Mr. Garvin obviously, and I understand that they are put in a

19   difficult position because of their learning about some of

20   these allegations now, and I certainly appreciate their

21   position, but I also know, having gotten to know about

22   Mr. Scott a little bit throughout the course of the trial, that

23   he is a very sophisticated lawyer who conducted very

24   sophisticated international transactions and knew or should

25   have known that some of the activities in which he was

k3c2scoC kjc

1    engaging, both before and after the trial, in connection with

2    properties that he knew or should have known were subject to

3    forfeiture was wrong and he did it anyway.  This is not a case

4    where one can say, well, perhaps he didn't know that this

5    house, pictures of which were entered in evidence at the trial,

6    were not going to be part of this.  So I just don't see that

7    there is an innocent explanation that can be provided

8    sufficient to overcome the burden that Mr. Scott has to prove

9    that he should be provided with bail, particularly in light of

10   Ms. Halle's withdrawal of the money that she has put in to the

11   court to assure Mr. Scott's continued appearance.  So I don't

12   see how I can do anything under these circumstances other than

13   revoke bail and require Mr. Scott's remand.

14         Now I'm happy to look at whatever submissions the

15   defense wants to put in, but as for now, Mr. Scott is remanded.

16   Again, I will expect the government to provide the appropriate

17   information to him as to when and where -- when is tomorrow by

18   no later than 9, but where.  To the extent that I need to

19   provide you with an order, I will do so.  And Mr. Taylor, I

20   would ask you to submit a proposed order exonerating

21   Ms. Halle's bail.

22         MR. TAYLOR:  Yes, sir.

23         THE COURT:  And I will execute that order after my

24   review.

25         Is there anything else?

k3c2scoC kjc

1          MR. GARVIN:  Yes, your Honor.  Your Honor, counsel for

2     the government stated that they would not be opposed to the

3     defense submitting in writing its position even though the

4     court would have Mr. Scott surrender tomorrow.  Would the court

5     be inclined to review that submission if we did have a date for

6     putting it in?  I'm looking for some guidance as to a date.

7          THE COURT:  I will review whatever you submit whenever

8     you submit it, Mr. Garvin.

9          MR. GARVIN:  Yes, sir.

10          And, your Honor, I know that I have belabored the

11     point, and I apologize for not knowing when to stop, but I do

12     hope the court appreciates that the funds with regard to the

13     mortgage contractor, while we recognize that what Mr. Scott did

14     was inappropriate because he should have asked the government

15     for their consent, the money went into the property to keep the

16     value of the property so that the property, which is one of the

17     biggest pieces of assets that are available for restitution,

18     would not go down in value.  This is not a case where he took

19     the $250,000 and spent it on some lavish item for himself.  The

20     funds went into the property that increased the value of the

21     property and maintained the property from being harmed, and I

22     think that there should be some distinction recognized for

23     that.

24          And as far as the situation with Ms. Halle, if

25     Mr. Scott was given an opportunity, he may be able to replace

k3c2scoC kjc

1    Ms. Halle, but obviously if he surrenders tomorrow, that's

2    going to -- at 9:00 that's going to greatly curtail his ability

3    to speak to people about replacing Ms. Halle.  So I know the

4    court has ruled, but I would respectfully ask if Mr. Scott be

5    permitted to surrender on Monday morning instead of tomorrow

6    morning to enable him to find somebody to replace Ms. Halle and

7    to respond to these allegations.

8            THE COURT:  Mr. DiMase, any response to that?

9            MR. DiMASE:  Yes.  We strongly object to that, your

10   Honor, and we request that the court stick with its ruling.

11           THE COURT:  Very well.

12           Your application, Mr. Garvin, is denied except, to the

13   extent that you wish to submit anything, like I said, I am

14   happy to review anything that you submit.

15           Okay?  We are adjourned.

16                            oOo

17

18

19

20

21

22

23

24

25

# **EXHIBIT B**

**GOVERNMENT
EXHIBIT
2617-B**
17 Cr. 630 (ER)

Mark Scott pay off mortgage for 600 Coral Way, Unit 12, Florida
Original purchase price: $1,580,000.00 on January 14, 2015
Payoff amount: $1,000,794.66 on October 16, 2016

Sourced from exhibits: GX-1703A - GX-1703C, GX-1701A - GX-1701B, GX-716A-GX-716E, GX-3105, GX-3106, GX-3107, GX-3117, GX-717A-GX-717G, GX-3104





xxxx8576
Bank of Ireland
Fenero Tradenext Holding

$500,000.00
Escrow 133SL Additional retainer
10/12/16

xxxx5001
Bank of Ireland
Fenero Tradenext Holding

$500,000.00
10/17/16

**Attorney's bank account**

xxxx9788
**Sabadell / IberiaBank
Nicole J. Huesmann PA**

$1,000,794.66
10/19/16

xxxx2190
Cenlarfsprincetn

Funds used to pay off mortgage