

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 26, 2024

**BY ECF**
The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

  Re: *United States v. Konstantin Ignatov*, S9 17 Cr. 630 (ER)

Dear Judge Ramos:

  The Government respectfully submits this letter in advance of the March 5, 2024, sentencing of defendant Konstantin Ignatov. The defendant committed serious crimes and lied on the witness stand when he testified at the trial of *United States v. Mark Scott* as a cooperating witness for the Government. The Probation Department accurately calculates his Guidelines range as 1,080 months, or 90 years (the "Guidelines Range"), and just punishment for his conduct plainly requires a substantial period of imprisonment. Nonetheless, considering all of the Section 3553(a) factors, and because the defendant has already served almost three years in prison prior to sentencing, the Government agrees with the recommendation of the Probation Department and the request of the defendant that a below-Guidelines sentence of time-served is appropriate here.

  I. **The Offense Conduct**

    A. **The OneCoin Scheme**

     i. **Background on OneCoin**

  Having presided over the trial against Mark Scott and having sentenced four defendants who also participated in various facets of the OneCoin scheme, the Court is intimately familiar with the OneCoin scheme. For this reason, the Government does not summarize the details of the scheme here, and instead relies on the description of the scheme as set forth in the Government's sentencing submission for Greenwood. See Dkt. No. 570. For ease of reference, the Government has included a brief summary of the OneCoin scheme below.

Co-defendants Greenwood and Ruja Ignatova ("Ruja")[1] conceived of and orchestrated a multibillion-dollar fraud scheme by which they defrauded millions of individual OneCoin investors (the "OneCoin Fraud Scheme"). Greenwood and Ruja co-founded OneCoin Ltd. ("OneCoin") in 2014. OneCoin was based in Sofia, Bulgaria. OneCoin marketed and sold a fraudulent cryptocurrency by the same name. Between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from at least 3.5 million victims.

While Greenwood and Ruja marketed OneCoin as a legitimate cryptocurrency like Bitcoin and deliberately drew the comparison between the two cryptocurrencies through their representations to investors and their marketing materials, OneCoin had no actual value and was conceived of by Greenwood and Ruja as a fraud from day one. The misrepresentations made by Greenwood and others to OneCoin investors were legion, and the cryptocurrency was worthless. Among other things, OneCoin lied to its members about how its cryptocurrency was valued, claiming that the price of OneCoin was based on market supply and demand, when in fact OneCoin itself arbitrarily set the value of the coin without regard to market forces. The purported value of a OneCoin grew steadily from €0.50 to approximately €29.95 per coin, as of in or about January 2019. The purported price of OneCoins never decreased in value

### B. The Defendant's Role in the Scheme

Ignatov is the younger brother of Ruja, OneCoin's co-founder and top leader until her disappearance from public view, in or about October 2017. In or around June 2016, Ignatov began working for OneCoin as Ruja's personal assistant. In that role, Ignatov was responsible for coordinating travel and meetings for Ruja. Ignatov was unaware that OneCoin was a fraudulent scheme when he began working at OneCoin. Beginning in or about October 2017, after Ruja disappeared, Ignatov quickly rose to the level of a high-level executive and spokesperson for OneCoin. Although Ignatov did not have an official title, he ultimately became the de facto leader for OneCoin, primarily because he was the sibling of Ruja. Ignatov also appeared at promotional events in Thailand, Singapore, Colombia, Argentina, Brazil, Paraguay, Bulgaria, France, and Spain. As a leader of OneCoin, Ignatov made fraudulent representations to investors about OneCoin's structure, value, usability, and future public offering. Some of those misrepresentations are set forth in greater detail below.

Prior to working for OneCoin, Ignatov was living in Germany and working for Porsche as a forklift driver. Ruja asked Ignatov if he would like to move back to Bulgaria and work for OneCoin as her personal assistant. Initially, Ignatov took a leave of absence from his position at Porsche so that he could do a "trial" period at OneCoin and see how he liked it. Ruja offered to pay Ignatov approximately €2,500 Euros per month to work for OneCoin. Ignatov's role at OneCoin from June 2016 through October 2017 was rather limited. As Ruja's personal assistant, Ignatov coordinated events, meetings, and travel for Ruja.

Ignatov's knowledge regarding the fraudulent nature of the OneCoin scheme evolved over time. In the beginning, Ignatov knew next to nothing about multi-level marketing or

---

[1] To avoid confusion between the defendant's last name, Ignatov, and his sister's last name, Ignatova, the Government refers to Ruja Ignatova as "Ruja" throughout this sentencing letter.

cryptocurrency. In addition, Ignatov had great respect and admiration for his sister Ruja, who was very accomplished prior to OneCoin (for example, Ruja went to Oxford and had worked for McKinsey before founding OneCoin). Because of Ignatov's admiration for his sister, he ignored some of the more obvious red flags surrounding OneCoin early on.

Nevertheless, even from the beginning, Ignatov had misgivings about OneCoin. The first OneCoin event Ignatov attended was called Coin Rush and took place in London in June 2016. During Ignatov's trip to London for that event, Ignatov attended a meeting organized by a top-level OneCoin promoter. Also present at the meeting were Ruja, Greenwood, and a representative of the Hells Angels. During the meeting, the representative from the Hells Angels pitched Ruja on making an investment into a Hells Angels security company (along the lines of bodyguards), and also pitched Ruja on hiring the Hells Angels for her own security. Ignatov thought it was bizarre that his sister was meeting with a representative from the Hells Angels. Ruja explained to Ignatov that the promoter frequently had crazy ideas like this and not to worry about it.

The purpose of the Coin Rush event was to announce that OneCoin was going to double the coins for each OneCoin investor. The concept of doubling the money for each investor did not make any sense to Ignatov. However, Ignatov did not have a background in finance or an understanding of cryptocurrency, and he thought he might be missing something or misunderstanding how OneCoin worked. During the Coin Rush event, Ignatov also heard the promoters make representations on stage that he thought could not possibly be true.

Over time, Ignatov observed an increasing number of red flags suggesting that OneCoin was not a legitimate business and was instead a criminal enterprise. Some of those red flags included:

- Within the first 1-2 months of working for OneCoin, Ignatov googled the company and saw allegations that OneCoin was a Ponzi scheme;

- Within the first 6 months of working for OneCoin, Ignatov took one or two trips to Hong Kong with Ruja. During those trips, on two separate occasions, high-level OneCoin executives came to Ruja's hotel and delivered bags/backpack(s) full of cash to Ruja. One of those backpacks had at least $1M Hong Kong dollars inside of it.

- Ruja, as well as other top OneCoin promoters, were making enormous amounts of money. Ruja appeared to be making as much as tens of millions of dollars a month.

- OneCoin affiliates were being arrested around the world.

- Bribes were being paid around the world to government officials.

- OneCoin had significant issues with banking. Accounts affiliated with OneCoin were consistently frozen. All accounts affiliated with OneCoin were opened in the name of straw companies. Individuals such as Gilbert Armenta were helping to launder OneCoin-derived money for Ruja's ultimate use.

- There were a number of incidents involving the theft of enormous sums of OneCoin money (tens of millions of dollars).

- Ruja had a policy that no friends or family members were permitted to invest in OneCoin.

- Promoters made claims at promotional events that Ignatov understood could not possibly be true.

- Ruja provided Ignatov with a list of lawyers who he should contact if Ruja was arrested.

- There were entire apartments full of OneCoin-derived cash in South Korea and Hong Kong.

- [2]

    The red flags surrounding OneCoin and Ruja came to a head in the summer through fall of 2017. First, Ruja told Ignatov that she was traveling to Kyrgyzstan to get a fake passport in someone else's name. Ruja explained to Ignatov that her security adviser, Frank Schneider, had told her it was important for her to get a fake passport. Ruja also told Ignatov that Greenwood and Gilbert Armenta both had fake passports. Next, in or around September 2019, Ruja informed Ignatov that she had hired a private investigator through Frank Schneider to spy on her boyfriend Gilbert Armenta. Ruja told Ignatov that Schneider had arranged for Ruja to purchase an apartment directly below Armenta's so that they could drill a hole through the ceiling and bug Armenta's apartment. After Armenta's apartment was bugged, Ruja began to receive transcripts of conversations that were picked up over the listening device. Among other things, Ruja learned that Armenta had been arrested by the FBI, and was providing information to them about Ruja and OneCoin. Ruja explained to Ignatov that the FBI was after Armenta for money laundering OneCoin proceeds, among other things.

    Soon after learning that Armenta had given the FBI incriminating information about Ruja, Ruja called a meeting of OneCoin management at her home in Sofia, Bulgaria. Ruja informed them that she was going to be going away for a while, and that everyone should remain calm and carry on with the business as usual. She did not indicate to anyone where she was going, or why she was leaving. Within days of that meeting, Ruja called Ignatov and told him to book her a one-way ticket to Vienna. Then, not long after that, Ruja called Ignatov again and told him to book her a separate one-way ticket to Athens. Ruja instructed Ignatov not to cancel her other ticket. Ignatov believed that Ruja was trying to make it more difficult for law enforcement authorities to track her whereabouts. Ruja flew to Athens with one security guard and no luggage. Ignatov subsequently spoke to that security guard, who told Ignatov that Ruja had been met at the airport

---

[2] While Ignatov's cooperation is public, certain aspects of that cooperation remain confidential and raise safety concerns. The sections of the sentencing letter discussing those issues have been redacted on the public docket.

in Athens by a group of men who appeared to be speaking Russian. Ignatov has never seen or spoken with Ruja again since that time.

Soon after Ruja disappeared, Ignatov became one of the de facto leaders of OneCoin. Based on Ignatov status as Ruja's brother, leaders within OneCoin turned to Ignatov to lead the company. It is clear from email and text message communications that Ignatov became one of the top decision makers at OneCoin. Furthermore, at public events, Ignatov was presented as one of OneCoin's top leaders. Although Ignatov became one of OneCoin's de facto leaders, there is no evidence that he ever earned additional income based on his change in role/title, or that he ever exercised the level of power and control his sister Ruja had. Ruja, for example, is believed to have earned somewhere in the range of $500M to $1B in OneCoin fraud proceeds. Ignatov, on the other hand, earned a modest monthly salary of approximately €3,000.

After Ruja's disappearance, Ignatov gained an even deeper understanding of the OneCoin fraud scheme. Among other things, Ignatov learned that the publicized value of OneCoin was not determined by supply and demand, but instead was set internally by OneCoin, and could be manually manipulated. Therefore, OneCoins were effectively worthless. Furthermore, Ignatov learned that OneCoin did not have a legitimate blockchain. Ignatov also learned that a purported audit of OneCoin's blockchain that had been disclosed to investors had never in fact been performed at all.

Despite gaining a deeper understanding of the OneCoin fraud scheme, Ignatov continued to keep the scheme going. In order to keep the OneCoin fraud scheme going, Ignatov made numerous misrepresentations to the public, including that OneCoin had a blockchain that it was "easy to use, easy to mine;" that Ignatov was in regular communication with Ruja; and that a purported merchant platform called Dealshaker was up and running with 50,000 merchants. These representations, among others, were false, and were intended to calm investors down after Ruja's disappearance, and to get them to further invest in OneCoin.

## II. Attempted Cooperation

Ignatov began proffering with the Government on or about July 29, 2019, approximately five months after he was charged by Complaint. Ignatov met with the Government for nine proffer sessions before entering a guilty plea pursuant to a cooperation agreement. Ignatov continued to meet with the Government after he pled guilty, in primary part so that the Government could prepare Ignatov to testify at the November 2019 trial against coconspirator Mark Scott.

Ignatov testified at that trial over the course of three days. Ignatov provided testimony on the following topics, among other things: (1) background testimony concerning OneCoin, the products offered by OneCoin, and the multilevel marketing structure used by OneCoin; (2) testimony concerning the fraudulent nature of OneCoin; and (3) testimony concerning OneCoin's issues with banking, and a high-level explanation of how OneCoin solved those issues through the use of a network of money launderers, including Mark Scott.

Ignatov had limited direct interaction with Scott; he only met him once, had no conversations of substance with him, and primarily communicated with him about logistics for meetings and travel. Ignatov also testified more generally that Scott was one of the main money

launderers for OneCoin. Given Ignatov's limited interactions with Scott, the Government presented a substantial quantity of evidence at trial that that was independent of Ignatov's testimony. Scott was convicted at the conclusion of trial.

After Scott was convicted, Ignatov continued to meet with the Government, and provided information about other coconspirators in the OneCoin scheme. Based in part on information provided by Ignatov, in or around September 2020 the Government charged Irina Dilkinska, Frank Schneider, and one additional coconspirator. Dilkinska subsequently pled guilty and the charges against Schneider and the additional coconspirator remain pending.

In or around August 2021, Mark Scott filed a Supplemental Rule 33 motion for a new trial ("Supplemental Motion") under seal. In that motion, Scott argued, among other things, that he was entitled to a new trial under Rule 33 on the basis that Ignatov testified falsely at the Scott trial when he testified that he had placed his laptop (the "Laptop") in a paper trash bag with other trash items, taken it to a trash bin on the Las Vegas strip, and thrown it into a trash bin in February 2019. The Government first learned of those allegations when Scott filed his Supplemental Motion, and quickly spoke with Ignatov, who immediately admitted to the perjury. Specifically, Ignatov admitted that he had not disposed of the Laptop in Las Vegas, but rather, Ignatov had given his Laptop to another individual on the day they were supposed to leave the United States, with instructions to give the Laptop back to Ignatov when they arrived in Bulgaria.

After several rounds of briefing, and oral argument, the Court denied Scott's Supplemental Motion. Specifically, the Court found that Ignatov's testimony regarding the Laptop was a purely collateral matter and thus was unlikely to have impacted the jury's determination of Scott's guilt, and that given the Government's presentation of overwhelming evidence independent of Ignatov's testimony that established Scott's guilt, Ignatov's testimony was not primarily determinative of Scott's guilt.

In light of Ignatov's false testimony at trial, the Government informed Ignatov that it would not file a letter on his behalf pursuant to Section 5K1.1 of the Sentencing Guidelines.

### III. Procedural History and Other Sentences Imposed

The defendant was arrested on a complaint on March 6, 2019, and ordered detained. On May 28, 2019, he waived indictment and an information charging him with one count of conspiracy to commit wire fraud was entered.

On October 4, 2019, he waived indictment again, and, pursuant to a cooperation agreement, pleaded to an information charging him with: (1) one count of conspiracy to commit wire fraud; (2) one count of wire fraud; (3) one count of conspiracy to commit money laundering; and (4) one count of conspiracy to commit bank fraud. All four counts pertained to the OneCoin scheme.

In November 2019, Ignatov testified as a cooperator at the Scott trial.

On January 29, 2021, Ignatov was bailed. On November 12, 2021, after the Government learned of Ignatov's perjury at the Scott trial, the defendant was remanded. He was bailed again

on November 14, 2022. In total, the defendant has spent approximately 34 months in custody on the charges in this case.

Ignatov is the fifth defendant to be sentenced in the case:

- On October 19, 2021, David Pike was sentenced to a term of probation of two years. Pike's Guidelines range was 6 to 12 months.

- On February 16, 2023, Gilbert Armenta was sentenced to a term of imprisonment of 60 months. Armenta's Guidelines range was 1,200 months. Armenta also entered into a cooperation agreement with the Government, but he committed additional crimes after entering into his cooperation agreement and the Government did not provide him with a Section 5K1.1 letter.

- On September 12, 2023, Karl Sebastian Greenwood, a cofounder of the OneCoin scheme, was sentenced to a term of imprisonment of 240 months. Greenwood's Guidelines range was 720 months.

- On January 25, 2024, Mark Scott was sentenced to a term of imprisonment of 120 months. Scott's Guidelines range was 600 months.

Probation recommends a sentence of time served, and the defendant requested a sentence of time served. The defendant is a citizen of Bulgaria who does not have status in the United States.

### IV.     The Sentencing Guidelines Range

The Probation Department calculated the Guidelines range as follows: the base offense level is seven; 30 levels are added because the loss amount is greater than $550,000,000; six levels are added because the offense resulted in substantial financial hardship to 25 or more victims; two levels are added because a substantial part of the fraudulent scheme was committed from outside the United States, or the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means; three levels are added because the defendant was a manager or supervisor; and three levels are subtracted because the defendant accepted responsibility.[3] The total offense level is 45, which is reduced to the maximum possible offense level of 43.

The defendant's criminal history category is I. A total offense level of 43 and a criminal history category of I results in a Guidelines range of life, but that range is then reduced to the statutory maximum of 1,080 months.

The defendant's cooperation agreement did not contain a stipulation as to the Guidelines range, and the defendant contests the application of the manager or supervisor enhancement. If

---

[3] Because the grouping analysis does not ultimately affect the offense level, this summary omits the grouping analysis, which is described in greater detail at paragraphs 77 to 87 of the PSR.

that enhancement did not apply, the defendant would also be eligible for a reduction pursuant to Section 4C1.1. Accordingly, the offense level would be 40, and the defendant's Guidelines range would be 292 to 365 months.

However, the manager or supervisor enhancement does apply. The defendant's own testimony at the Scott trial makes crystal clear that he had a leadership role. The defendant's leadership had limits, as he points out, and that is why he is subject to the three point enhancement for a manager or supervisor rather than the four point enhancement for a leader or supervisor. Below are the sections of trial testimony where Ignatov clearly admitted his leadership role:

> **Q**. After your sister disappeared, did your position at OneCoin change or did it remain the same?
>
> **A**. It changed.
>
> **Q**. How did it change?
>
> **A**. _I became one of the top leaders in OneCoin._
>
> **Q**. After you became one of OneCoin's top leaders, did your salary change or remain the same?
>
> **A**. It remained the same.
>
> **Q**. What were some of your main responsibilities as one of OneCoin's top leaders?
>
> **A**. I was presenting on network events, I was meeting people from the network, _and I had some decision-making abilities._
>
> **Q**. When you say decision-making abilities, _what types of decisions were you responsible for?_
>
> **A**. _For example, marketing, or release and hiring of employees._
>
> **Q**. During this time period, were you in touch with Ruja?
>
> **A**. No.
>
> **Q**. Did you make representations that you were in touch with Ruja?
>
> **A**. Yes, I did.
>
> **Q**. Why did you make those representations?
>
> **A**. In front of the network so that everybody thinks that everything in the company is still going, and everything is okay.
>
> **Q**. Who did you make those representations that you were still in touch with Ruja to?
>
> **A**. To everybody except my parents.
>
> **Q**. As one of the company's top leaders, did you help to keep the fraud scheme going?
>
> **A**. Yes.
>
> **Q**. What types of things did you do to help keep the fraud scheme going?

Page 9

**A**. I was, for example, presenting at OneCoin events, mentioning that I'm still in touch with Ruja, that she's still in the decision-making process involved, and I promised things to happen at certain dates.

**Q**. When you say you promised things to happen at certain dates, what types of things did you promise?

**A**. For example, the opening of the exchange.

P. 133-134 (Emphasis added.) *See also id*. at 230 (**Q**. Mr. Ignatov, you were a high-ranking leader at OneCoin; is that correct? **A**. Yes.); 302 (**Q**. You eventually became one of the top OneCoin leaders, right? **A**. Yes.); 406 (**Q**. But you became a leader of OneCoin, right? **A**. Yes.)

## V.   The Appropriate Sentence

### A.  Applicable Law

While advisory following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines remain "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). That is because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46. For that reason, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006).

In imposing a sentence, the Court must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant;
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. The Court Should Impose a Sentence of Time Served

Three competing considerations—the underlying offense conduct, the defendant's cooperation, and his perjury—drive the Government's sentencing recommendation of time served.

As to the offense conduct, as the Court well knows, OneCoin was an egregious fraud that took billions of dollars from millions of victims worldwide. Ignatov was certainly not the most culpable defendant in that fraud, and he entered into the fraud late in the scheme. At the same time, Ignatov was "one of the top leaders in OneCoin" after his sister's disappearance. His role in the scheme was serious and calls for a term of imprisonment, consistent with the time he has already served.

Next, Ignatov's cooperation with the Government cuts both ways. To his credit, Ignatov proffered with the Government and ultimately entered into a cooperation agreement with the Government. He told the Government about his crimes and the crimes of others, assisted the Government in charging others, and he testified at the Scott trial. With the exception of his testimony about the Laptop—which the Court described as "such a small part of his testimony as to be negligible" and "a purely collateral matter"—that testimony was truthful.

Nonetheless, even if Ignatov's false testimony about the Laptop was immaterial, to lie under oath is a serious infraction. Indeed, such conduct was a significant breach of the most central obligation of cooperation: truthfulness. Ignatov's perjury breached his cooperation agreement with the Government, broke his oath to the Court to tell the truth, and jeopardized the Government's conviction against Mark Scott. Ignatov's perjury also rendered him unable to testify in future proceedings against other co-defendants. Such violations can and sometimes do undermine entire prosecutions, wasting limited law enforcement and court resources and resulting in a miscarriage of justice. Here, in light of significant independent evidence against Scott, the Government's case against Scott was not dependent on Ignatov's testimony, and the Court correctly denied Scott's challenge to his conviction based on the perjury. Even still, there is no doubt that Ignatov's violations negatively impacted the Government's efforts in the wide-ranging OneCoin prosecution.

All of this counsels in favor of a longer sentence than would otherwise be appropriate absent Ignatov's false testimony. If Ignatov had not already spent time in jail in this case, the Government would be seeking an incarceratory sentence. Here, though, the defendant has spent nearly three years in jail already, which is sufficient in light of his conduct and the breach of his cooperation agreement.

The sentence imposed on Gilbert Armenta is a useful point of comparison. Armenta's underlying conduct was worse than Ignatov's—he engaged in the fraud for a longer period of time, had a deeper involvement in it, made far more money, and committed a number of additional crimes unrelated to OneCoin. His cooperation was also more substantial than Ignatov's: the Government described it at Armenta's sentencing as "extraordinary." But Armenta's breaches of his cooperation agreement were also even more serious. Armenta sold a private jet he had bought with criminal proceeds in contravention of the Government's instructions. The Government confronted him and gave him a second chance. After he had breached his cooperation agreement once and been warned about the consequences of any subsequent breaches, Armenta laundered

approximately $7 million from multiple sources in multiple transactions. That type of conduct is so serious that it would typically be the subject of a separate prosecution. This Court imposed a sentence of five years on Armenta. Given the greater seriousness of Armenta's underlying conduct and the multiple breaches of his cooperation agreement, a sentence approximately 40% lower for Ignatov—equivalent to time served—is appropriate.

## VI. Restitution and Forfeiture

Due to the difficulties that would be associated with fashioning a restitution order in this case, the Government agrees with defense counsel that the Court should not enter a restitution order against the defendant.

Title 18, United States Code, Section 3663A(c)(3) provides that restitution shall not be applied in certain types of cases such as the instant case (i.e., a fraud case), if the Court determines that:

> (A) the number of identifiable victims is so large as to make restitution impracticable; or

> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

The Government submits that both factors are met here. Between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from at least 3.5 million victims. Further, the defendant and his co-conspirators targeted OneCoin investors throughout the world. Calculating investor losses would require identifying each of these millions of investors and determining how much they each invested. Although a small subset of investors have come forward and identified themselves to the Government, the vast majority have not. Moreover, obtaining this information would be even more difficult in this case given the passage of time and the absence of accurate contact information for most of the victims.

For these reasons, the Government respectfully submits that it would be, as a practical matter, impossible to fashion a restitution order in this case and, in any event, the need to do so does not outweigh the complication and prolongation of the sentencing process. Therefore, the Government respectfully requests that the Court decline to enter a restitution order, as the Court did in the sentencings of Armenta and Greenwood.

As to forfeiture, the defendant earned approximately €3,000 per month, and received a one-time bonus of approximately €10,000. The defendant worked for OneCoin from June 2016 until his arrest in March 2019. That is approximately 33 months, which results in a total salary of approximately €109,000, or $118,000. Accordingly the defendant is required to forfeit $118,000, and a copy of a forfeiture order will be submitted to the Court.

## VII. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of time served.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/
Nicholas Folly
Juliana Murray
Kevin Mead
Assistant United States Attorneys
(212) 637-2211

cc: All Counsel of Record (ECF)